1
2
3
4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

5

6 | ALMOG MEIR JAN,

Plaintiff,

7 | v.

8 | PEOPLE MEDIA PROJECT, a Washington
Non-Profit Corporation, d/b/a PALESTINE
9 | CHRONICLE; RAMZY BAROUD; JOHN
HARVEY; and DOES 1 through 10,

10

Defendants.

11

**NO.  3:24-cv-05553-TLF**

**RESPONSE TO DEFENDANTS'
MOTION TO DISMISS**

*NOTED FOR HEARING:
October 10, 2024*

12

## I.    <u>INTRODUCTION</u>

13

Give Abdallah Aljamal some credit:[1] He practiced what he preached. Aljamal—

14 pursuant to his role as a compensated employee of Defendants—preached true threats against

15 Jews in the pages of the Palestine Chronicle. Then, he put his money (provided by his

16 employment with Palestine Chronicle) where his mouth was and acted as a Hamas slaver-jailer

17 of October 7 hostages. Defendants (quite understandably) wish to distance themselves as much

18 as possible from their erstwhile terrorist employee (described accurately by Defendants as

19 "since deceased."). But these attempts are unsuccessful.

20

Plaintiff has alleged that Defendants took substantial actions *in the United States* that

21 aided and abetted violations of international law. Under Ninth Circuit black letter law, that

22 disposes of any extraterritoriality problems. Plaintiff further plausibly alleged both the *actus*

23

---

[1] Not really.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 1



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

1    *reus* and *mens rea* elements of aiding and abetting an international crime under the Ninth

2    Circuit's ATS standards. The crimes against humanity underlying Plaintiff's claims are well-

3    recognized as against international law. None of Defendants' miscellaneous defenses apply.

4        And, in Defendants' haste to get out of this case and accuse Israel (speciously and

5    immaterially) of genocide, they perform an almost impressive caselaw misrepresentation hat

6    trick: (1) misstating a holding of the United States Supreme Court; (2) making up a holding of

7    the Ninth Circuit out of whole cloth; and (3) misconstruing a holding of the International Court

8    of Justice.

9        Accordingly, the Motion should be denied for the reasons outlined below.

10                    **II.    STANDARDS**

11        It is well settled, "[t]o survive a motion to dismiss, a complaint must contain sufficient

12    factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

13    *v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

14    (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

15    the court to draw the reasonable inference that the defendant is liable for the misconduct

16    alleged." *Iqbal*, 556 U.S. at 663. For a 12(b)(1) facial motion to dismiss, this Court accepts the

17    factual allegations in the complaint as true, and Plaintiff as the nonmoving party is entitled to

18    have those facts construed in the light most favorable to Plaintiff. *Inst. of Cetacean Research*

19    *v. Sea Shepherd Conservation Soc'y*, 153 F. Supp. 3d 1291, 1298–99 (W.D. Wash. 2015).

20    Similarly, when considering a motion to dismiss under 12(b)(6), this Court construes the

21    complaint in the light most favorable to Plaintiff as the nonmoving party. *Id.* The Court must

22    therefore accept all well-pleaded allegations of material fact as true and draw all reasonable

23    inferences in favor of Plaintiff. *Id.*

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 2



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1

### III.    ARGUMENT

2

**A. This Court Has Subject Matter Jurisdiction because Plaintiff Has Plausibly
Alleged that Defendants Took Substantial Actions Domestically that Aided and
Abetted Violations of International Law.**

3

4

*1.    The Substantial Acts of Aiding and Abetting Occurred in the United States.*

5

The ATS states that "[t]he district courts shall have original jurisdiction of any civil

6

action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

7

United States." 28 U.S.C. § 1350. "On its face, the statute specifies that, to state a claim,

8

plaintiffs must (i) be 'aliens,' (ii) claiming damages for a 'tort only,' (iii) resulting from a

9

violation 'of the law of nations' or of 'a treaty of the United States.'" *Flores v. S. Peru Copper*

10

*Corp.*, 414 F.3d 233, 242 (2d Cir. 2003). This Court has subject matter jurisdiction pursuant to

11

28 U.S.C. §§ 1331 & 1350 because Plaintiff is a foreign national who was kidnapped and

12

injured as a result of torts "committed in violation of the law of nations or of a treaty of the

13

United States." 28 U.S.C. § 1350.

14

The ATS does not have extraterritorial reach. *Kiobel v. Dutch Petroleum Co.*, 569 U.S.

