**UNITED STATES DISTRICT COURT WESTERN DISTRICT
OF WASHINGTON AT TACOMA**

_____

ALMOG MEIR JAN, SHLOMI ZIV, ANDREY KOZLOV
         Plaintiffs,

                      **MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

                                  **Case No. 3:24-CV-5553-TLF**

PEOPLE MEDIA PROJECT, a Washington Non-Profit Corporation, d/b/a PALESTINE
CHRONICLE; RAMZY BAROUD; JOHN HARVEY; and DOES 1 through 10,
         Defendants.
_____

## I. <u>Introduction & Statement of Facts</u>

      This case is brought by three Israeli Plaintiffs with no U.S. contacts against a U.S. non-profit news organization and its principals under the Alien Tort Claims Act. Plaintiffs, who were kidnapped on October 7, 2023, in Israel by unspecified militants of Hamas – a non-state actor -- and held captive in Gaza for approximately 8 months, allege that their captivity and alleged, unspecified mistreatment in captivity were, at least in part, the responsibility of an individual in Gaza, now deceased, who has written articles for the Defendant news organization.

      However, what jumps out in the Amended Complaint is that Plaintiffs never say, and indeed carefully avoid saying, what exactly the alleged responsibility of that individual, named Abdallah Aljamal (Aljamal), was. First, they do not allege that Aljamal participated in any way in their kidnapping on October 7. Instead, Plaintiffs say they were kidnapped by unspecified persons associated with Hamas on October 7, 2023, and ultimately released in an Israeli military operation approximately 8 months later. Plaintiffs indicate that they were found on the day of their release in the home of Aljamal. However, they never say how many hours or days of the 8 months of their total captivity, beyond the time of release, took place in Aljamal's home. As it stands, we only know for certain from the Amended Complaint that Plaintiffs were allegedly in

Aljamal's home for an unspecified time on that one day.  Indeed, there are numerous instances in which Plaintiffs could say how long they were in Aljamal's home and in his captivity, and yet fastidiously refrain from doing so.  *See*, Amended Complaint, Pars. 1-3; 11-13, 54-55, 69.  This glaring omission, especially at this time in the proceedings when Plaintiffs have already been permitted to amend their complaint to cure the deficiencies in their first one, is fatal to Plaintiffs' claims as we demonstrate below.

Similarly, Plaintiffs, more concerned with detailing and maligning the news stories in Defendants' publication and attempting to promote their own version of historical and current events, never specify what alleged mistreatment they were subjected to while in captivity beyond saying that they were subjected to "arbitrary punishment, physical threats, and physical and psychological abuse."  Amended Complaint at Par. 5.  Plaintiffs do not even attempt to allege that this alleged mistreatment arose to something amounting to torture.  Again, this is fatal to their case.

Plaintiffs do not allege that Defendants, all based in the State of Washington, participated in any way in his kidnapping, detention or mistreatment thousands of miles away.   Rather, Plaintiff attempts to claim that Defendants are liable for the damages and injuries he suffered in Israel and Gaza at the hands of Hamas by virtue of the fact that Defendants allegedly employed and paid the Aljamal to write articles for them and because they allegedly published Hamas "propaganda."

In addition, Plaintiffs do not allege anywhere in the Amended Complaint that Defendants had any idea, or could have had any idea, that Hamas was planning to carry out their operations on October 7, 2023, including any kidnappings.  Moreover, to the extent that Plaintiffs attempt to allege that Defendants were communicating with Aljamal through unspecified "electronic

means" after October 7, 2023, they do so upon mere "information and belief" (Amended Complaint, Par. 41, 67) -- a quite disfavored basis for allegations in a complaint.

Plaintiff's claims must fail under U.S Supreme Court and Ninth Circuit precedent which makes it clear that the Alien Tort Claims Act does not cover the specific acts which allegedly resulted in Plaintiff's injuries and because, even if it did, there is a much too tenuous connection between these acts in the Middle East and the United States to overcome the presumption against extraterritorial application of the Act.   Specifically, Plaintiffs do not claim that the alleged payments – the only colorable claim of material support -- made to Aljamal were carried out in the United States or through platforms/banks in the United States.  This is fatal to their claim because, without such allegations, Plaintiffs cannot overcome the presumption against extra-territoriality.

Simply stated, the Alien Tort Statute (ATS) does not apply extraterritorially- and Plaintiffs cannot manufacture jurisdiction over a Washington-based nonprofit for events that occurred entirely abroad. This case has no connection to the U.S. and fails at the threshold.

