1
2
3
4

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

5
6
7
8
9
10
11

| | |
|---|---|
| ALMOG MEIR JAN, SHLOMI ZIV, and ANDREY KOZLOV,<br><br>                                    Plaintiffs,<br><br>v.<br><br>PEOPLE MEDIA PROJECT, a Washington Non-Profit Corporation, d/b/a PALESTINE CHRONICLE; RAMZY BAROUD; JOHN HARVEY; and DOES 1 through 10,<br><br>                                    Defendants. | NO.  3:24-cv-05553-TLF<br><br>**RESPONSE TO DEFENDANTS'**<br>**MOTION TO DISMISS**<br><br>*NOTED FOR HEARING:*<br>*April 11, 2025* |

12

## I.    <u>INTRODUCTION</u>

13
14
15
16
17
18
19
20
21
22
23

Plaintiffs have amended the Complaint to allege precisely what the Court indicated was necessary to remedy the narrow defects identified in its prior order. The Amended Complaint now clearly and explicitly alleges that Defendants made ongoing payments to Abdallah Aljamal "while knowing that Aljamal was a Hamas operative involved in Hamas's October 7, 2023 attacks and in the ongoing terrorist war crime of holding Israeli citizens thereafter," Am. Compl. ¶ 9, that Defendants knew "that Aljamal was a Hamas operative and spokesperson before, during, and in the months after the October 7, 2023 attacks," *id.* ¶ 62, and that "Defendants knew that Aljamal was a terrorist participating in kidnapping and hostage-taking," *id.* ¶ 65. Plaintiffs also allege specific facts showing that Defendants remained in close contact with Aljamal before and after October 7, 2023, *id.* ¶¶ 41-42, 59, 61, 67-68, and that Aljamal remained openly and publicly involved with Hamas's terrorism before, during, and after the

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

atrocities of that day, *id.* ¶¶ 35-36, 39, 41, 50, 58. These allegations raise a plausible inference that Defendants knowingly aided and abetted Aljamal's egregious violations of international law from their homes and business in the Western District of Washington. *Id.* ¶¶ 14, 20.

By sufficiently pleading knowledge, Plaintiffs have resolved, not only their *mens rea* problem, but also their extraterritoriality problem. The Court found the original complaint's extraterritoriality allegations lacking only "because Jan does not allege that Defendants knew Aljamal was a Hamas operative or involved in acts of terrorism" and therefore Defendants "domestic decision to pay him does not have a sufficient nexus to the conduct relevant to the [ATS's] focus." Dkt. 40 at 23 (quotations omitted). The Amended Complaint's extensive allegations of actual knowledge resolve that issue as well.

Defendants, by contrast, completely ignore the Court's prior decision. They do not address at all whether Plaintiffs' new allegations are sufficient to plausibly allege that they were aware of Aljamal's ongoing participation in Hamas's hostage-taking and terrorism. Rather, their motion to dismiss simply repeats arguments that this Court already rejected (*i.e.*, *Sosa* Steps 1 and 2, exhaustion, and the political question doctrine), and raises new arguments that Defendants declined to raise previously. This Court should recognize that the narrow defects it identified in the original complaint have been cured, decline Defendants' invitation to reconsider its prior rulings, and allow this case to proceed.

## II.     <u>STANDARDS</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. For a Rule 12(b)(1) facial motion to dismiss, this Court accepts the factual allegations in the complaint as true, and Plaintiffs as the nonmoving party are entitled to have those facts construed in the light most favorable to Plaintiffs. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 153 F. Supp. 3d 1291, 1298–99 (W.D. Wash. 2015). Similarly, when considering a motion to dismiss under Rule 12(b)(6), this Court construes the complaint in the light most favorable to Plaintiffs. *Id.* The Court must therefore accept all well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of Plaintiffs. *Id.*

### III.   ARGUMENT

**A. The Amended Complaint Cured the Two Narrow Deficiencies Identified by This Court as to the Compensation Allegations.**

   *1.   The Court Has Already Determined That the Complaint Properly Pled All But Two Narrow Aspects of Plaintiffs' Alien Tort Statute Claims.*

This Court began its review of the initial Complaint by noting that the Supreme Court's *Sosa* decision creates a two-part test for determining whether a cause of action may be recognized under the Alien Tort Statute ("ATS"): (1) "the alleged violation must be of an international norm that is 'specific, universal, and obligatory,'"; and (2) a court must evaluate "whether allowing this case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before [a new form of liability] can be imposed." Dkt. 40 at 6 (alteration in original) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732–33 (2004)).

Before proceeding to each *Sosa* step, this Court noted that "Defendants do not contest that the underlying torts committed against Jan by Aljamal and Hamas—the kidnapping and imprisonment of a civilian hostage—are international human rights violations that are

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 3



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    actionable under the ATS. *See generally* Dkt. 27; Dkt. 33; Dkt. 36." *Id.* at 7. As discussed

2    below, Defendants still have not done so.