15

108 (2013). Therefore, ATS plaintiffs must establish that "the [defendant] took substantial

16

actions domestically that aided and abetted violations of international law." *Doe v. Cisco Sys.*,

17

73 F.4th 700, 736 (9th Cir. 2023), *rehearing and rehearing en banc denied*, No. 15-16909 (9th

18

Cir. Sept. 3, 2024). Here, Plaintiff has plausibly alleged that he has experienced harm because

19

of actions the Defendants committed in the United States. Plaintiff's claims are that Defendants

20

aided and abetted the kidnapping and terrorism perpetrated against him through their actions

21

in the United States—namely, by funding Aljamal, a known Hamas terrorist and Plaintiff's

22

captor, and giving Aljamal a platform to justify his actions. The Complaint is *not* centrally

23

about the underlying conduct of Aljamal in Israel, although that is the offense that Defendants

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

aided and abetted. Rather, the *domestic* conduct of compensating and publishing Aljamal's Hamas propaganda is the gravamen of Plaintiff's ATS claims. Accordingly, despite Defendants' baseless protests, the ATS's jurisdictional reach is satisfied.

> 2. *Aiding and Abetting Is a Recognized Cause of Action Under the ATS that Covers Well-Pleaded Domestic Conduct.*

Defendants allege that "the Supreme Court in *Nestle v. John Doe*, . . . held that 'aiding and abetting' is not a cause of action contemplated by the [ATS]." Dkt. # 27 at 19, ¶ 35. That is false and contrary to the Ninth Circuit, which held *two years* after *Nestle* that aiding and abetting absolutely is contemplated by the ATS. *Cisco*, 73 F.4th at 717, 736 ("We . . . conclude again, in agreement with every circuit to have considered the issue, that aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS."). Indeed, in addition to the Ninth Circuit, the Second, Fourth, and Eleventh Circuits have all recognized aiding and abetting liability under the ATS. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011); *Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008). These holdings remain untouched and are still good law post-*Nestle*.

Defendants' confusion over the holding in *Nestle*—and, in turn, over the caselaw of this Circuit and others—likely stems from the fact that they confuse a plurality opinion for a majority one. Justice Thomas wrote Part III of *Nestle* and was joined by only Justices Gorsuch and Kavanaugh, making that section not controlling law, since six Justices did not agree. It is Part III of *Nestle* that contemplates the question of whether aiding and abetting claims can be brought under the ATS, opining that they cannot. But the *majority opinion* in *Nestle* expressly

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 4



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    did *not* reach the question of whether aiding and abetting could be an ATS claim—and

2    therefore the basis for establishing jurisdiction—instead only holding that "[e]ven if we

3    resolved all these [aiding and abetting] disputes in respondents' favor, their complaint would

4    impermissibly seek extraterritorial application of the ATS." *Nestle USA, Inc. v. Doe*, 593 U.S.

5    628, 634 (2021). The "disputes" in question were the arguments of petitioners and the United

6    States "that aiding and abetting is not even a tort, but merely secondary liability for a tort" and

7    "that 'the conduct relevant to the [ATS's] focus' is the conduct that directly caused the injury."

8    *Id.* at 634. In other words, the Supreme Court assumed *arguendo* that aiding and abetting

9    claims *could* theoretically establish jurisdiction, but then held that the conduct alleged in *Nestle*

10   was extraterritorial anyway.

11           Notably, the Ninth Circuit in *Nestle* was reversed *only* on the question of whether the

12   conduct alleged was, in fact, extraterritorial. But the Supreme Court, as noted above, did *not*

13   disturb the Ninth Circuit's underlying holding "that aiding and abetting comes within the

14   ATS's focus." *Doe v. Nestle, S.A.*, 929 F.3d 623, 641 (9th Cir. 2018). The Ninth Circuit's

15   position on aiding and abetting—along with the similar holdings in the Second and Fifth

16   Circuits—was not overturned by the Supreme Court in *Nestle*.

17           Accordingly, the Ninth Circuit still asks if a plaintiff's "allegations, taken as true, state

18   a plausible claim that the [defendant] took substantial actions domestically that aided and

19   abetted violations of international law." *Cisco*, 73 F.4th at 736. "[C]onduct within the United

20   States that constitutes aiding and abetting a violation of international law, even if other conduct

21   [*i.e.*, the principal's acts] occurred abroad, is a violation of the law of nations that falls within

22   the focus of the ATS." *Id.* at 737 (brackets in original); *cf. Al Shimari v. CACI Premier Tech.,*

23

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

*Inc.*, 758 F.3d 516 (4th Cir. 2014) (rejecting extraterritoriality argument where plaintiffs were injured in foreign country by employees of a U.S. corporation with extensive U.S. ties).

Plaintiff easily met the Ninth Circuit standard and alleged that Defendants took substantial actions domestically that aided and abetted violations of international law. Unlike in *Nestle*, Plaintiff is not alleging mere "corporate decisionmaking" that then resulted in downstream effects. Instead, Plaintiff plausibly alleges that (1) Defendants in America compensated a Hamas terrorist as the Hamas terrorist kept Plaintiff hostage (Dkt. 1 at 9, ¶ 37), and (2) provided that Hamas terrorist with an American 501(c)(3) platform for his propaganda pieces, which often published to two to three articles *per day*. That is not corporate decisionmaking—that is aiding and abetting terrorism (Dkt. 1 at 9–10, ¶¶ 30–36; 11–14, ¶¶ 49–57).