Moreover, the chief aim of Plaintiff's actions against Defendants is their Constitutionally-protected rights to free speech and freedom of the press, and the Complaint is clearly motivated by the desire to curb if not wholly suppress these rights.  Even assuming, *ex arguendo*, that Plaintiffs are not seeking to curb free speech, this lawsuit unequivocally functions as an unconstitutional attack on press freedom. Plaintiffs seek to hold Defendants liable for publishing content they dislike—something the First Amendment forbids. Courts have consistently rejected efforts to impose liability on journalists for reporting on controversial or extremist viewpoints.

In addition, Plaintiffs' actions must also fail because they do not allege that the injuries they claim they suffered were committed by state actors or under the color of state law, nor do they claim that they attempted to exhaust their remedies for said injuries in Israel.   Each of these

deficiencies provide an independent basis for this Court to find that it lacks subject matter jurisdiction under the ATCA.

In sum, this case must be dismissed in its entirety and with prejudice because it fails as a matter of law on multiple independent grounds:

1. The Court lacks jurisdiction under the Alien Tort Statute (ATS) because Plaintiffs' claims arise from alleged conduct occurring entirely outside the United States, and the Supreme Court has made clear that ATS does not apply extraterritorially. *Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108 (2013); *Nestlé USA, Inc. v. Doe,* 141 S. Ct. 1931 (2021);

2. Plaintiffs' claims are barred by the First Amendment, as they seek to impose liability on Defendants for constitutionally protected journalistic activities, in violation of Supreme Court precedent. *Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010);

3. Plaintiffs fails to establish proximate causation, and do not plausibly allege that Defendants' conduct had any direct effect on Plaintiffs' captivity or mistreatment *Jesner v. Arab Bank, PLC,* 138 S. Ct. 1386 (2018*); Doe v. Cisco Systems, Inc*., 73 F.4th 700 (9th Cir. 2023);

4. Plaintiffs' civil conspiracy claim fails for wholesale failure to state facts showing any actual agreement between Defendants and Hamas. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)*; Ashcroft v. Iqbal,* 556 U.S. 662 (2009*);

5. The political question doctrine precludes judicial review because adjudicating this case would require the Court to evaluate foreign military actions and U.S. foreign policy determinations. *Baker v. Carr,* 369 U.S. 186 (1962*); Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004);

6. Plaintiffs have not exhausted their remedies in Israel. *Sarei v. Rio Tinto,* 550 F.3d 822 (9th Cir. 2008);

7. Plaintiffs' material support for terrorism claim is fatally flawed because payments (which do not exist) to a journalist do not constitute material support under U.S. law. *Boim v. Holy Land Foundation,* 549 F.3d 685 (7th Cir. 2008).

## II. Argument

### A. Pleading Requirements After *Tombly* and *Igbal*

A civil conspiracy claim requires an agreement between defendants and a co-conspirator. Plaintiffs fail to allege any facts showing that Defendants had a "meeting of the minds" with Hamas or its affiliates. Courts routinely reject conspiracy claims based on vague or speculative allegations.

In the landmark cases of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court raised the bar for the requirements which a plaintiff's complaint must meet to properly state a claim and avoid dismissal.

In *Twombly*, a case involving alleged conspiracy to manipulate prices in violation of Section 1 of the Sherman Anti-Trust Act, the Court held that scrutiny of allegations at the pleading stage is important given the risk for abusive and expensive discovery. 550 U.S. at 558-559.

The Court explained that, under FRCP Rule 8, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. Specifically, when dealing with conspiracy allegations, the Court held that it was not enough for a plaintiff to merely claim that there was some, unspecified "agreement" or "conspiracy" to circumvent the law, but that the plaintiff instead must allege specific facts to support the claim of such an "agreement." *Id.* at 565 and fn. 10.  In the case before it, the Court held that the plaintiff had not met that bar where it did not give the specific time during a period of years or place where illicit agreements to fix prices were made or who was involved in making these agreements. *Id.*

The Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), reaffirmed that **a complaint must contain sufficient factual matter to state a plausible claim for relief.** While detailed factual allegations are not required, mere labels, conclusions, or formulaic recitations of elements are insufficient *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). A complaint cannot rely on "naked assertions" without factual enhancement and must allow the court to draw a reasonable inference of liability. *Iqbal*, 556 U.S. at 678.

The Supreme Court in *Iqbal*, 556 U.S. at 678, clarified **that a complaint must do more than allege facts that are "merely consistent with" liability**—*it must cross the line from possibility to plausibility*. *Twombly*, 550 U.S. at 557. Courts do not accept legal conclusions as true, and threadbare recitals of elements, supported only by conclusory statements, are insufficient. A complaint must provide well-pleaded facts that allow the court to infer more than the mere possibility of misconduct—otherwise, it fails to state a claim under Rule 8. *Accord*, *Doe v. Cisco Systems, Inc.,* 73 F.4th 700, 712 (9th Cir. 2023).