3        This Court then held that "Jan's aiding and abetting claims satisfy Sosa's first

4    requirement" because "aiding and abetting liability is a norm of customary international law

5    with sufficient definition and universality to establish liability under the ATS." *Id.* at 7–8

6    (quoting *Doe I v. Cisco Sys. Inc.*, 73 F.4th 700, 717 (9th Cir. 2023)). At *Sosa* Step 2, this Court

7    concluded that "potential foreign relations consequences and traditional deference to Congress

8    should not preclude Jan from pursuing his claims of accomplice liability under the ATS." *Id.*

9    at 9. Rather than undermining the foreign relations goals of the United States, the Court

10   determined that "recognizing accomplice liability in cases such as this may better serve the

11   original purpose of the ATS by providing 'a forum for violations of international law that, if

12   lacking, could cause foreign relations strife or "embarrass[ment]" to the United States.'" *Id.* at

13   10 (citing *Cisco*, 73 F.4th at 720).

14       This Court swiftly rejected Defendants' related argument that the Court should dismiss

15   this case under Rule 12(b)(1) as presenting a nonjusticiable political question. *Id.* at 10–12.

16   The Court reasoned that "Jan is not challenging foreign policy decisions that are committed to

17   the political branches" and "[t]here are no foreign policy concerns that caution against

18   recognizing Jan's claims under the ATS that a U.S. corporation and U.S. individuals aided and

19   abetted his imprisonment. Nor is there evidence that Congress would oppose recognizing this

20   kind of ATS action." *Id.* at 11. Accordingly, the Court concluded "that Jan has satisfied *Sosa's*

21   second step and—if his factual allegations meet the Ninth Circuit's standard for accomplice

22   liability—he may pursue his aiding and abetting claims under the ATS." *Id.* at 11–12.

23

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 4

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

As to the factual allegations for accomplice liability, this Court found that the Complaint's allegations that Defendants employed Aljamal and paid him money after October 7 and while Jan was captive "meet the *actus reus* requirements for ATS liability." *Id*. at 14. Specifically, "the timing and extent of Aljamal's employment support the conclusion that these payments provided assistance with substantial effect on Jan's captivity." *Id*. at 15.

This Court, however, found the original Complaint did not allege the requisite *mens rea*. In particular, Jan did not allege that "Defendants had actual knowledge that Aljamal was a Hamas operative on or after October 7, when it was commonly known that Hamas was holding Israeli hostages in Gaza." *Id*. at 16. Or in other words, Jan did not allege that "that Defendants knew Aljamal was holding Israeli civilians hostage; that he had participated in any acts of terrorism, related to October 7 or otherwise; or even, critically, that Aljamal was a Hamas operative in the months following the October 7 attacks." *Id*. at 15.

Similarly, the Court held that Jan did "not establish that the conduct relevant to the ATS's focus occurred in the United States" because the "relevant domestic conduct is compensating Aljamal as a journalist of the Palestine Chronicle" and "Jan does not allege that Defendants knew that Aljamal was a Hamas operative or involved in acts of terrorism." Dkt. 40 at 23. In other words, Jan needed to allege actual knowledge to create "a sufficient nexus" to the relevant domestic conduct. *Id*.

Nonetheless, the Court explained, because its "dismissal of the complaint turns on the specific facts alleged, and Jan could conceivably plead additional facts to show Defendants' conduct satisfies the *actus reus* and *mens rea* elements of accomplice liability, particularly with respect to the compensation allegations." *Id*. at 23. Accordingly, the Court granted Jan leave to amend.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 5

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

In summary, this Court has (1) already found the Complaint satisfies *Sosa* steps 1 and 2;[1] (2) noted that Defendants had not contested the underlying torts; (3) held that Jan failed to sufficiently plead *mens rea* because he had not alleged that Defendants had actual knowledge Aljamal was a Hamas operative engaged in international law violations on or after October 7; and (4) held that Jan had not defeated the presumption against extraterritoriality for the same reason.

### 2. The Amended Complaint Sufficiently Pleads Actual Knowledge.

The Amended Complaint resolves the narrow actual knowledge deficiency that the Court identified. "The knowledge *mens rea* standard is satisfied when a defendant acts . . . with awareness of a substantial likelihood that the defendant's acts would assist the commission of a crime." *Cisco Sys.*, 73 F.4th at 734. That said, "[i]t is not necessary that the aider or abettor know the precise crime that was intended and was in fact committed" so long as the aider and abettor "is aware that one of a number of crimes will probably be committed, and one of those crimes is committed." *Id.* (quotations omitted); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 495 (2023) ("Aiding and abetting does not require the defendant to have known 'all particulars of the primary actor's plan.'") (quoting *Restatement (Third) of Torts: Intentional Torts to Persons* §10, Comment c, p. 104). Moreover, "when ongoing abuses are common knowledge, knowing action may be imputed to the defendant." *Id.* (quotations omitted).