**B. Plaintiff's Allegations Satisfy All the Necessary Elements of an ATS Claim.**

The Ninth Circuit has already held (many times) that aiding and abetting is a violation of international law cognizable under the ATS. *Cisco*, 73 F.4th at 716. To allege a claim of aiding and abetting liability for kidnapping and terrorism, Plaintiff must plausibly allege (1) *actus reus*, and (2) *mens rea*. *Id.* at 724. Specifically, Plaintiff must allege that Defendants assisted the principal (here, Hamas and its terrorist Aljamal) with substantial effect on the international law violation. Second, Plaintiff must allege that this assistance was "knowing." *Id.*

***Mens Rea***. A plaintiff satisfies the knowledge requirement by alleging that "a defendant acts with knowledge that the defendant's actions will assist in the commission of a crime or with awareness of a substantial likelihood that [the defendant's] acts would assist the commission of a crime." *Cisco*, 73 F.4th at 734 (citation and quotation marks omitted). "It is

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 6



1    not necessary that the aider or abettor know the precise crime that was intended and was in fact

2    committed—if [the accused] is aware that one of a number of crimes will probably be

3    committed, and one of those crimes is committed." *Id.* And "statements regarding the purposes

4    and goals of the project for which they are providing assistance can establish awareness that

5    crimes are likely to be committed." *Id.* Most importantly of all though, "when ongoing abuses

6    are common knowledge, knowing action may be imputed to the defendant." *Id.*

7            Therefore, under the ATS, Plaintiff need not allege that Defendants knew that their

8    material support for Aljamal would go to the specific harm Aljamal and Hamas inflicted upon

9    Plaintiff. Rather, Plaintiff need only allege Defendants knew they were giving material support

10   to an operative of a terrorist organization. Plaintiff has plausibly alleged that Aljamal was a

11   member of Hamas (a designated FTO), and that Defendants knew or should have known that

12   fact. Therefore, it necessarily follows that Defendants knew that the money and moral support

13   going to the principal Aljamal would be used in the commission of a possible crime (crimes

14   that occur in the commission of acts of terrorism), regardless of whether they specifically knew

15   it would be the kidnapping of Plaintiff. Specifically, Defendants compensated Aljamal and

16   should have known that any such compensation to Aljamal would be used in furtherance of

17   Aljamal's public role within Hamas, including the principal violation of holding Plaintiff

18   hostage, itself a quintessential act of terrorism (Dkt. 1 at 9, ¶ 37). Defendants knew or should

19   have known that Hamas Operative Aljamal was a Hamas operative and spokesperson. *Id.* at ¶

20   36. As late as 2022, Aljamal had appeared on Palestinian radio on behalf of the Hamas Ministry

21   of Labor. *Id.* at 8, ¶ 33–34; Ex. A. It is reasonable to assume that Defendants knew "a number

22   of crimes [would be] committed" by Aljamal, as a member Hamas, one of which was the

23   principal violation at issue here. Further, Plaintiff alleged that Defendants knew providing

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 7



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Aljamal with a platform would amount to providing Hamas with an opportunity to justify and defend its kidnapping and murder across the pages of an American publication (Dkt. 1 at 9, ¶ 37). It is hard to imagine a better public relations coup for Hamas—and, indeed, a more useful service to a terrorist organization that must survive on propaganda in order to continue its very existence.

Last, Plaintiff alleged that Hamas's ongoing abuses were common knowledge, so knowing action may be imputed to Defendants. In other words, Defendants knew Aljamal was a Hamas terrorist (considering he publicly appeared as a Hamas spokesperson (Dkt. 1 at 8, ¶ 34), and they knew Hamas committed crimes (among them terror and kidnapping), and they knew that their money was going to support Aljamal. These ongoing abuses by Hamas are common knowledge and have been for decades. Of course, Defendants knew that their fungible funds going to Aljamal were being used by Hamas in support of its terrorist activities.

Defendant Baroud, as Editor-in-Chief of the Palestine Chronicle, previously served as Deputy Managing Editor of *Al Jazeera* online, a news outlet controlled by the Qatari government with close ties to Iran's Islamic Revolutionary Guard Corps and Hamas (Dkt. 1 at 7, ¶ 27). Defendant Harvey organized a campaign to make the Gaza Strip's Rafah neighborhood—a Hamas stronghold—a sister city to Washington's Olympia. *Id.* at ¶ 28. It would stretch the bounds of logic to believe neither Defendant was familiar with Hamas's status as a terrorist organization and its associated crimes. Additionally, Defendant Baroud's daughter wrote about her family's connection to Nuseirat, which she learned from her father, and indicated that there is still Baroud family in Nuseirat. *See* Zarefah Baroud, "Beit Dara and Gaza: An intergenerational tale of struggle against erasure" available at https://www.aljazeera.com/opinions/2024/3/27/beit-daras-and-gaza-an-intergenerational-tale-



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

of-struggle-against-erasure (March 27, 2004); Dkt. 1 at 8, ¶ 35. CNN wrote recently, it was "no secret" that Aljamal was a member of Hamas.[2] Plaintiff was held hostage in Nuseirat, where Aljamal's family was known and were leaders, and where members of Defendant Baroud's family lives. (Dkt. 1 at 8, ¶ 35.)