As we demonstrate below, Plaintiffs' aiding and abetting claims lack the specificity necessary under *Twombly* and *Iqbal* to survive a motion to dismiss, and indeed amount to nothing more than conclusory claims not grounded in fact, but instead merely concocted after Plaintiffs' initial failed attempt to sufficiently plead their case against Defendants.

Most notably,  Plaintiffs fail to state any logical or remotely plausible link between Defendants' conduct and Plaintiffs' injuries**.** Plaintiffs wholly fail to establish that anything Defendants did had any effect on their captivity. Plaintiffs' allegations rest on speculation, fear-mongering, a bad-faith media campaign aimed at maligning the Defendants and This Court-instead of resting on sufficient facts.

**B.** *Sosa* **& Progeny: The Shrinking Scope of ATCA Subject Matter Jurisdiction**

Plaintiff brings this case under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, which grants federal jurisdiction over certain violations of international law. Though enacted in 1789, the ATS remained largely dormant until the late 20th century. In Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), the Supreme Court ruled that the ATS provides jurisdiction but does not create a federal cause of action, limiting claims to a narrow set of universally recognized international law violations. The Court identified piracy, violations of safe conduct, and attacks on ambassadors as the core offenses contemplated by the statute, emphasizing that courts have only a limited role in expanding ATS liability beyond these historical norms. The Court reached this conclusion in light of the fact that the ATCA did not expressly create a private right of action AND that the ATCA, by its nature, involves international claims which inevitably have "potential implications for the foreign relations of the United States . . . ." *Sosa*, 542 U.S. at 727. As the Court explained, this consideration "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs. It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." *Id.* In short, the potential for such "collateral consequences is itself a reason for a high bar to new private causes of action for violating international law." *Id.*

Based on such considerations, the Court held that the federal courts should not "recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted" in the 18th Century. 542 U.S. at 732. In the end, the Court found that

the violation alleged by Sosa – his kidnapping by the DEA and his summary, one-day detention – did not constitute such a norm cognizable by the courts.  The Court left it for another day to precisely define the outer bounds of this norm.

Relevant to the instant case, the Court emphasized that, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."  *Sosa*, 542 U.S. at 732-733.   As we explain further below, the "practical consequences" for free speech rights protected by the First Amended which this case entails militates strongly against this Court's exercise of jurisdiction in this case.

In addition to the foregoing, the Supreme Court noted three other considerations for the courts in deciding whether to exercise jurisdiction in a particular ATCA case:  (1) whether the alleged perpetrator was a state actor rather than a private individual or entity, most international norms only regulating the actions of the former; (2) whether the Plaintiff attempted to exhaust his/her remedies in her home country; and (3) whether the case involved a controversy impermissibly interfering with the foreign relations of the United States, and consequently whether the case should therefore be dismissed on political question grounds.  *Sosa,* 542 U.S. at Footnotes 20 & 21.   As for the political question issue, the Court gave the example of the case of *In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379, in which the South African government asserted that "these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which 'deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill."  *Sosa*, 542 U.S. at Footnote 21.

8

Simply stated, Courts cannot adjudicate disputes requiring foreign policy determinations (*Baker v. Carr, 369 U.S. 186 (1962)*). This case would require the Court to rule on whether Israel's military operations and Hamas' actions constitute war crimes—issues that belong to the Executive Branch, not the judiciary. Courts have consistently declined jurisdiction over cases that would interfere with U.S. foreign policy (*Sosa v. Alvarez-Machain, 542 U.S. 692, 727 (2004)*). As we discuss in further detail below, all of these considerations support dismissal in the instant case. First, Plaintiffs do not and cannot allege that the alleged perpetrator of the alleged violations in the instant case (a Hamas operative) was a state actor. Second, Plaintiffs did not exhaust their remedies before attempting to bring their claims before this court in the United States. As for the third consideration, the United States is currently in the process of attempting to broker a comprehensive cease-fire agreement between Israel and Hamas which, *inter alia*, would involve the release of captives by both sides, including the release of US citizens by Hamas. ***It should be noted that, for the first time ever, the US is now talking directly to Hamas in an effort to resolve such issues.*** *See*, "US and Hamas Hold Direct Talks on Hostages, Officials Say," *New York Times* (March 5, 2025). It is conceivable that cases of this kind which seek redress by alleged captives of Hamas for alleged harm done in captivity will adversely impact these efforts of the U.S. and any resulting cease-fire agreement.