To satisfy this standard and sufficiently plead "actual knowledge," this Court suggested that Plaintiffs would need to allege "that Defendants knew Aljamal was holding Israeli civilians hostage; that he had participated in any acts of terrorism, related to October 7 or

---

[1] Because the Court had made legal holdings on *Sosa* Steps 1 & 2 that are not disturbed by the Amended Complaint or Motion to Dismiss, Plaintiffs do not clutter this memorandum by repeating their arguments, but they do incorporate all arguments on *Sosa* made in their original Opposition to the first Motion to Dismiss, Dkt. 33.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 6

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  otherwise" and that "Aljamal was a Hamas operative in the months following the October 7

2  attacks." *Id.* at 15–16. Plaintiffs could meet this burden, among other means, by alleging that

3  "Defendants had actual knowledge that Aljamal was a Hamas operative on or after October 7,

4  when it was commonly known that Hamas was holding Israeli hostages in Gaza." *Id.* at 16.

5      Plaintiffs have now sufficiently alleged each of those facts, and more. Specifically, the

6  Amended Complaint now includes the following factual allegations:

7   - Defendants "compensate[ed] Hamas Operative Aljamal for his propaganda, all the while knowing that Aljamal was a Hamas operative involved in Hamas's October 7, 2023 attacks and in the ongoing terrorist war crime of holding Israeli citizens thereafter." Am. Compl. ¶ 9.

9   - "Defendants knew that Hamas Operative Aljamal was an operative and official spokesperson for Hamas." *Id.* ¶ 38.

10   - "Defendants knew that before, during, and after October 7, 2023, Hamas was committing numerous international crimes, including, but not limited to, kidnapping, holding hostages for ransom, and mentally, emotionally, and physically torturing them." *Id.* ¶ 56.

12   - Defendants knew "that Aljamal was a Hamas operative and spokesperson before, during, and in the months after the October 7, 2023 attacks." *Id.* ¶ 62.

14   - Defendants knew "that Aljamal was a terrorist participating with Hamas in Hamas's terrorist activities." *Id.*

15   - "While compensating him as a 'journalist,' Defendants knew that Aljamal was holding Israeli citizens, victims of October 7, hostage." *Id.* ¶ 63.

16   - "While compensating him as a 'journalist,' Defendants knew that Aljamal, as a Hamas operative, participated in acts of terrorism as part of his duties as such." *Id.* ¶ 64.

18   - "Defendants knew that Aljamal was a terrorist participating in kidnapping and hostage-taking." *Id.* ¶ 65.

19      It is beyond plausible that Defendants knew all of this given their close employment

20  relationship and personal connections with Aljamal and Aljamal's open and notorious

21  membership in Hamas. Aljamal served as an official spokesmen for Hamas's Ministry of Labor

22  and publicly appeared on Arab media as a spokesmen for Hamas. *Id.* ¶¶ 35-36. Aljamal never

23  severed his Hamas connections; rather, Aljamal's Facebook page, "which Defendant Baroud

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 7



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

regularly viewed" and interacted with, included photographs of Hamas headbands and a graphic for Hamas's security bureau, and identified him as a Hamas operative. *Id.* ¶ 39, 41, 58. On October 7, 2023, Aljamal publicly praised Hamas's terrorist attack on his Facebook page stating, "Praise be to God, thank you very much . . . Oh God, pay back." *Id.* ¶ 50. Likewise, on October 7, "Aljamal posted on his public TikTok . . . 'Praise be to God, abundant, good and blessed praise.. O God, guide us . . . O God grant us the victory that you promised.. O God, acceptance, acceptance, acceptance.. Your victory, O God.'" *Id.* ¶ 57.

In addition to regularly viewing Aljamal's public social media posts, "Defendants were in consistent, direct, and substantial contact with Aljamal" before and after October 7, 2023. *Id.* ¶ 59. Indeed, after October 7, when Aljamal ceased publicly posting to social media, his communications with Defendants migrated to other forms of electronic communications, including via Skype and WhatsApp. *Id.* ¶¶ 41, 61, 67. Defendants' communications with Aljamal dramatically increased after October 7 as Aljamal began regularly providing text of stories, digital images, and other material to Palestine Chronicle. *Id.* ¶¶ 42, 59. Aljamal even specifically informed Defendants that he was "holding Israelis hostage and participating in other activities of Hamas." *Id.* ¶ 67.

Defendants routinely compensated Aljamal for work he performed in a war zone, where Defendants knew that his work could only be completed "with direct and substantial contacts with other Hamas terrorists providing him information to publish, power for his electronic devices, and Internet access for transmission of materials and communications." *Id.* ¶ 60. Defendant Baroud and Aljamal are even from the same hometown in Gaza and collaborated on articles as far back as 2019. *Id.* ¶ 37.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 8



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Finally, because the Amended Complaint now clearly and plausibly alleges that Defendants knew Aljamal was a Hamas operative after October 7, 2023, *id.* ¶ 62, when it was common knowledge that Hamas was engaged in acts of terrorism including kidnapping, holding, and concealing Israeli hostages, *id.* ¶ 64, knowledge that Aljamal was involved in such activities may be imputed to Defendants. *See* Dkt. 40, at 16; *Doe I*, 73 F.4th at 734–35 (holding that, where the primary wrongdoer's "ongoing abuses are common knowledge, knowing action may be imputed to the defendant" who provides aid, and inferring that, because "news media and government entities reported on the widespread abuses taking place in China," Cisco provided technology to China "with awareness that the international law violations of torture, arbitrary detention, disappearance, and extrajudicial killing were substantially likely to take place").[2]