Defendants obfuscate by stating a wrong standard, here "general awareness" that "requires more than mere knowledge that one's services might be used by bad actors." (Dkt. 27 at 19, ¶ 35). As established above, *Cisco* sets the *actual* standard, which is indeed "knowledge" that the principal is "aware that one of a number of crimes will probably be committed." *Cisco*, 73 F.4th at 734. It is perfectly obvious to anyone that a member of Hamas will "probably" commit a crime in furtherance of its stated goals: the eradication of Jews and the State of Israel.

***Actus Reus***. "[A] a defendant is liable for aiding and abetting a violation of international law when the accused provides assistance, encouragement, or moral support that has a substantial effect on the crimes." *Id.* In assessing the effect of Defendants' assistance, this Court considers the "cumulative contribution" made to the alleged violation, not whether each individual act had substantial effect. *Id.* at 725–26. "[A]n actor may have a substantial effect on the perpetration of international law violations by supplying computer hardware, software, or technological support that enhances the capacity of the principal to coordinate and facilitate operations in which crimes are committed." *Id.* at 726. Further, assistance does not "need to be used for exclusively criminal purposes to be actionable[,]" and it is "immaterial

---

[2] Florence Davey-Attlee *et al.*, *'He was a pious man': The Gaza neighborhood shocked to find Israeli hostages in their midst*, CNN, July 19, 2024 https://www.cnn.com/2024/07/19/middleeast/gaza-neighborhood-israeli-hostages-intl-cmd/index.html#.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  whether [the money] was spent on salaries or for lethal gas." *Id.* at 728–29 (quoting *Flick*, 6

2  T.W.C. at 1221).

3          Defendants argue, "Plaintiff has not alleged that the Defendants provided any material

4  support, funding, or resources that directly contributed to Hamas's terrorist activities." (Dkt.

5  27 at 18, n.2).[3] This is incorrect. Plaintiff plausibly alleged that Defendants provided assistance

6  and moral support to a Hamas terrorist, support that had a substantial effect on the crime. First,

7  Plaintiff alleged that Defendants provided the principal violator with financial compensation.

8  *Cisco,* 73 F.4th at 728–29. Money is "fungible," *Holder v. Humanitarian Law Project*, 561

9  U.S. 1, 31 (2010), and constitutes the most basic form of aid, allowing the principal to use it in

10  support of the underlying conduct.

11          To that end, Plaintiff properly alleged that Defendants provided money to the principal

12  that had a substantial effect on his kidnapping and terrorism, namely by employing the

13  principal as a "correspondent" and providing him with the wherewithal to keep three Israeli

14  hostages in his home (Dkt. 1 at 15, ¶ 61; Ex. B). Just prior to the rescue of Plaintiff, Defendants

15  listed Hamas operative Aljamal as a "correspondent for the Palestine Chronicle." *Id.* Within

16  hours of the revelation of Aljamal's involvement in Plaintiff's hostage-holding, Defendants

17  downgraded Aljamal's role to "contributor" and, in a later public statement, "freelance

18  contributor" who wrote for The Palestine Chronicle "on a voluntary basis." *Id.*; Ex. C.

19  Defendants knew that the title "correspondent" too readily revealed his salaried or other

20  recurring payment arrangement with The Palestine Chronicle. Therefore, Defendants raced to

21  distance themselves from the terrorist hostage-taker that they had been financially supporting.

22

23

---

[3] Page citation is to the blue ECF pagination at the top of the page.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 10



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

In addition to financial support, Defendants provided Hamas Operative Aljamal, whose connections to Hamas were publicly known, with a U.S.-based, taxpayer-subsidized platform to publish Hamas propaganda and to pass the material off as independent journalism. Examples of Aljamal's *literal* Hamas propaganda—as in, written by a Hamas operative—include glorifying October 7 as a "daring attack" (Dkt. 1 at 12, ¶ 51); parroting the Hamas claim that it had captured Israeli soldiers in Jabaliya (Hamas had not done so) (*id.* at 12–13, ¶ 53); spreading the grotesque lie that Israel had targeted civilians in a United Nations Relief and Works Agency ("UNRWA") school (despite public knowledge that Israel had done the precise opposite) (*id.* at 13–14, ¶ 54); and generally (and repeatedly) eulogizing known Hamas terrorists as victims of unjustified Israeli aggression (*id.* at 13, ¶ 54). By supporting Hamas operative Aljamal's writings and justifications for kidnapping and murder, Defendants provided a service to Aljamal—namely, the provision of a platform for Hamas's propaganda that would feature a veil of legitimacy, given the platform's revered 501(c)(3) status, and would allow Aljamal to justify Hamas's hostage-taking and murder to an American audience. One such example of Defendants' platforming Hamas propaganda can be found in an Aljamal article[4] from May 27 of this year, published two months before Plaintiff's rescue from Aljamal's custody and still available on Defendants' Palestine Chronicle website. In the article, Aljamal, writing pursuant to his employment as a journalist for Defendants, favorably included quotes like, "[t]he capture of Israeli soldiers brought joy back to our hearts" defining the capture of Israelis as resistance, "the only option." Further, the same article favorably includes quotes emphasizing the importance of holding Israelis hostage because it is a negotiating tactic