Meanwhile, after *Sosa*, the Supreme Court continued to whittle away at the ATCA in ways fatal to the Plaintiff's Complaint. Thus, in *Kiobel v. Royal Dutch Shell,* 569 U.S. 108 (2013), the Court was confronted with an ATCA case brought by Nigerian nationals who were granted asylum in the U.S. and who alleged that Dutch, British, and Nigerian corporations aided and abetted the Nigerian Government in committing serious violations of the law of nations in Nigeria. While the Supreme Court initially granted *certiorari* to decide the quite contested issue of whether corporations are subject to suit under the ATCA, the Second Circuit having dismissed

9

the case on the grounds that they are not, the Supreme Court ended up resolving the case on the much more expansive issue of whether the courts even have "extra-territorial jurisdiction" under the ATCA. That is, the Court questioned whether the courts have jurisdiction over cases, such as this one, involving torts which take place outside the jurisdiction of the United States.

Ultimately, the Court dismissed the case before it by Plaintiffs -- U.S. asylee residents at the time the complaint was filed -- against foreign corporations having minimal contacts with the U.S. for allegedly aiding abetting violations carried out in Nigeria. As an initial matter, the Court found applicable to the ATCA the well-established canon which provides that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010), and reflects the 'presumption that United States law governs domestically but does not rule the world,' *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437, 454 (2007)." *Kiobel*, 569 U.S. at 115.

As the Court explained, "this presumption 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.' *EEOC* v. *Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (*Aramco*)." 569 U.S. at 115. The Court in *Kiobel* explained that these considerations make the presumption against extra-territoriality jurisdiction particularly pressing in the case of actions brought under the ATCA, and especially . "when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign." *Kiobel,* 569 U.S. at 116-117.

In the end, the Court, in dismissing the claim before it for alleged violations taking place in Nigeria, held that "all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. . . . Corporations are often present in many countries, and it would reach too far to say that mere corporate

presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required." *Kiobel*, 569 U.S. at 124-125.

While the Court in *Kiobel* did not define what it means for a case to "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application," it soon would, and in a way which requires dismissal of the Complaint in this case. But even before this, courts began to dismiss cases similar to the instant one based upon the *Kiobel* decision. *See*, *e.g.*, *Ben-Haim v. Neeman*, 543 F.App'x 152, 155 (3d Cir. 2013) (dismissing appeal of two plaintiffs (one a U.S. resident alien and the other a U.S. citizen) against defendants, including two U.S. non-profit organizations they accused of aiding and abetting, for alleged violations taking place in Israel). The instant case is even more susceptible to dismissal than *Ben-Haim* in that (1) it involves a case brought by non-U.S. nationals with no alleged contacts with the United States; and (2) unlike in *Ben-Haim* in which the Plaintiffs exhausted their remedies in Israel all the way to the Israeli Supreme Court, the Plaintiff in this case does not even allege an attempt to exhaust his Israeli remedies.

Courts routinely dismiss ATS claims when plaintiffs fail to first seek justice in their home country (*Sarei v. Rio Tinto, 550 F.3d 822 (9th Cir. 2008)*). Plaintiffs make no allegation that they sought legal remedies in Israel before bringing this suit. This failure alone warrants dismissal.

 The Supreme Court would continue to narrow the application of the ATCA in the case of *Nestle USA, Inc. V. John Doe I., et al.* 593 U.S. 628 (2021) -- a case on appeal from the U.S. Court of Appeals for the Ninth Circuit. As the instant case, *Nestle* involved claims against U.S. Defendants, in that case corporations, for allegedly aiding and abetting actors abroad in committing international law violations. In *Nestle*, the Court held specifically that "where the statute, as here, does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.' *RJR Nabisco*, 579 U.S. at 337."

11

*Nestle*, 593 U.S. at 628-629.  In *Nestle*, the "conduct relevant to the statute's focus" was alleged

forced labor on farms raising cacao for the making of chocolate.  As the Court found, "[a]ll of

*that* alleged conduct occurred overseas in this suit."  *Id.* at 633 (emphasis added).

As the Court explained, "[n]early all of the conduct that they say aided and abetted forced

labor – providing training, fertilizer, tools, and cash to overseas farms – occurred in Ivory Coast.

The Ninth Circuit nonetheless let this suit proceed because respondents pleaded as a general

matter that 'every major operational decision by both [defendant] companies is made in or

approved in the U.S.' . . .  But allegations of general corporate activity – like decision-making –

cannot alone establish domestic application of the ATS."  *Nestle*, 593 U.S. at 634.  As the Court

noted, "'[t]he presumption against extraterritorial application would be a craven watchdog

indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.' . . .

To plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege

more domestic conduct than general corporate activity.  The Ninth Circuit erred when it held

otherwise." *Id.*

**C.   Plaintiffs Do Not Allege That the Alleged Violations Were Carried Out by State Actors**
        As the Ninth Circuit, relying upon *Sosa*, *supra.*, held in *Doe v. Cisco Systems, Inc.*, 73

F.4th 700, 740 (9th Cir. 2023), "certain forms of conduct violate the law of nations under the

ATCA 'only when undertaken by state actors or those acting under color of law.'  We note that

not all violations of international law require state action. Courts have recognized several that do

not, including the prohibitions against piracy, the slave trade, and certain war crimes. . . ."   As

the court continued, "[a]lthough Plaintiffs need not establish that Cisco itself acted under color of

state law, they must show, for at least some of the alleged international law violations, that Cisco

aided and abetted the offenses of a state actor." *Id.*

In the instant case, Plaintiffs do not allege that Hamas is a state actor, and it in fact is not

because Gaza and Palestine are not recognized as States by the United Nations or by the US or

Israel.  Rather, Gaza is a territory occupied by Israel.   And indeed, Plaintiffs expressly allege that Hamas "is a terrorist group" and a "Foreign Terrorist Organization" (Amended Complaint at Pars. 21, 22) -- that is, NOT a State or State actor.

While Defendants are unaware of any ATCA case which has addressed this issue as it applied specifically to Hamas,[1] there are cases dealing with this in regard to the Palestinian Liberation Organization (PLO) as well as the Palestinian Authority (PA) which governs in the occupied West Bank and which the US and Israel at least recognize as a legitimate authority there.   Indeed, the US government has at times expressed its desire to have the PA take governance of Gaza in lieu of Hamas.  *See*, "US welcomes new Palestinian Authority government following repeated calls for reform," *Times of Israel* (March 30, 2024). However, even in that instance, where at least one of the defendants was arguably a "public official" associated with the PA in the West Bank, the U.S. Court of Appeals for the Second Circuit held that the ATCA does not provide jurisdiction over a case for torture against non-state actors like the PLO and the Palestinian Authority.  *Shafi v. Palestinian Authority*, 642 F.3d 1088, 1095 (2d Cir. 2011).  The court in that case found that decision compelled, in part, by the Supreme Court's decision in *Sosa*, distinguishing other similar cases decided pre-*Sosa*.  *Id.*  As the court held in *Shafi*:  "[a]pplying its cautious standard, the *Sosa* Court held that the forceful abduction of Alvarez did not constitute a tort cognizable under the statute. As the Court noted, Alvarez's approach 'would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by law of the jurisdiction in which it took place.' . . . Similarly, the

---

[1] The Supreme Court did deal with ATCA claims relating to Hamas in the case of *Jesner v. Arab Bank*, but never reached the state action issue because it dismissed the case soley on the basis that the defendant bank was a foreign entity and as such was not subject to suit under the ATCA.  *See*, *Jesner v. Arab Bank*, 138 S.Ct. 1386 (2018).  Notably, the case was dismissed on these grounds despite the fact that Plaintiffs alleged that the defendant foreign bank utilized its New York branch to clear dollar-denominated transactions that allegedly benefited Hamas and other alleged terrorist groups.

proposition advanced by the appellants before us could open the doors of the federal courts to claims against non-state actors anywhere in the world alleged to have cruelly treated any alien. To recognize such a sweeping claim would hardly be consistent with the standards of caution mandated by the *Sosa* Court." *Id.* at 1094.

The court in *Shafi* also rejected the attempt of appellants to get around the state action requirement by alleging that the alleged torture they were subjected to by the PLO and the PA violated international law norms, for example under the Geneva Conventions. Plaintiffs' passing and half-hearted allegation similar to this in Paragraph 96 – in which they allege that hostage-taking is a war crime under the Fourth Geneva Convention and the Rome Statute of the International Criminal Court – must also be rejected.

In *Shafi,* the court explained, while appellants argued that they were tortured in the course of an "armed conflict" within the meaning of the Geneva Conventions, they describe this alleged conflict as "as occurring in Israel, the West Bank and the Gaza Strip," and "the nature of Israeli relations with the territory wherein the alleged torture took place, are subjects of continuing dispute."[2] *Id.* at 1095. Consequently, the Court held, the international norms that appellants attempted to base their claims were simply not "sufficiently definite," as required by the Supreme Court in *Sosa*, to be actionable under the ATCA. *Id.*

---

[2] The court in *Shafi* based this decision in part because, at the time, Palestine as a non-State was rejected as a party to the Geneva Conventions. 642 F.3d at 1095 and fn. 5. This changed after the *Shafi* decision when Palestine was allowed to join the Conventions as a non-UN member observer. However, Defendants assert that the reasoning of *Shafi* -- that the non-State status of Palestine as well as the lack of clarity as to the nature of the conflict between Israel and Palestine make international law claims against the PLO and PA too insufficiently definite to be cognizable under the ATCA -- still applies to bar Plaintiffs' claims in their Amended Complaint. On this score, we also note that, while Plaintiffs in Paragraph 96 of the Amended Complaint also try to base a war crime claim for alleged hostage-taking under Article 8(2)(a)(viii) of the Rome Statute, this too must be rejected as a key element of such a claim is that the alleged violation take place in the context of an "international armed conflict." *See*, Rome Statute, Article 8(2)(a)(viii)(6). The very same uncertainty about the nature of the conflict between Israel and Palestine noted by the court in *Shafi* applies here to bar this claim as well.