### 3. The Amended Complaint Pleads a "Sufficient Nexus" to Defeat the Presumption Against Extraterritoriality.

"For an ATS claim to survive a motion to dismiss, the claim must 'touch and concern' activities that occur in the United States" with "sufficient force to displace the presumption against extraterritorial application." Dkt. 40 at 21–22 (quoting *Kiobel v. Dutch Petroleum Co*., 569 U.S. 108, 124–25 (2013)). In particular, the plaintiff must plausibly allege that "'the conduct relevant to the statute's focus occurred in the United States.'" *Id.* at 22 (quoting *Nestle USA, Inc. v. Doe (Nestle II)*, 593 U.S. 628, 632 (2021)). If plaintiff does so, "the case involves

---

[2] These allegations would also suffice to meet any "proximate causation" requirement as invented by Defendants in their Motion, though no such thing exists for the ATS. *See* Dkt. 45-1 at 21 (suggesting a new requirement that Plaintiffs must show that "Defendants' payments to a journalist had no direct or foreseeable connection to the harm suffered."). Certainly, the citations there provided by Defendants say no such thing, either at the pages cited or anywhere else. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1392 (2018) (pincite to nonprecedential Supreme Court syllabus); *Doe v. Cisco Systems, Inc*., 73 F.4th 700, 713 (9th Cir. 2023) (pincite to procedural history of case). The *actual* requirements for an ATS claim, as described in detail in *Cisco* and by this Court in its original Order, have been met.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 9



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

a permissible domestic application even if other conduct occurred abroad." *Nestle II*, 593 U.S. at 633 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)).

The 'conduct relevant to the ATS's "focus" is "'the conduct constituting the alleged offenses under the law of nations'" which, in an aiding and abetting case, is the "conduct that constitutes aiding and abetting another's violation of the law of nations.'" *Cisco Sys.*, 73 F.4th at 737) (quoting *Mastafa v. Chevron Corp.*, 770 F.3d 170, 184–85 (2d Cir. 2014)). Accordingly, "conduct within the United States that constitutes aiding and abetting a violation of international law" is "within the 'focus' of the ATS" and, therefore, constitutes a permissible domestic application of the ATS, "'even if other conduct occurred abroad'" *Id.* (quoting *Nestle II*, 593 U.S. at 633; *see also id.* at 739 (plaintiffs have pled "sufficient [activity] to overcome the presumption against extraterritoriality if that activity, considered separately, satisfied the *actus reus* and *mens rea* of aiding and abetting liability).

In granting the previous motion to dismiss, the Court determined that the "relevant domestic conduct is compensating Aljamal as a journalist of the Palestine Chronicle." Dkt. 40, at 23. However, the Court held that "because [plaintiff] does not allege that Defendants knew that Aljamal was a Hamas operative or involved in acts of terrorism, their domestic decision to pay him does not have a sufficient nexus to 'the conduct relevant to the statute's focus'" *Id.* By amending the Complaint to sufficiently plead that Defendants' had actual knowledge of Aljamal's ongoing terrorists activities at the time of "their domestic decision to pay him," Plaintiffs have alleged a sufficient domestic nexus for the *mens rea* of aiding and abetting, which is the "the conduct relevant to the statue's focus." *Id.* In particular, Plaintiffs have alleged that while making payments to Aljamal from the United States, Defendants knew he was a Hamas operative, Dkt. 41 ¶ 9, knew he was engaged in acts of terrorism, *id.* ¶ 64, and

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

knew he was engaged in hostage taking and kidnapping. *Id.* ¶ 65. Defendants gained this knowledge by, among other means, engaging in "constant, direct, and substantial" electronic communication with Aljamal from the United States, during which conversations Aljamal informed Defendants of Aljamal's participation in Hamas's war crimes, including the holding of Israeli hostages. Am. Compl. ¶¶ 39-42, 50, 59, 67-68; *see Doe I*, 73 F.4th at 739 (holding that "Plaintiffs have plausibly alleged that Cisco's domestic activities satisfied the mens rea for aiding and abetting liability" where the foreign principal's illegal "objectives [were] communicated to Cisco," which was based in San Jose, California").

Defendants respond by insisting that "all of the alleged conduct which is the focus of the Plaintiff's claims—alleged kidnapping, detention and mistreatment—took place abroad." Dkt. 45, at 18. But, as noted above, the Ninth Circuit has explicitly held that "the focus" of an ATS claim for aiding and abetting is the "conduct … that constitutes aiding and abetting." *Doe I*, 73 F.4th at 737. Thus, a plaintiff overcomes the presumption against extraterritorial application if he pleads "conduct within the United States that constitutes aiding and abetting a violation of international law, … 'even if other conduct [i.e., the principal's acts] occurred abroad.'" *Id.* (quoting *Nestle II*) (alteration made by *Doe I*).