---

[4] Abdallah Aljamal–Gaza, *"Resistance Our Only Option"–Palestinians React to News of Israeli Soldiers Captured in Jabaliya*, PALESTINE CHRONICLE, May 27, 2024, https://www.palestinechronicle.com/resistance-our-only-option-palestinians-react-to-news-of-israeli-soldiers-captured-in-jabaliya/.



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

to win back Palestinian prisoners: "The occupation knows well that it cannot free its captives by force…Its only option is to negotiate an exchange deal that complies with the Resistance's conditions…it is the right of the Palestinian people to free their prisoners…This is what the Resistance groups are working on." What they are "working on," of course, is holding Israelis hostage. Defendants published this. It beggars belief that they did not know their support for Aljamal could extend to kidnapping and hostage-holding. Hamas operatives cannot publish their propaganda in traditional U.S. media outlets—they must rely on individuals and entities like Defendants to do so.

These facts dispose of Defendants' attempts to disrupt a causal link between their actions and the actions of the principals. Even if "scope of employment," as opposed to the controlling standards of *Cisco*, were used, Plaintiff satisfies that standard as well. Defendants all but agree that Aljamal's calls for violence against Jews were valid (Defendants spend close to three pages of their legal brief baselessly accusing Israel of committing genocide as a means of implying both the propaganda outlined above, and the heinous acts of Aljamal were somehow justified). Considering that Defendants' editorial policy was aligned with the Hamas principal, it is difficult to pretend that Aljamal's actions in support of Defendants' stated goals against Jews were not within the scope of his employment. Regardless, the individual/corporate distinction apparently raised by Defendants has no basis in the Ninth Circuit's *actus reus* law for aiding and abetting liability under the ATS.

***Exhaustion***. Defendants wishcast an "exhaustion doctrine" under the ATS. There is no such thing. The *Sosa* Court, *in dicta*, *suggested* in a *footnote* that exhaustion *might* be a factor to consider in "appropriate" future cases:



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

> [T]he European Commission argues as *amicus curiae* that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals…We would certainly consider this requirement in an appropriate case.

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 733, n.21 (2004) (citation omitted). By the Court's own words, this is not a strict requirement to be met in every ATS claim.

Here, the exhaustion principle does not apply—this is no "appropriate case." Defendants seem to think the exhaustion principle requires that this suit be brought in Israel. But the "domestic legal system" is the *United States*, not Israel, because the conduct alleged— the aiding and abetting kidnapping, hostage-taking, and terrorism—occurred in the United States. The financiers of the now-deceased Hamas terrorist are located in the United States. The platform upon which the Hamas terrorist propagandized the crimes of his organization is located in the United States. It is true that international law generally prefers remedies be sought first in the domestic legal system where the harm occurred, as the Supreme Court noted in *Sosa*. Here, the claim is against an entity residing *in this district*, the tortious actions of which (aiding and abetting their terrorist employee) occurred *in this district*. The exhaustion factor—which fails to even amount to a requirement—does not cut against Plaintiff's choice to sue in this district.

**Political Question Doctrine**. The political question argument flirts with either frivolity or an express confession of liability in this case. Defendants simply state that, because the current administration is presently trying to negotiate a ceasefire, *all claims arising out of October 7* are nonjusticiable (Dkt. 27 at 13, ¶ 27). Under that logic, all ATA claims brought

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 13



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

after 9/11 would have been nonjusticiable because of the executive branch's post-9/11 attempts to resolve the war and capture or kill the terrorists responsible.[5]

The Ninth Circuit has already held, "recognizing aiding and abetting liability does not trigger *Sosa*'s principal foreign policy concern." *Cisco*, 73 F.4th at 720. That is because accomplice liability "is much more likely to be used to address the transgressions of nongovernmental actors." *Id.* Here, those nongovernmental actors are Defendants, but it is also important to note that the underlying principals—Hamas terrorists—are *also* nongovernmental actors, thereby not once but twice avoiding the problem addressed by *Sosa*'s political question rule.

### C. Defendants' First Amendment Arguments Are Irrelevant Because Defendants Provided a Hamas Operative with Financial Compensation and a Publication Platform.