Defendants contend that the very same can be said of the alleged hostage-taking claims in the instant case where Plaintiffs utterly fail in their Amended Complaint to even try to claim that the alleged violations against them were carried out in the course of any armed conflict. *See*, *e.g.*, *Estate of Ahuva Amergi v. The Palestinian Authority, The Palestinian Liberation Organization*, 611 F.3d 1350, 1358 (11th Cir. 2010) ("[t]here is virtually nothing in the Third Amended Complaint that pleads the existence of an ongoing armed conflict. The Third Amended Complaint does not explain whether the conflict was a war, how long it had gone on, who was fighting, what they were fighting for, how the conflict had evolved, or how the tort at issue fit into the larger picture. Quite simply, the Third Amended Complaint fails to establish subject matter jurisdiction under the ATS.") (citing, *Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1258 (11th Cir. 2009) (allegations of "systematic intimidation, kidnapping, detention, torture, and murder of Colombian trade unionists at the hands of paramilitary forces" (non-State actors), not actionable under ATCA as they could not be said to have taken in place in the course of the armed conflict in Colombia).

**D. Plaintiffs Do Not Allege That They Attempted to Exhaust Their Domestic Remedies**

This naturally flows into the next issue of the necessity of exhausting domestic remedies. Thus, because Gaza is not its own separate state, but rather, an occupied territory of Israel, Plaintiffs are able and therefore should exhaust their remedies in Israel – a venue Plaintiffs would have to concede they could obtain justice in -- before attempting to bring suit in the United States.     The U.S. Court of Appeals for the Ninth Circuit, citing *Sosa*, *supra* at fn. 20, has held that  "[w]here the `nexus' to the United States is weak, courts should carefully consider the question of exhaustion, particularly — but not exclusively — with

respect to claims that do not involve matters of `universal concern.'" *Sarei v. Rio Tinto*, 550 F.3d

822, 824 (9th Cir. 2008) (*en banc*).  The *en banc* decision noted that the case before it

> "lacks the traditional bases for exercising our sovereign jurisdiction to prescribe
> laws, namely nationality, territory, and effects within the United States. . . . The
> lack of a significant U.S. `nexus' is an important consideration in evaluating
> whether plaintiffs should be required to exhaust their local remedies in
> accordance with the principle of international comity."

*Rio Tinto,* 550 F.3d at 831.

In the instant case, the nexus between Plaintiffs' claims and the United States are also

weak, and for the very same reasons given by the Ninth Circuit in *Rio Tinto*.  Thus, the

nationality of the Plaintiffs is Israeli, and they have no connection to the United States.  In

addition, the alleged violations carried out against Plaintiffs all took place in Israel and Gaza.

And finally, the effects of these alleged violations within the United States are at best negligible,

a fact we deal in more detail below.  Given this, this Court should require Plaintiffs to exhaust

their domestic remedies in Israel before pursuing their claims here.

### E.  The ATCA Does Not Apply to the Extra-territorial Acts Alleged in Complaint

It is here that the pleading requirements of *Twombly* and *Iqbal*, combined with the

narrowing scope of the ATCA, converge to mandate the dismissal of the Amended Complaint.

As discussed above, the Supreme Court in *Twombly* held that, when dealing with conspiracy

allegations, it was not enough for a plaintiff to merely claim that there was some, unspecified

"agreement" or "conspiracy" to circumvent the law, but that the plaintiff instead must allege

specific facts to support the claim of such an "agreement."  550 U.S. at 565 and fn. 10.   In the

case before it, the Court held that the plaintiff had not met that bar where it did not give the

specific time during a period of years or place where illicit agreements to fix prices were made or

who was involved in making these agreements.  *Id.*  In the instant case, while Plaintiffs certainly

make claims about who (Defendants) aided and abetted whom (Aljamal) in detaining them in

custody, they do not specify – and in fact appear not to want to specify -- the time during the eight-month period between Plaintiffs' kidnapping by persons unknown and their release from captivity that Plaintiffs were supposed to be held in the custody of Aljamal and in his home, much less when Defendants were alleged to have become aware of said custody.  And, if, as the Amended Complaint can be fairly read, Plaintiffs were only held by Aljamal in his home for some time on the day of his release, it is uncertain how Defendants could have the requisite knowledge that they were somehow acting in ways that aided and abetted this ephemeral conduct.