Defendants next argue that making payments to terrorists, knowing that they are terrorists and are using the money to fund their ongoing violations of international law, is not a sufficient actus reus for aiding and abetting. Dkt. 45 at 18. That this Court has already held the opposite. Dkt. 40 at 14-15 (Plaintiffs "meet the *actus reus* requirements for ATS liability" because "the timing and extent of Aljamal's employment support the conclusion that these payments provided assistance with substantial effect on Jan's captivity.").

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 11



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    Finally, Defendants argue that Plaintiffs have not sufficiently alleged that the payments

2    originated in the United States, speculating that the "alleged payments could have been made

3    through a third country or even through cash payments in Gaza." Dkt. 45 at 19. This hypothesis

4    is entirely inconsistent with the Amended Complaint, which alleges that all of the Defendants,

5    at all relevant times, resided in the Western District of Washington. Am. Compl. ¶ 20. In

6    particular, People Media Project, the corporate defendant that is alleged to have made the

7    payments to Aljamal, is incorporated in Washington and has its principal place of business at

8    1503 5th Avenue SW, Olympia, Washington 98502-5247. *Id.* ¶¶ 14, 20. The Amended

9    Complaint does not remotely suggest that these payments were executed by some corporate

10   subsidiary abroad; indeed, People Media Project has no foreign affiliates, as far as Plaintiffs

11   are aware, and the Amended Complaint certainly does not suggest that they do. Instead, the

12   Amended Complaint alleges that the payments to Aljamal were made through the "Palestine

13   Chronicle," which is "an English language and U.S.-based news outlet" that "employed …

14   Aljamal as a 'journalist,' provided him with a U.S-based and taxpayer funded platform," and

15   "compensated" him. *Id.* ¶ 15; *see also id.* ¶¶ 42-43, 69, 82, 100, 114. Moreover, the human

16   beings who are alleged to have communicated directly with Aljamal and caused the ongoing

17   payments to him are Defendant Ramzy Baroud, the Editor-in-Chief of the Palestine Chronicle

18   and a Governor of People Media Project, and Defendant John Harvey, a Governor of People

19   Media Project and a manager of the Palestine Chronicle. Am. Compl. *Id.* ¶¶ 37, 41-42, 59, 62,

20   67-68. The Amended Complaint alleges that, at all relevant times, these individuals worked in

21   Olympia, Washington and resided in the Western District of Washington. *Id.* ¶¶ 14, 20. At the

22   very least, these facts "allow[] the court to draw the reasonable inference" that the alleged

23   payments were sent from the United States. *Iqbal*, 556 U.S. at 678**.**

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 12



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

1    This case is therefore nothing like *Kiobel* and *Nestle II*, upon which Defendant's rely.

2    Dkt. 45, at 18-19. As the Ninth Circuit explained, those cases simply "held that 'mere corporate

3    presence,' and 'allegations of general corporate activity,' including corporate decision-making,

4    are insufficient to show domestic conduct warranting application of the ATS." *Doe I*, 73 F.4th

5    at 737 (quoting *Kiobel*, 569 U.S. at 125, and *Nestle II*, 593 U.S. at 634, respectively). "In both

6    cases, the plaintiffs also alleged that the defendants took specific actions that aided and abetted

7    violations of international law, but those alleged actions by defendants took place entirely (or

8    nearly entirely) abroad." *Id.* "In *Kiobel*, petitioners sued several foreign oil companies" for

9    providing "Nigerian forces with food, transportation, and money." *Id.* at 736. "[A]ll the

10   relevant conduct took place outside the United States,'" however, whereas "the only alleged

11   conduct within the United States was 'mere corporate presence.' *Id.* (quoting *Kiobel*, 569 U.S.

12   at 124–25).

13       Similarly, in *Nestle II*, "'[n]early all the conduct' alleged to constitute aiding and

14   abetting child slavery, including 'providing training, fertilizer, tools, and cash to overseas

15   farms,' 'occurred in Ivory Coast.'" *Id.* at 737 (quoting *Nestle II*, 593 U.S. at 634). Accordingly,

16   "the Court reiterated that 'allegations of general corporate activity—like decisionmaking—

17   cannot ***alone*** establish domestic application of the ATS.'" *Id.* (quoting *Nestle II*, 593 U.S. at

18   634 (emphasis added). Notably, it was undisputed that Nestle's "resource distribution . . .

19   occurred outside the United States." *Nestle II*, 593 U.S. at 631–32. Indeed, Nestle appeared to

20   have significant operations in the Ivory Coast—providing its farmers with not just cash but

21   "training, fertilizer, [and] tools" in exchange for "the exclusive right" to its coca products. *Id.*

22   In this context, "generic allegations" that a massive corporation's U.S. headquarters made

23

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 13



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  "operational decisions" is insufficient because making "'operational decisions' is an activity

2  common to most corporations in the U.S." *Id.* at 634.