Defendants' First Amendment arguments fail for at least three reasons. Many of Plaintiff's allegations do not concern speech but rather concern monetary and technical support of Aljamal. Perhaps Defendants are implying that monetary support of terrorism is "expressive conduct," but not even Defendants go so far as to say that out loud. Giving terrorists funds or providing them publication services is not speech.

To the extent any allegation does concern speech regarding Defendants' provision of a publication platform to Aljamal and Hamas, it is immaterial. "It is well-established that speech that constitutes criminal aiding and abetting is not protected by the First Amendment." *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 329 (D. Mass. 2013) (citing cases). Because

---

[5] Even if this case were significant enough to upset ceasefire negotiations, that argument itself is an implicit concession that Defendants or their agent(s) were so deeply involved with the high echelons of Hamas that this litigation could affect Hamas negotiations. If the outcome of this case is so critical to Hamas, Defendants have essentially conceded liability in this matter.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 14

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

criminal aiding and abetting is actionable under the ATS civilly, as the Ninth Circuit has stated explicitly, the First Amendment simply has no application to this claim.

Last, most of the substance of Defendants' First Amendment defense is asserting that Israel is in fact committing genocide; therefore, Aljamal's and Defendants' writings on genocide are justified and protected by the First Amendment. It's not clear how any of that is legally relevant or plausibly accurate. But, even if it were, Plaintiff details below the misrepresentations, obfuscations, and misunderstandings that underlie Defendants' false statement that "the Ninth Circuit cited with seeming approval the decision of the International Court of Justice in which the ICJ found that Israel has plausibly been engaged in genocide in Gaza since October 7, 2023." (Dkt. 27 at 21, ¶ 44).

**D. The Principal Actions that Defendants Assisted Amount to Violations of Customary International Law.**

Furthermore, Plaintiff plausibly alleged that the underlying actions by the principals Hamas and Aljamal are well-recognized violations of customary international law.

*Kidnapping and Imprisoning Civilian Hostages*. International law universally prohibits kidnapping and imprisoning civilian hostages. More specifically, Article 34 of the Fourth Geneva Convention, which the United States ratified in 1955 (and which the Palestine Liberation Organization has stated is binding upon the PLO), is designed to protect civilians and prohibits the taking of hostages.[6] The provision has universal buy-in, with *every* UN member state signing on. Every nation, therefore, considers the norm against kidnapping and holding civilian hostages to be specifically defined and obligatory on every state.

---

[6] IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 34 (Aug. 12, 1949), *available at* https://www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.33_GC-IV-EN.pdf.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 15

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

The prohibition against this specific genre of crimes against humanity is a *jus cogens* norm. *Jus cogens* norms are, by definition, universal, specific, and obligatory, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992), thereby satisfying *Sosa*'s requirements for claims under the ATS. *See, e.g.*, *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007) ("[J]us cogens violations that form the least controversial core of modern day ATCA jurisdiction[] includ[e] allegations of war crimes, crimes against humanity.") (vacated on other grounds); *see also In re ESTATE OF MARCOS HUMAN RIGHTS Litig.*, No. 91-15891, 1992 U.S. App. LEXIS 26517, at *20 (9th Cir. Oct. 19, 1992) ("[T]he district court did not err in founding jurisdiction on a violation of the jus cogens norm prohibiting official torture."). The Ninth Circuit has recognized that on the list of *jus cogens* norms are prohibitions against causing the disappearance of individuals, prolonged arbitrary detention, and crimes against humanity. *Siderman*, 965 F.2d at 717.

Similarly, international law universally prohibits acts designed to commit genocide. The Hamas Charter explicitly calls for the eradication of Israel and of global Jewry. The Convention on the Prevention and Punishment of the Crime of Genocide calls for perpetrators of genocide to be punished, labels genocide a crime, and asks that states enact laws to punish those guilty of violating the Convention. *Kadic v. Karadzic*, 70 F.3d 232, 241–42 (2d Cir. 1995); *see also* Art. I, IV-VI of the Genocide Convention. The United States has joined that treaty, along with a supermajority of nations. The overwhelming consensus in international law is that prohibition against genocide rises to the level of a *jus cogens* norm, which the Ninth Circuit has already recognized, *Siderman*, 965 F.2d at 717.