Plaintiffs may respond to this by arguing that they nonetheless allege that Aljamal was somehow involved in kidnappings and the detention of other individuals throughout the 8-month period in question, and that this is sufficient to meet the pleadings bar in order to survive dismissal.  But there again, Plaintiffs have the same pleading deficiencies.  This is so because, beyond stating in a conclusory fashion that Aljamal engaged in such participation, Plaintiffs give absolutely no detail about this alleged participation.  Specifically, they do not state at all what level of participation he allegedly had in the in kidnappings of unknown persons not Plaintiffs on October 7, 2023, nor do they give any detail of specifically when he held captives in his home or who he held, beyond specifying that he held the Plaintiffs some time on the day of their release.  Given this, there is no plausible claim that Defendants could have had knowledge of such nefarious participation or how they could have been aiding and abetting it.

This leads directly to the Supreme Court's holding that plaintiffs in ATCA cases have a high bar in establishing that they can overcome the presumption against the extra-territorial application of the statute.  Specifically, the holding and reasoning of the Supreme Court in *Doe v. Nestle*, *supra.* is fatal to the instant case which alleges that Defendants, in operating a news and political analysis service, somehow aided and abetted the kidnapping, imprisonment and

alleged mistreatment of Plaintiffs in Israel and the Occupied Territory of Gaza through Defendants' "general corporate activity" of publishing articles and paying those who contribute articles to that service.  In other words, just as in *Nestle*, all of the alleged conduct which are the focus of Plaintiffs' ATCA claims – alleged kidnapping, detention and mistreatment – took place abroad.

And, Plaintiffs have failed to allege that Defendants have engaged in any conduct in the US which amount to aiding and abetting the alleged abuses in this case.  First of all, Defendants have failed, beyond mere conclusory allegations which do not pass muster under *Twombly* and *Iqbal*, remedy the deficiencies in their initial Complaint regarding the publishing of Aljamal's articles as somehow amounting to aiding and abetting Aljamal's or Hamas's misdeeds.  Thus, while this Court properly found that the articles published by Defendants about the grave situation in Gaza, and Israel's responsibility for this situation, "do not cross the line from protected speech to inciting or preparing for unlawful activity" (Order Granting Motion to Dismiss at p. 21), and therefore cannot support a claim for aiding and abetting, Plaintiffs have not alleged anything in their Amended Complaint to alter this conclusion.

And, second, as to the claims about alleged payments by Defendants to Aljamal -- which Defendants vehemently deny but accept as true for this purposes of this Motion -- payments to a journalist are not material support for terrorism. Plaintiffs do not allege that Defendants' payments were intended to support terrorist activity, nor that Defendants had the requisite knowledge of any such activity. Courts have rejected similar attempts to impose liability for lawful financial transactions (*Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008)). Plaintiffs cannot, and have failed to, stretch anti-terrorism laws to criminalize journalism.

Moreover, Plaintiffs do not make specific allegations about these payments to overcome the presumption against the extra-territorial application of the ATCA.  This is so because

Plaintiffs do not allege how or where these payments were allegedly made. As far as we know from the Amended Complaint, these alleged payments could have been made through a third country or even through cash payments in Gaza. This places the instant case squarely within the holding of the Supreme Court in *Nestle v. Doe*, in which the Court found rejected plaintiffs' ATCA claims grounded upon alleged "conduct that they say aided and abetted forced labor – providing training, fertilizer, tools, and cash to overseas farms," given that all of this conduct "occurred in the Ivory Coast." 593 U.S at 634. The Supreme Court held that the fact that defendants had a presence in the US and may have made decisions regarding the aforesaid conduct in the US was not enough to overcome the presumption against extra-territorial application of the ATCA. *Id.* This holding applies here to mandate dismissal of Plaintiffs' Amended Complaint.

### F. Plaintiffs' Claims Against the Individual Defendants Must be Dismissed

Plaintiff's claims against the individual Defendants, Baroud and Harvey, must be dismissed as they are based upon their conduct as the officers/managers of the People Media Project, d/b/a Palestine Chronicle, a non-profit corporation, and Plaintiffs have not made allegations nearly sufficient to hold them liable for the conduct of the corporation alleged in this case.