3      Here, by contrast, the Defendants are not a foreign corporation like the Royal Dutch

4  Petroleum Company at issue in *Kiobel*, or a massive multinational corporation with extensive

5  foreign operations, like Nestle. They are a U.S.-based "501(c)(3) nonprofit" and "news outlet,"

6  Am. Compl. ¶¶ 6, 14-15, 101, as well as the editor-in-chief and manager of that nonprofit, both

7  of whom are alleged to have lived and worked in the United States while causing the unlawful

8  payments to be made and to have extensive personal contact with the international law violator,

9  *id.* ¶¶ 14, 20. This is a far cry from attempting to base jurisdiction on "generic allegations" that

10  a multinational corporation has a "mere corporate presence" in the U.S. or on "general

11  allegations" of "operational decisions . . . common to most corporations."

12      Indeed, the aiding and abetting activity alleged here is far more plausibly domestic than

13  in *Cisco*, which involved "a multinational corporation based in San Jose, California, with

14  branch offices throughout the world, including in the Asia-Pacific region." *See Doe I*, 73 F.4th

15  at 710. There, the plaintiff relied on "corporate decision-making and oversight in San Jose of

16  actions taken in China to build and integrate" a major domestic surveillance system in China.

17  *Id.* at 738. The plaintiffs there even named the vice president of Cisco China as a defendant.

18  *Id.* at 713. Nonetheless, the Ninth Circuit correctly held "this case involves a permissible

19  domestic application of the ATS against corporate defendant Cisco, because much of the

20  corporation's alleged conduct constituting aiding and abetting occurred in the United States,"

21  including communications with the alleged primary wrongdoers and designing of the

22  surveillance system. *Id.* at 709, 738–39.

23

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 14

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

**B. The Motion to Dismiss Raises or Repeats Arguments Already Explicitly Addressed and Rejected by this Court.**

 *1. As This Court Already Held, the Political Question Doctrine Does Not Apply.*

Defendants again assert, without making any new arguments in support, that the political question doctrine requires dismissal of the Amended Complaint under Rule 12(b)(1). However, this Court has already found this argument "unpersuasive." Dkt. 40 at 11¹. The Court found this case justiciable because "[t]here are no foreign policy concerns that caution against recognizing Jan's claims under the ATS that a U.S. corporation and U.S. individuals aided and abetted his imprisonment. Nor is there evidence that Congress would oppose recognizing this kind of ATS action." *Id.* The Ninth Circuit has also held that "recognizing aiding and abetting liability does not trigger *Sosa*'s principal foreign policy concern." *Cisco*, 73 F.4th at 720.

 Neither Defendants' Motion nor the Amended Complaint provide any reason to depart from the Court's previous conclusion that the political question doctrine does not bar consideration of this case. Defendants state that "the US is now talking directly to Hamas in an effort to resolve such issues." Dkt. 45-1 at 9. But the Court has already found that "[w]hile Defendants point to the United States' role in brokering negotiations between Israel and Hamas on a cease-fire agreement, they do not identify an ATS-specific caution that is pertinent to this case." Dkt. 40 at 11 (citation omitted). Moreover, if there were really a concern that this lawsuit would somehow derail the administration's cease-fire negotiations, one would expect the State Department to object, as it frequently does in cases that present a real risk of interfering with U.S. diplomacy or foreign relations. *See Cisco Sys.*, 73 F.4th at 721 ("Unlike cases in which both U.S. and foreign government actors raise objections to the litigation, no foreign government or Executive Branch agency has submitted an amicus brief, declaration, or letter

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 15

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

objecting to this lawsuit.") (collecting cases); *Kiobel*, 569 U.S. at 124 (noting that foreign governments frequently object to ATS cases that they believe infringe on their sovereignty).

### 2.   As This Court Already Held, Exhaustion Is Not Required Here.

Defendants again rehash the same argument as their original motion to dismiss that Plaintiffs' claims are barred because they did not exhaust all of their potentially available remedies in Israel. However, the Court has already flatly rejected this argument, noting that the Supreme Court did not adopt an exhaustion requirement in *Sosa*. *Id.* at 10 n.1. The Ninth Circuit has also "decline[d] to impose an absolute requirement of exhaustion in ATS cases." *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 824 (9th Cir. 2008). Rather, exhaustion is merely a "discretionary" doctrine under the ATS, which should be "carefully consider[ed]," especially for "claims that do not involve matters of 'universal concern.'" *Id.* "Matters of 'universal concern' are offenses for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders." *Id*.

The conduct at issue here is precisely the type that is punishable in a state without regard to territoriality or nationality. Plaintiffs seek redress for payments made to a known terrorist in the Western District of Washington, not Israel. And this Court has already found such aiding and abetting claims to be "universal" in nature. Dkt. 40 at 7–8 (quoting *Cisco Sys., Inc.*, 73 F.4th at 718). The Court even noted that punishing the conduct at issue "in cases such as this may better serve the original purpose of the ATS" by providing a forum *in the United States*. *Id.* at 10. That statement alone is a rejection of a need for Plaintiffs to bring suit in Israel. The Court has already exercised its discretion to not require exhaustion, and neither Defendants' Motion nor the Amended Complaint provide any reason to depart from that decision.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1          3.  *As This Court Already Held, Payments to a Terrorist Journalist Can Constitute*
2             *Material Support of Terrorism.*

3          For the first time, Defendants make the baffling argument that compensating (*i.e.*,

4  providing actual money to) a known terrorist cannot constitute material support for terrorism.