*Acts of Race-Based Murder and Terror*. International law universally prohibits acts of terrorism such as those Hamas perpetrated on October 7. For example, since the Nuremberg

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 16



trials and the aftermath of World War II, it has been universally recognized that it is unacceptable to murder, rape, torture, imprison, deport, enslave, or exterminate a civilian population.[7] The Nuremberg trials also recognized that persecution based on political, racial or religious reasons violated international law.[8] Likewise, the prohibition against a campaign of racially motivated murder is a *jus cogens* norm. *Siderman*, 965 F.2d at 717. Plaintiff has plausibly alleged what is well-known and documented: Hamas's systematic terror campaign against Israel is one against Jews because they are Jews. What we call "terrorism" as perpetrated by Hamas and its agents like Aljamal is nothing more than Jew-targeting murder.[9]

International law likewise universally prohibits the material support of terrorism. Article 2.1(b) of the International Convention for the Suppression of the Financing of Terrorism prohibits any person from "by any means, directly or indirectly, unlawfully and willfully, provid[ing] or collect[ing] funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out" any "act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international

---

[7] Nuremberg Control Council Law No. 10, art. II, § 1(b)–(d), *available at* https://avalon.law.yale.edu/imt/imt10.asp.
[8] *Id.* at § 1(c).
[9] *See, e.g.*, the "Hamas Covenant 1988" or "Covenant of the Islamic Resistance Movement" which states, among other things: "Moreover, if the links have been distant from each other and if obstacles, placed by those who are the lackeys of Zionism in the way of the fighters obstructed the continuation of the struggle, the Islamic Resistance Movement aspires to the realisation of Allah's promise, no matter how long that should take. The Prophet, Allah bless him and grant him salvation, has said: "**The Day of Judgement will not come about until Moslems fight the Jews (killing the Jews), when the Jew will hide behind stones and trees. The stones and trees will say O Moslems, O Abdulla, there is a Jew behind me, come and kill him.** Only the Gharkad tree, (evidently a certain kind of tree) would not do that because it is one of the trees of the Jews." (related by al-Bukhari and Moslem)." Available at https://avalon.law.yale.edu/20th_century/hamas.asp (visited September 26, 2024) (emphasis added).

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 17

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

organization to do or to abstain from doing any act."[10] Over 130 countries, including the United States, have signed this Convention and it has been commended in U.S. federal court for its "articulable [and] discernable standards and regulations." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 249 (2d Cir. 2003); *see also* Curtis A. Bradley & Mitu Gulati, Withdrawing from International Custom, 120 Yale L.J. 202, 252 (2010) (describing the ICJ's position that "widespread ratification of a treaty can itself constitute the state practice and opinio juris needed to generate CIL, with the result that even nations that do not join the treaty may become bound by CIL rules that are similar to the terms of the treaty").

　　　　Furthermore, the norm against terrorism is exactly the kind of norm against the actions of the *hostis humani generis* ("enemy of all humankind") that are actionable under the ATS. "*Sosa* concluded that under the ATS only claims that 'rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to'" causes of action about violation of safe conducts, infringement of the rights of ambassadors, and piracy "may be recognized today." *Cisco*, 73 F.4th at 714 (citing *Sosa*, 542 U.S. at 725). The throughline for violators of safe conduct, ambassadors' rights, and piracy is a general disregard for the basic rules that govern the interactions of humanity at the most basic level, so that the proverbial pirate has become a stateless, destructive entity. *Id.* at 740 ("[N]ot all violations of international law require state action. Courts have recognized several that do not, including the prohibitions against piracy, the slave trade, and certain war crimes."). That particular type of flagless, stateless criminal has made himself an enemy to all nations in the modern age, and just as "the torturer has become like the pirate and slave trader before him hostis humani

---

[10] International Convention for the Suppression of the Financing of Terrorism art. 2.1(b), Dec. 9, 1999, 2178 U.N.T.S. 197, *available at* https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-11&chapter=18&clang=_en.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

generis, an enemy of all mankind," *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980), so too has the genocidal Jew-hating terrorist (and anyone financing such a person) become such a criminal. Accordingly, crimes of the nature alleged in this case easily satisfy the standard to serve as the underlying tortious basis for the primary tort, aiding and abetting, alleged here.

## **Misrepresentations of Law in the Motion to Dismiss**

### A. *Misrepresentation of Supreme Court Decision*

As discussed above, Defendants misstate a pivotal holding of the United States Supreme Court, stating falsely: "the Supreme Court in *Nestle v. John Doe*, *supra*., held that 'aiding and abetting' is not a cause of action contemplated by the [ATS]." (Dkt. 27 at 19, ¶ 35). That is a fundamental and blatant misrepresentation of controlling law. True enough— this mistake may have occurred due to a careless read of *Nestle* that missed where the majority dropped off into a plurality, but there is no "empty-head pure-heart" justification for misstating a holding of the Supreme Court. *United States v. Yida*, 498 F.3d 945, 952 (9th Cir. 2007). Moreover, within the context of the further legal misrepresentations discussed below, this misstatement looks less like an oversight and more like a pattern.

### B. *Misrepresentation of a District Court Opinion as Controlling Circuit Court Opinion*

It also appears that in their rush to condemn Israel, Defendants further misled this Court twice over, first by stating that a holding by a district judge was a finding of genocide by the Ninth Circuit and second by misstating the underlying holding of the ICJ. More specifically, Defendants (among other problematic tactics) falsely claim to this Court: "the Ninth Circuit cited with seeming approval the decision of the International Court of Justice in which the ICJ found that Israel has plausibly been engaged in genocide in Gaza since October 7, 2023." (Dkt.