While "[i]t is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment," it is equally well-settled that, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." 3A W. Fletcher, Cyclopedia of the Law of Private Corporations §1137, pp. 300-301 (rev. ed. 1991-1994); 10 *id.*, §4877 (rev. ed. 1997-2001)." *David Meyer v. Emma Mary Ellen Holley, et vir, et*

*al.,* 537 U.S. 280, 286 (2003) (reversing 9th Circuit's decision that individual officer was liable under the Fair Housing Act for the discriminatory acts of employee). As the Supreme Court explained, "the relevant principal/agency relationship demands not only control (or the right to direct or control) but also "the manifestation of consent by one person to another that the other shall act *on his behalf . . .* , and consent by the other so to act." *Id.* (Court's emphasis).

As an initial matter, without yet getting into the very narrow application of the ATCA to the type of extraterritorial claims at issue in this case, Plaintiffs' claim against ALL Defendants must fails because they do not and cannot claim that the alleged wrongful deeds in this case – kidnapping, imprisonment, unspecified abuse and mistreatment – were done in the scope or authority of the alleged wrongdoer's (Aljamel's) capacity as a journalist for the Palestine journalist. That is, Plaintiffs allege that Aljamel was hired by the Chronicle to write articles for it; not to engage in such tortious acts. Therefore, Plaintiffs cannot make out a successful claim against the corporate Defendant in this case. But even assuming, *arguendo*, they could, they certainly cannot make out a claim against the individual Defendants as they do not allege anything beyond their control of the operations of the news organization to hold them liable for the alleged misdeeds of the corporation – that is, they do not allege that the individual Defendants somehow consented to Aljamal's alleged tortious acts thousands of miles away and well outside his journalist duties.

## III.  Conclusion:  Plaintiffs' Amended Complaint Should be Dismissed With Prejudice

Despite the opportunity to amend, Plaintiffs have still failed to allege facts sufficient to establish jurisdiction, causation, or a legally cognizable claim. Courts routinely deny leave to amend when plaintiffs have had previous opportunities to correct deficiencies but have failed to do so. In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court held that while leave to amend should be freely given, it is not warranted in cases of "repeated failure to cure deficiencies

by amendments previously allowed." Similarly, in *Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981, 1007 (9th Cir. 2009), the Ninth Circuit affirmed dismissal with prejudice where the

plaintiff had multiple opportunities to amend but failed to correct the deficiencies, noting that

"the district court's discretion to deny leave to amend is particularly broad where plaintiff has

previously amended the complaint." Given these repeated failures, further amendment would be

futile, and dismissal with prejudice is warranted.

No additional amendment can cure the fundamental defects in this case. Plaintiffs' claims

fail because they cannot allege any domestic conduct by Defendants that "touches and concerns"

the United States with sufficient force to establish ATS jurisdiction. *Kiobel v. Royal Dutch*

*Petroleum Co.,* 569 U.S. 108, 124-25 (2013*); Nestlé USA, Inc. v. Doe,* 141 S. Ct. 1931, 1936

(2021). Plaintiffs also cannot overcome the First Amendment, which bars liability for journalistic

content unless it is directly coordinated with a foreign terrorist organization. *Holder v.*

*Humanitarian Law Project,* 561 U.S. 1, 39-40 (2010). Furthermore, Plaintiffs' claims fail

because they cannot allege proximate causation, as Defendants' payments to a journalist had no

direct or foreseeable connection to the harm suffered. *Jesner v. Arab Bank, PLC,* 138 S. Ct.

1386, 1392 (2018); *Doe v. Cisco Systems, Inc.,* 73 F.4th 700, 713 (9th Cir. 2023). Their civil

conspiracy claim is legally impossible to fix because they fail to allege a "meeting of the minds"

between Defendants and Hamas, which is required under *Bell Atl. Corp. v. Twombly,* 550 U.S.

544, 556 (2007*); Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009*).*

Finally, Plaintiffs have made no attempt to exhaust legal remedies in Israel, as required

before bringing an ATS claim - and adjudicating this case would interfere with U.S. foreign

policy, violating the political question doctrine. *Baker v. Carr,* 369 U.S. 186, 217 (1962); *Sosa v.*

*Alvarez-Machain,* 542 U.S. 692, 727 (2004).

Given these insurmountable barriers, Plaintiffs cannot amend their complaint in a way that would survive dismissal and further attempts to do so would be futile and serve no purpose other than continuing to harass the vulnerable, and injured, Defendants and the Court, here and in the press as they have taken to so flagrantly doing.

Respectfully submitted,

  ss/ Daniel M. Kovalik                       ss/Ralph Hurwitz
Daniel M. Kovalik                             Ralph Hurwitz
112 Washington Place, #15K                    P.O. Box 25642
Pittsburgh, Pa. 15219                         Seattle, WA 98165
(412) 335-6442                                alph@hurvitz.com
dkovalik@outlook.com