5  Dkt. 45-1 at 18. However, this Court had already held that Defendant's payments to Aljamal

6  constitute sufficient *actus reus* for aiding and abetting liability, explaining that "the timing and

7  extent of Aljamal's employment support the conclusion that these payments provided

8  assistance with substantial effect on Jan's captivity." Dkt. 40 at 15. And to the extent this

9  argument attempts to attack Plaintiffs' underlying claim that such payments constitute an

10  independent violation of the law of nations (a generous interpretation, given Defendants' (still

11  incorrect) statement that payments to a terrorist "do not constitute material support under *U.S.*

12  *law*." Dkt. 45-1 at 4 (emphasis added).

13          Nevertheless, Defendants' *only* support for this baffling notion is a Seventh Circuit

14  case, *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008).

15  But *Boim* in no way supports Defendants' argument. First, *Boim* was a material support case

16  brought under the Antiterrorism Act, not the ATS. *Id.* at 688. Second, *Boim*'s holding with

17  respect to providing financial assistance to terrorists was simply that "[t]o give money to an

18  organization that commits terrorist acts is not intentional misconduct unless one . . . knows that

19  the organization engages in such acts," *id.* at 693, which the Amended Complaint alleges in

20  detail. And third, *Boim*'s core holding, that the ATA did not establish a cause of action based

21  on secondary liability, was expressly abrogated by Congress. *See* 18 U.S.C. § 2333(d)(2); *King*

22  *v. Habib Bank Ltd.*, 2022 U.S. Dist. LEXIS 176536, at *24 (S.D.N.Y. Sep. 28, 2022)

23  (discussing history of *Boim* and Justice Against Sponsors of Terrorism Act).

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 17

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

C. **Defendants' Remaining Arguments Are Without Merit.**

    1. *The Amended Complaint Resolves the First Amendment Concerns the Court Previously Identified.*

Defendants once again attempt to cast Plaintiffs' Complaint as an attempt "to curb free speech and freedom of the press." Dkt. 45-1 at 3. Plaintiffs recognize that the Court already held that "Defendants' decisions to publish Aljamal's articles are protected by the First Amendment." Dkt. 40 at 23. Viewing that as a legal pronouncement barring any further claims based on this "publication theory," Plaintiffs chose to remove the publication theory of accomplice liability from the Amended Complaint entirely. Accordingly, the Amended Complaint now relies solely upon the "compensation theory" of liability, which this Court noted to be "particularly" capable of cure through amendment. *Id.*

This Court never held nor implied that Defendants' *compensation* of Aljamal could be shielded by the First Amendment. And Defendants never quite make that argument themselves, instead seemingly relying on a genre of policy argument, *i.e.*, that finding liability for compensating a terrorist employed as a "journalist" would violate First Amendment principles. *See* Dkt. 45-1 at 8 ("[T]he 'practical consequences' for free speech rights protected by the First Amended [*sic*] which this case entails militates strongly against this Court's exercise of jurisdiction in this case."). But Defendants cannot (and so they do not) provide any case law for such a preposterous position. If someone knowingly compensates a terrorist while he is committing acts of terrorism, that individual can be held liable for such aid under the ATS, even if the terrorist then also publishes First Amendment-protected content as part of his (other) day job. The Court should therefore reject Defendants' rehashed First Amendment arguments.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

2.   *The Amended Complaint Makes No Civil Conspiracy Claim.*

Throughout their Motion, Defendants reference a supposed "civil conspiracy" claim by Plaintiffs. It is not clear whether this is the result of a stray copy-and-paste or is simply a way that Defendants are describing the aiding and abetting liability claims at issue here. Suffice it to say, civil conspiracy and aiding and abetting liability are not the same. *See Twitter*, 598 U.S. at 489–90 ("[Unlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer"). To the extent Defendants attempt to subject Plaintiffs' claims to a heightened pleading standard by casting them as civil conspiracy claims, the Court should reject such an attempt as plainly wrong. To the extent Defendants are simply conflating aiding and abetting liability with civil conspiracy liability, then, as discussed above, their concerns have been addressed by the fact that Plaintiffs have now sufficiently alleged aiding and abetting liability under the ATS as this Court directed.