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

27 at 21, ¶ 44). To the contrary, in affirming, the Ninth Circuit directly called out and set aside the lower court's statements on genocide:

> Among other things, the district court stated that "the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law." To the extent plaintiffs construe the district court's commentary as factual findings, plaintiffs are incorrect. Because the district court lacked subject matter jurisdiction, any claimed factual findings and related commentary are of no legal force.

*Def. for Children Int'l-Palestine v. Biden*, 107 F.4th 926, 933–34 (9th Cir. 2024) (per curiam). Patently misstating the holding of a Ninth Circuit case (or just making one up) is behavior that merits a hard look from this Court.

### C. Misrepresentation of International Court of Justice Decision

The federal judicial opinion to which Defendants likely intended to cite (and which they attached as Defendants' Ex. B) was that of Judge Jeffrey White of the Northern District of California, which can be properly located at *Def. for Children Int'l-Palestine v. Biden*, No. 23-cv-05829-JSW, 2024 WL 390061, 2024 U.S. Dist. LEXIS 17219, at *16 (N.D. Cal. Jan. 31, 2024), *aff'd* 107 F.4th 926 (9th Cir. 2024). It is true that Judge White asserted, "the ICJ has found" that "it is plausible that Israel's conduct amounts to genocide." This assertion, however, is itself incorrect and misunderstands what the ICJ has done (and what the ICJ does generally). Then-President of the ICJ, the Honorable Joan Donoghue, issued the ruling in question and has explained that the ICJ "*didn't decide the claim of genocide was plausible*."[11]

Accordingly, Defendants misstate the holding of the ICJ as well. The Court should look carefully at the fact that Defendants appear not to even understand (among other things) some

---

[11] *See* BBC News, Interview of Joan Donoghue, available at https://www.youtube.com/watch?v=bq9MB9t7WlI (emphasis added).

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 20

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

of the most basic facets of international law, namely, that the ICJ decides plausibility of rights, not plausibility of genocide. Defendants chose not to inform the Court of the ICJ's actual decision or of Joan Donoghue's publicly available descriptions of the decision as it concerns the "plausibility of genocide." Why Defendants made that choice merits serious consideration.

## IV. <u>CONCLUSION</u>

Accordingly, Plaintiff respectfully requests this Court to deny the Motion.

I certify that this Response contains 6,372 words, in compliance with the Local Civil Rules.

DATED this 2nd day of October 2024.

Respectfully submitted,
TOMLINSON BOMSZTYK RUSS

By: _____
Aric S. Bomsztyk, WSBA #38020
Blair M. Russ, WSBA #40374
1000 Second Avenue, Suite 3660
Seattle, Washington 98104
Telephone: (206) 621-1871
asb@tbr-law.com
bmr@tbr-law.com

Mark Goldfeder (*pro hac vice*)
NATIONAL JEWISH ADVOCACY
CENTER, INC.
THE INTERNATIONAL LEGAL FORUM
1718 General George Patton Drive
Brentwood, TN 37027
Phone: (800) 269-9895
mark@jewishadvocacycenter.org
ben@jewishadvocacycenter.org

David Schoen (*pro hac vice*)
LAW OFFICES OF DAVID SCHOEN
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: (334) 395-6611
schoenlawfirm@gmail.com

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 21

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1

2          Jason Torchinsky (*pro hac vice*)
           Erielle Davidson (*pro hac vice*)
3          HOLTZMAN VOGEL BARAN
           TORCHINSKY & JOSEFIAK PLLC
4          2300 N Street, NW, Suite 643A
           Washington, DC 20037
5          jtorchinsky@holtzmanvogel.com
           edavidson@holtzmanvogel.com
6          Phone: (202) 737-8808

7          Phillip Gordon (*pro hac vice*)
           John Cycon (*pro hac vice*)
8          Caleb Acker (*pro hac vice* forthcoming)
           HOLTZMAN VOGEL BARAN
9          TORCHINSKY & JOSEFIAK PLLC
           15405 John Marshall Hwy
10         Haymarket, VA 20169
           cacker@holtzmanvogel.com
11         Phone: (202) 737-8808

12         *Counsel for Plaintiff*

13                  **<u>CERTIFICATE OF SERVICE</u>**

14         I am employed by the law firm of Tomlinson Bomsztyk Russ, over the age of 18, not

15    a party to this action, and competent to be a witness herein.

16         On Wednesday, October 2, 2024, I caused true and correct copies of the foregoing

17    document (Response to Defendants' Motion to Dismiss) to be delivered via ECF to all parties

18    of record.

19         I declare under penalty of perjury under the laws of the State of Washington that the

20    following is true and correct.

21         DATED this day 2nd of October 2024, in Snohomish County, Washington.

22         Signature: _____
23         Printed Name: _____Lisa Sebree_____

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 22

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907