3.   *The Amended Complaint Need Not Allege State Action.*

Again, for the first time, Defendants suggest that Plaintiffs' allegations fail because they do not allege that the underlying violations of international law were carried out by "state actors." Dkt. 45-1 at 12–15. Defendants are wrong. While Defendants' theory is not totally clear, it appears Defendants urge this Court to adopt a rule that, for hostage-holding and kidnapping claims under the ATS, Plaintiffs must allege the perpetrator was a state actor. *See* Dkt. 45-1 at 12–15. Not so. As the Ninth Circuit has recognized, courts have long held that "not all violations of international law require state action." *Cisco Sys.*, 73 F.4th at 740 (citing cases).. Rather, "under the law of war as codified in the Geneva Conventions, all 'parties' to a conflict — which includes insurgent military groups — are obliged to adhere to . . . fundamental requirements of the law of war." *Kadic v. Karadzic*, 70 F.3d 232, 242–43 (2d Cir.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 19

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1995) (quoting Geneva Convention I art. 3(1)) (cited favorably in *Cisco Sys.*, 73 F.4th at 740).

In particular, Common Article 3 to the Geneva Convention "binds parties to internal conflicts

regardless of whether they are recognized nations or roving hordes of insurgents," to

"humanely" treat "[p]ersons taking no active part in the hostilities." *Id.* (quoting Geneva

Convention I art. 3(1)).  Specifically, it prohibits state and nonstate combatants "at any time

and in any place whatsoever with respect to [such] persons" from engaging in "cruel treatment

and torture," "taking of hostages," or "outrages upon personal dignity, in particular humiliating

and degrading treatment." *Id.* (quoting Geneva Convention I art. 3(1)).  Nor is state action

required for aiding and abetting liability under the ATS.  *See Cisco Sys.*, 73 F.4th at 720 (9th

Cir. 2023) ("[A]iding and abetting liability is most likely to be alleged, as here, in suits against

U.S. citizens and corporations, not foreign governments.").

     4.   *The Amended Complaint Sufficiently States Claims Against the Individual Defendants.*

Defendants once again argue that Plaintiffs' claims against the individual Defendants

cannot proceed under various theories of corporate vicarious liability. Dkt. 45-1 at 19–20. The

argument is so specious that the Court rightfully did not even deign to address it in its prior

Opinion, and Plaintiffs will not belabor the point here. Suffice it to say, it is black letter Ninth

Circuit law that "[a] corporate officer or director is, in general, personally liable for all torts

which he authorizes or directs or in which he participates, notwithstanding that he acted as an

agent of the corporation and not on his own behalf." *Facebook, Inc. v. Power Ventures, Inc.*,

844 F.3d 1058, 1069 (9th Cir. 2016) (internal quotation and citation omitted). Defendant

Baroud is a Governor of People Media Project, the Editor-in-Chief of the Palestine Chronicle

and responsible for editorial, content, and management decisions of the Palestine Chronicle.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Dkt. 41 ¶ 16. Defendant Harvey is a Governor, principal officer, and manager of People Media Project and Palestine Chronicle and is ultimately responsible for management and financial decisions. *Id.* ¶ 17. Together, the Amended Complaint alleges that the individual Defendants personally authorized and directed the Palestine Chronicle's compensation of Hamas Operative Aljamal, with whom they were in constant direct contact. *See id.* ¶¶ 16–17, 39-43, 67-68.

Plaintiffs do not assert a vicarious liability claim against a corporation and its officers based on the acts of a corporate employee. Rather, Plaintiffs assert claims against a corporation and its corporate officers for personally and knowingly aiding and abetting the acts of a known terrorist principal. The individual Defendants are liable both individually and as corporate officers for the acts of aiding and abetting they authorized and directed. *See Facebook*, 844 F.3d at 1069. This Court should once again decline Defendants' invitation to conclude otherwise.

## IV.  <u>CONCLUSION</u>

Accordingly, Plaintiffs respectfully request this Court to deny the Motion.

I certify that this Response contains 6,355 words, in compliance with the Civil Rules.

DATED this 3rd of April 2025.

Respectfully submitted,
TOMLINSON BOMSZTYK RUSS

By: _____
Aric S. Bomsztyk, WSBA #38020
Blair M. Russ, WSBA #40374
1000 Second Avenue, Suite 3660
Seattle, Washington 98104
T: 206.621.1871
asb@tbr-law.com
bmr@tbr-law.com

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 21

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

NATIONAL JEWISH ADVOCACY
CENTER, INC.
THE INTERNATIONAL LEGAL FORUM
Mark Goldfeder (*pro hac vice*)
1718 General George Patton Drive
Brentwood, TN 37027
Phone: (800) 269-9895
mark@jewishadvocacycenter.org
ben@jewishadvocacycenter.org
anat@jewishadvocacycenter.org

LAW OFFICES OF DAVID SCHOEN
David Schoen (*pro hac vice*)
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: (334) 395-6611
schoenlawfirm@gmail.com

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
Jason Torchinsky (*pro hac vice*)
Erielle Davidson (*pro hac vice*)
John J. Cycon *(pro hac vice)*
Kellen Dwyer *(pro hac vice forthcoming)*
2300 N Street, NW, Suite 643A
Washington, DC 20037
jtorchinsky@holtzmanvogel.com
edavidson@holtzmanvogel.com
jcycon@holtzmanvogel.com
kdwyer@holtzmanvogel.com
Phone: (202) 737-8808

*Counsel for Plaintiffs*

RESPONSE TO DEFENDANTS' MOTION TO DISMISS - 22

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907