UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALMOG MEIR JAN; SHLOMI ZIV; ANDREY KOZLOV,<br><br>Plaintiff,<br><br>v.<br><br>PEOPLE MEDIA PROJECT, a Washington Non-Profit Corporation, d/b/a PALESTINE CHRONICLE; RAMZY BAROUD; JOHN HARVEY; and DOES 1 through 10,<br><br>Defendant. | Case No. 3:24-cv-05553-TMC<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY |

## I.   INTRODUCTION

This case arises from the kidnapping of Plaintiffs Almog Meir Jan, Shlomi Ziv, and Audrey Kozlov by Hamas during the terrorist attack of October 7, 2023. Plaintiffs are Israeli citizens who were kidnapped at the Nova Music Festival and held hostage by Hamas operative Abdallah Aljamal before being rescued by the Israel Defense Forces. Defendants are People Media Project, doing business as the Palestine Chronicle, its individual officers Ramzy Baroud and John Harvey, and unnamed Doe Defendants 1 through 10.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 1

Plaintiffs allege that Defendants employed and compensated Aljamal for work as a journalist before and after the October 7 attack, despite knowing Aljamal was a Hamas operative. Plaintiffs assert that through these actions, Defendants aided and abetted their kidnapping and imprisonment as well as aided and abetted terrorism in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

Plaintiff Jan first filed this lawsuit on July 9, 2024. Dkt. 1. On September 12, 2024, Defendants moved to dismiss for failure to state a claim. Dkt. 27. The Court granted the motion but also granted leave to amend, finding that the defects in the complaint could be cured by alleging additional facts. *Jan v. People Media Project*, No. 3:24-cv-05553-TMC, 2025 WL 359009, at *1 (W.D. Wash. Jan. 31, 2025). Specifically, the Court noted that Jan's allegations that Defendants paid Aljamal while he held Jan captive in his home could support a claim for aiding and abetting only if Defendants knew they were paying a Hamas operative. *Id.* But because Jan's complaint did not allege actual knowledge, the claims based on compensating Aljamal ("the compensation allegations") were dismissed. *Id.* at *7–9. Additionally, the Court dismissed Jan's claims based on the contents of Defendants' articles ("the propaganda allegations") as they are shielded by the First Amendment's protection of speech on matters of public concern. *Id.* at *9–11.

Plaintiffs filed an amended complaint, Dkt. 41, and Defendants again moved to dismiss for failure to state a claim and for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1), Dkt. 45. The amended complaint adds two Plaintiffs, abandons theories of liability based on the contents of Defendants' speech, and alleges facts to support that Defendants knew Aljamal's affiliation with Hamas but continued to pay him following the October 7 attacks. These allegations meet the *actus reus* and *mens rea* requirements for accomplice liability under the ATS as set forth by the Ninth Circuit in *Doe I v.*

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 2

*Cisco Sys., Inc.*, 73 F.4th 700 (9th Cir. 2023). Plaintiffs have therefore stated a plausible claim that Defendants aided and abetted their kidnapping and Hamas's acts of terrorism. Plaintiffs have also sufficiently pled that the payments to Aljamal occurred in the United States, overcoming the presumption against extraterritoriality. The Court thus DENIES Defendants' motion to dismiss (Dkt. 45) and the motion to stay discovery (Dkt. 46) is DENIED as moot.

## II.    BACKGROUND

The following facts are those alleged in the amended complaint. Dkt. 41. Because the Court is considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Jan's factual allegations must be taken as true and construed in the light most favorable to him. *See Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

Jan, Ziv, and Kozlov were kidnapped from the Nova Music Festival and held hostage in Gaza by Abdallah Aljamal. Dkt. 41 ¶¶ 2–4, 6, 11–13. After being held for 246 days, they were rescued from Aljamal's home by the Israel Defense Forces. *Id.* Plaintiffs allege that beginning in May 2019, Aljamal worked as a journalist for the Palestine Chronicle, which regularly published his articles. *Id.* ¶¶ 6, 34. However, "Aljamal also served as an official spokesperson for Hamas's Ministry of Labor" and "Defendants knew that . . . Aljamal was an operative and official spokesperson for Hamas." *Id.* ¶¶ 35, 38. For example, Plaintiffs allege that Aljamal's Facebook page included a photo of his son wearing Hamas headbands posted on June 6, 2023, and a graphic that is the symbol for Hamas's internal security bureau. *Id.* ¶ 39. Following October 7, Plaintiffs allege that Aljamal posted on his Facebook page and TikTok account a message supporting the attack. *Id.* ¶¶ 50, 57. They assert that individual "Defendants regularly viewed and interacted with" Aljamal's social media posts. *Id.* ¶¶ 50, 39, 58.

After October 7, Aljamal's publications on the Palestine Chronicle "increased exponentially, often publishing two to three pieces per day[.]" *Id.* ¶ 59. And to receive and publish Aljamal's articles, Plaintiffs allege that "Defendants were in consistent, direct, and substantial contact with Aljamal, using electronic and internet means." *Id.* Specifically, "Defendants used electronic and internet means, including, but not limited to, WhatsApp and Skype, to communicate with Hamas Operative Aljamal following October 7, 2023 to coordinate Defendants' publishing of Hamas propaganda, including the publishing of justifications for Aljamal's imprisonment of Israeli citizens." *Id.* ¶ 67. Plaintiffs further assert that "Defendants knew that Aljamal was a terrorist participating in kidnapping and hostage-taking through their close employment relationship and their personal connections, *e.g.,* Aljamal and Defendant Baroud are from the same hometown in Gaza." *Id.* ¶ 65.

Plaintiffs were rescued on June 8, 2024. They allege that once Aljamal's name and identity was reported in the news, "Defendants attempted to minimize their connection to Plaintiffs' captor." *Id.* ¶ 85. The next day, the Palestine Chronicle changed Aljamal's position on its website from a "correspondent" to a "contributor." *Id.* ¶ 86. But "[r]egardless of his employment status," Plaintiffs assert that "it is indisputable that Defendants provided Hamas Operative Aljamal, whose connections to Hamas were publicly known, with a U.S.-based and taxpayer subsidized platform to publish Hamas propaganda[.]" *Id.* ¶ 89. Plaintiffs also allege that "the compensation Defendants paid Hamas Operative Aljamal for his propaganda directly enabled him to imprison Plaintiffs in his home." *Id.* ¶ 90. Thus, "[b]y compensating Hamas Operative Aljamal for his propaganda, all the while knowing that Aljamal was a Hamas operative involved in Hamas's October 7, 2023 attacks . . . Defendants aided, abetted, and materially supported both Hamas Operative Aljamal and Hamas itself in their acts of terrorism, including kidnapping and holding Plaintiffs hostage for 246 days, in violation of international

law." *Id.* ¶ 9; *see id.* ¶ 92 ("As a result of Defendants' aiding, abetting, and materially supporting a known Hamas operative and propagandist, Plaintiffs suffered physical injuries, severe mental anguish, and extreme emotional pain and suffering.").

Plaintiffs bring two claims under the ATS, 28 U.S.C. § 1350. *Id.* ¶¶ 93–118. First, Plaintiffs allege that, by compensating Aljamal as an employee, "Defendants aided and abetted Hamas Operative Aljamal in cooperating in the kidnapping of Plaintiffs and imprisoning Plaintiffs as hostages in his home, in violation of international law." *Id.* ¶ 103. Second, Plaintiffs allege that in doing so, "Defendants aided and abetted Hamas's acts of terrorism on October 7 and after, in violation of international law." *Id.* ¶ 116.

On March 13, 2025, Defendants moved to dismiss Plaintiffs' claims. Dkt. 45. Plaintiffs responded, Dkt. 51, and Defendants replied, Dkt. 54. Defendants then filed a motion to stay discovery pending the Court's ruling on the motion to dismiss. Dkt. 46.

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr.*, 768 F.3d at 945, but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV. DISCUSSION

**A.    Aiding and Abetting Liability under the ATS**

*1.    The Court's prior order on Defendants' motion to dismiss.*

In its order[1] on Defendants' first motion to dismiss, the Court explained that under binding Ninth Circuit precedent, aiding and abetting liability is a cause of action recognized under the ATS because it satisfies *Sosa v. Alvarez-Machain*'s two-part test. *Jan*, 2025 WL 359009, at *3–5; *see Cisco*, 73 F.4th at 714; *Sosa*, 542 U.S. 692, 732–33 (2004). First, the Court determined that "aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS." *Jan*, 2025 WL 359009, at *4 (quoting *Cisco*, 73 F.4th at 717). Second, the Court concluded that potential foreign relations consequences and traditional deference to Congress did not preclude Jan from

---

[1] In their motion to dismiss, Defendants repeat arguments from their earlier motion on the scope of the ATS, exhaustion of domestic remedies, and the political question doctrine. *See* Dkt. 45-1 at 7–9, 15–16; Dkt. 54 at 8–9, 13–14. Because the Court has already rejected these arguments in its prior order, *see* Dkt. 40 at 7–12, n.1, it does not address them here.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 6

pursuing his claims of accomplice liability under the ATS. *Id.* at *4–5. The Court also rejected the argument that the political question doctrine barred Jan's claims, observing that his tort claims against private U.S. Defendants did not implicate foreign policy decisions committed to the political branches. *Id.* at *6; *see Cisco*, 73 F.4th at 722.

Since Jan could pursue his aiding and abetting claims under the ATS, the Court then proceeded to apply the relevant standard. Dkt. 40 at 12. The Court explained that because customary international law supplies the standard for accomplice liability in the Ninth Circuit, the plaintiff must plausibly allege that the defendant engaged in a sufficient *actus reus* and had the requisite *mens rea. Id.* (citing *Cisco*, 73 F.4th at 724). In *Cisco*, the Ninth Circuit adopted the "global consensus" that the "actus reus of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation." 73 F.4th at 724 (collecting cases). And the Ninth Circuit joined the Eleventh Circuit in holding that the "*mens rea* for aiding and abetting liability under customary international law is knowing assistance." *Id.* (citations omitted).

With respect to Jan's compensation allegations, the Court determined that he met the *actus reus* requirement. *Jan*, 2025 WL 359009, at *7–8. Jan had alleged that Defendants enabled his imprisonment by employing Aljamal and paying for his articles, as many as two or three pieces a day, during the time that Aljamal kept Jan as a hostage inside his home. *Id.* at *8 (citing Dkt. 1 ¶¶ 32, 37, 49). Even though Jan did not allege specific amounts of money, the Court concluded that the timing and extent of Aljamal's employment supported the reasonable inference that the payments provided assistance with substantial effect on Jan's captivity. *Id.*; *see Cisco*, 73 F.4th at 728.

But the Court also concluded that the original complaint did not satisfy the *mens rea* requirement—that the assistance be "knowing." *Jan*, 2025 WL 359009, at *8–9; *see Cisco*, 73

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 7

F.4th at 734 (holding that "customary international law imposes aiding and abetting liability for knowing assistance"). Jan only alleged that because Aljamal had served at some point as a spokesperson for the Hamas-run Ministry of Labor in Gaza, and he and Defendant Baroud were from the same Gaza town, "Defendants knew or should have known that Hamas operative Aljamal was an operative and official spokesperson for Hamas." *Jan*, 2025 WL 359009, at *8 (quoting Dkt. 1 ¶¶ 33–36). The Court noted that "knew or should have known" is a negligence standard, which is "a less culpable mental state than actual knowledge or recklessness." *Id.* (quoting *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022)).

The Court emphasized the importance of actual knowledge to prevent organizations in international conflict zones from being "swept in" to ATS liability and to capture the essence of accomplice culpability. *Id.* at *9; *see Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023) ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue."). Thus, absent plausible factual allegations that Defendants knew Aljamal was a Hamas operative or that their payments were being used to assist Hamas, Jan did not state a claim for accomplice liability under the ATS. *Jan*, 2025 WL 359009, at *8–9.

    **2.**    *The compensation allegations satisfy the mens rea requirement.*

Plaintiffs now argue that they "have amended the Complaint to allege precisely what the Court indicated was necessary to remedy the narrow defects identified in its prior order." Dkt. 51 at 1. Plaintiffs allege "that Aljamal was a Hamas operative and spokesperson before, during, and in the months after the October 7, 2023 attacks," *see* Dkt. 41 ¶ 62, and that "Defendants knew that Aljamal was a terrorist participating in kidnapping and hostage-taking," *see id.* ¶ 65; Dkt 51 at 1. Specifically, Plaintiffs contend that they have added the following specific allegations of actual knowledge:

- Defendants "compensate[ed] Hamas Operative Aljamal for his propaganda, all the while knowing that Aljamal was a Hamas operative involved in Hamas's October 7, 2023 attacks and in the ongoing terrorist war crime of holding Israeli citizens thereafter." Dkt. 41 ¶ 9.

- "Defendants knew that Hamas Operative Aljamal was an operative and official spokesperson for Hamas." *Id.* ¶ 38.

- "Defendants knew that before, during, and after October 7, 2023, Hamas was committing numerous international crimes, including, but not limited to, kidnapping, holding hostages for ransom, and mentally, emotionally, and physically torturing them." *Id.* ¶ 56.

- Defendants knew "that Aljamal was a Hamas operative and spokesperson before, during, and in the months after the October 7, 2023 attacks." *Id.* ¶ 62.

- Defendants knew "that Aljamal was a terrorist participating with Hamas in Hamas's terrorist activities." *Id.*

- "While compensating him as a 'journalist,' Defendants knew that Aljamal was holding Israeli citizens, victims of October 7, hostage." *Id.* ¶ 63.

- "While compensating him as a 'journalist,' Defendants knew that Aljamal, as a Hamas operative, participated in acts of terrorism as part of his duties as such." *Id.* ¶ 64.

- "Defendants knew that Aljamal was a terrorist participating in kidnapping and hostage-taking." *Id.* ¶ 65.

Dkt. 51 at 7.

Plaintiffs have supported these allegations by pleading facts, based on Aljamal's social media and communications with the Defendants, to support a reasonable inference that Defendants knew Aljamal was affiliated with Hamas and involved in the October 7 attack. *Id.* For example, on October 7, 2023, "Aljamal publicly praised Hamas's terrorist attack on his Facebook page stating, 'Praise to be God, thank you very much . . . Oh God, pay back.'" *Id.* at 8 (quoting Dkt. 41 ¶ 50). That day, he also "posted on his public TikTok . . . 'Praise be to God, abundant, good and blessed praise . . . O God, guide us . . . O God grant us the victory that you promised . . . O God, acceptance, acceptance, acceptance . . . Your victory, O God.'" *Id.* (quoting Dkt. 41 ¶ 57).

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 9

Plaintiffs further contend that along with "regularly viewing Aljamal's public media posts, 'Defendants were in consistent, direct, and substantial contact with Aljamal' before and after October 7, 2023." *Id.* (quoting Dkt. 41 ¶ 59). And when Aljamal stopped publicly posting to social media, Plaintiffs assert that his communications with Defendants moved to other forms of electronic communications such as Skype and WhatsApp. *Id.* (citing Dkt. 41 ¶¶ 41, 61, 67). They argue that the "Defendants' communications with Aljamal dramatically increased after October 7 as Aljamal began regularly providing text of stories, digital images, and other material to [the] Palestine Chronicle." *Id.* (citing Dkt. 41 ¶¶ 42, 59).

Defendants contend[2] that Plaintiffs' claims fail because they "do not allege anywhere in the Amended Complaint that Defendants had any idea, or could have had any idea, that Hamas was planning to carry out their operations on October 7, 2023, including any kidnappings." Dkt. 45-1 at 2; *see* Dkt. 54 at 6 ("Plaintiffs do not allege any facts showing Defendants knew that Aljamal was involved in the October 7 hostage-taking at the time of payment."). Additionally, Defendants argue that Plaintiffs' aiding and abetting claims "lack the specificity necessary under *Twombly* and *Iqbal* to survive a motion to dismiss . . . [and] Plaintiffs wholly fail to establish that anything Defendants did had any effect on their captivity." Dkt. 45-1 at 6. Specifically, they contend that Plaintiffs "do not state at all what level of participation [Aljamal] allegedly had in the [] kidnappings of unknown persons not Plaintiffs on October 7, 2023, nor do they give any detail of specifically when he held captives in his home or who he held, beyond specifying that

---

[2] Defendants argue that Plaintiffs are asserting a civil conspiracy claim which "requires an agreement between defendants and a co-conspirator." Dkt. 45-1 at 5. Plaintiffs deny that they are bringing a conspiracy claim and maintain that they have only asserted aiding and abetting liability. Dkt. 51 at 19. The Court agrees that Plaintiffs have only raised an aiding and abetting claim, which does not require Plaintiffs plead an agreement between Defendants and Aljamal. *See Twitter*, 598 U.S. at 489–90 ("[U]nlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts, thus eliminating a significant limiting principle.") (citation omitted).

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 10

he held the Plaintiffs some time on the day of their release." *Id.* at 17; *see* Dkt. 54 at 7. Defendants therefore conclude that "there is no plausible claim that Defendants could have had knowledge of such nefarious participation or how they could have been aiding and abetting it." Dkt. 45-1 at 17; *see* Dkt. 54 at 7.

These arguments are unpersuasive. The allegations in the amended complaint meet the *mens rea* requirement for ATS liability. Plaintiffs allege that Defendants had actual knowledge that Aljamal was a Hamas operative in the months following the October 7 attacks, when it was commonly known that Hamas was holding Israeli hostages in Gaza. For accomplice liability under the ATS, "it is not necessary that the aider or abettor know the precise crime that was intended and was in fact committed—if the accused is aware that one of a number of crimes will probably be committed, and one of those crimes is committed," the *mens rea* standard is satisfied. *Cisco*, 73 F.4th at 734 (cleaned up). "[W]hen ongoing abuses are common knowledge, knowing action may be imputed to the defendant." *Id.*; *see also id.* at 735 (*mens rea* requirement was met because "the complaint alleges facts demonstrating that [Defendant] was aware of . . . Chinese authorities' goal to use Golden Shield technology [that Defendant helped design and develop] to target [Plaintiffs] and that it was widely known that the authorities' efforts involved significant and ongoing violations of law, especially torture and arbitrary detention").

Plaintiffs' assertion of actual knowledge is supported by sufficient factual allegations. For example, Plaintiffs allege that Aljamal "publicly appeared in Arab media as a spokesperson for the Hamas-run Ministry of Labor." Dkt. 41 ¶ 36. They also assert that Aljamal posted a photo on his public Facebook page on June 6, 2023, which shows his son wearing a Hamas headband. *Id.* ¶ 39. They also allege that Aljamal posted a graphic of a symbol representing Hamas's internal security bureau. *Id.* On October 7, 2023, Aljamal publicly supported the attacks by expressing gratitude for the event on his public Facebook page and TikTok. *Id.* ¶¶ 50, 57 ("Praise be to God,

thank you very much . . . Oh God, payback" and "Praise be to God, abundant, good and blessed praise . . . O God grant us the victory that you promised[.]"). Plaintiffs allege that Defendants knew of Aljamal's affiliation with Hamas because they regularly viewed his social media posts. *Id.* ¶ 50. Additionally, Plaintiffs assert that Defendants were in direct contact with Aljamal prior to and after October 7 because the Palestine Chronicle continued publishing his articles. *Id.* ¶ 59. Specifically, Defendants communicated with Aljamal through WhatsApp and Skype to coordinate the publication of Aljamal's articles after October 7, which "increased exponentially, often publishing two to three pieces per day[.]" *Id.* ¶¶ 59, 67. Despite knowing that "Hamas was committing numerous international crimes, including . . . kidnapping [and] holding hostages for ransom," Plaintiffs allege that Defendants continued compensating Aljamal as a journalist. *Id.* ¶¶ 56, 64.

Defendants argue that Plaintiffs lack specificity in their allegations with respect to Aljamal's participation in kidnapping Plaintiffs and holding them hostage in his home. Dkt. 45-1 at 17; Dkt. 54 at 6–7. But at the motion to dismiss stage, Plaintiffs need not plead "detailed factual allegations" but rather "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545. Plaintiffs have done so here. They allege that Defendants regularly viewed and interacted with Aljamal's social media posts which expressed his support and affiliation with Hamas before and on October 7. *See* Dkt. 41 ¶¶ 39, 50, 57. Importantly, Plaintiffs assert that after October 7, Defendants continued to directly communicate with Aljamal and increasingly published his articles, demonstrating a "close employment relationship." *Id.* ¶ 62. Along with publishing the articles, Plaintiffs allege that Defendants kept paying Aljamal for his writing, even though at the time, it was commonly known that Hamas was holding hostages in Gaza. *Id.* ¶¶ 43, 62, 63, 64.

These allegations are sufficient to "plead[] factual content that allows the [C]ourt to draw the reasonable inference that" Defendants knew or were aware of the substantial likelihood that compensating Aljamal for his articles would assist in the taking of civilian hostages. *Boquist*, 32 F.4th at 773; *see Cisco*, 73 F.4th at 734. Since Plaintiffs have sufficiently pled that Defendants' assistance was "knowing," *see Cisco*, 73 F.4th at 734, the motion to dismiss the ATS claims on this basis is DENIED.

### B.     Extraterritorial Application of ATS

The Supreme Court has held that the presumption against extraterritoriality applies to ATS suits. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013). For an ATS claim to survive a motion to dismiss, the claim must "touch and concern" activities that occur in the United States. *Id.* at 124–25. The Supreme Court has explained that the purpose of the presumption is to "protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* at 115 (cleaned up).

In *Nestle USA, Inc. v. Doe* (*Nestle II*), the Supreme Court clarified the "touch and concern" requirement and established "a two-step framework" for analyzing whether a court could exercise jurisdiction over an ATS claim. 593 U.S. 628, 632 (2021). First, federal courts must consider whether the statute gives clear indication that it applies extraterritorially. *Id.* The ATS does not. *Id.* (citing *Kiobel*, 569 U.S. at 124). Second, if the statute does not apply extraterritorially, "plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Id.* at 633 (quoting *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016)).

Defendants contend that Plaintiffs' ATS claims do not overcome the extraterritoriality presumption because "Plaintiffs failed to allege that Defendants have engaged in any conduct in the US which amount[s] to aiding and abetting the alleged abuses in this case." Dkt. 45-1 at 18.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 13

They further argue that "Plaintiffs do not claim that the alleged payments—the only colorable claim of material support—made to Aljamal were carried out in the United States or through platforms/banks in the United States." *Id.* at 3. Specifically, Defendants maintain that "Plaintiffs do not allege how or where these payments were allegedly made . . . [and] [a]s far as we know from the Amended Complaint, these alleged payments could have been made through a third country or even through cash payments in Gaza." *Id.* at 19.

Plaintiffs respond that by "amending the Complaint to sufficiently plead that Defendants[] had actual knowledge of Aljamal's ongoing terrorist activities at the time of their domestic decision to pay him, Plaintiffs have alleged a sufficient domestic nexus for the *mens rea* of aiding and abetting which is the conduct relevant to the statute's focus." Dkt. 51 at 10 (cleaned up). Additionally, Plaintiffs argue that speculation that the payments originated outside the United States is inconsistent with their amended complaint which alleges that all Defendants, at all relevant times, resided in Washington. *Id.* at 12. For example, Plaintiffs allege that People Media Project is incorporated in Washington and has its principal place of business in Olympia, Washington. Dkt. 41 ¶ 14. Similarly, all individual Defendants worked in Olympia and resided in the Western District of Washington. *Id.* ¶ 20. Plaintiffs conclude that these facts allow the Court to draw a reasonable inference that the alleged payments were sent from the United States. Dkt. 51 at 12 (citing *Iqbal*, 556 U.S. at 678).

The Court agrees. The conduct relevant to the focus of the ATS claims is the action that Plaintiffs allege aided and abetted their kidnapping. *See Nestle II*, 593 U.S. at 634. Here, that action is compensating Aljamal knowing that it would substantially assist him in committing human rights violations. Dkt. 41 ¶ 63. As explained above, *see supra* Sec. IV.A.2., Plaintiffs have alleged the requisite *mens rea* for accomplice liability and thus the domestic decision to pay

Aljamal has a sufficient nexus to "the conduct relevant to the statute's focus." *Nestle II*, 593 U.S. at 633.

Additionally, taking the amended complaint as true and construing it in Plaintiffs' favor, the allegations support a reasonable inference that Defendants' payments were made in the United States. Dkt. 41 ¶¶ 14, 20. People Media Project and individual Defendants resided in Washington state during the relevant period and there are no allegations that would suggest payments were made to Aljamal from outside the United States. *See id.* Since Plaintiffs have alleged domestic conduct that could overcome the presumption against extraterritoriality, the motion to dismiss is DENIED on this basis.

C.     **State Action**

Defendants next argue that "certain forms of conduct violate the law of nations under the [ATS] 'only when undertaken by state actors or those acting under the color of law.'" Dkt. 45-1 at 12 (citing *Cisco*, F.4th at 740); Dkt. 54 at 9. Although Plaintiffs do not need to establish that Defendants themselves are state actors, Defendants contend that Plaintiffs must allege that they aided and abetted the offenses of a state actor. Dkt. 45-1 at 12. But since Plaintiffs only allege that Hamas is a designated foreign terrorist organization and not a state actor, Defendants argue that the amended complaint must be dismissed for lack of jurisdiction. *Id.* at 12–13 (citing *Cisco*, F.4th at 740).

Defendants cite *Ali Shafi v. Palestinian Authority* in support of their argument that state action is required for a claim to be actionable under the ATS. 642 F.3d 1088, 1094 (D.C. Cir. 2011); Dkt. 45-1 at 13. There, Ali Shafi—a Palestinian national—brought an ATS claim against the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") for torture in violation of the law of nations. *Ali Shafi*, 642 F.3d at 1091. The D.C. Circuit addressed whether

"the ATS provide[s] jurisdiction in the district court over a civil action by a[] [noncitizen][3] for torture committed by nonstate actors such as the PLO[.]" *Id.* It applied the two-step analysis provided in *Sosa* and held that allegations of non-state torture were not recognized as violations of the law of nations for claims brought under the ATS. *Id.* at 1094.

Plaintiffs respond that the "Ninth Circuit has recognized that courts have long held that 'not all violations of international law require state actions.'" Dkt. 51 at 19 (quoting *Cisco*, 73 F.4th at 740). Specifically, Plaintiffs contend that the taking of civilian hostages violates the law of war, which is codified in Article 3 of the Geneva Conventions. *Id.*; *see* Geneva Convention I art. 3(1) ("[T]he following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons: . . . taking of hostages[.]"). And Article 3 of the Geneva Conventions "binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents." Dkt. 51 at 20 (quoting *Kadic v. Karadzic,* 70 F.3d 232, 243 (2d Cir. 1995)). This is because the "liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II . . . and remains today an important aspect of international law[.]" *Kadic*, 70 F.3d at 243. Since hostage-taking is prohibited for all parties to an armed conflict—state actors and non-state actors alike—Plaintiffs contend that the amended complaint need not allege state action. Dkt. 51 at 20.

In *Al Sharif*, while the D.C. Circuit held that torture by non-state actors was not actionable under the ATS, it also clarified that "[w]e do not purport to decide that the ATS can create no actions against private actors." 642 F.3d at 1095. The court recognized that "other circuits may have taken a broader view of the governing questions." *Id.* at 1094. For example,

---

[3] This order uses the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578, n.2 (2020).

citing *Kadic*, the D.C. Circuit noted that the Second Circuit "did conclude that a sufficient international consensus existed to support the implication of a claim for relief within the jurisdiction conferred by the ATS for genocide by nonstate actors." *Id.* (citing *Kadic*, 70 F.3d 232). Importantly, the D.C. Circuit pointed out that "*Sosa* makes clear that the analysis of whether 'international law extends the scope of liability . . . to the perpetrator being sued, if the defendant is a private actor' pertains to the 'given norm' being analyzed" and "*Sosa* underscores the context-dependent nature of the ATS analysis." *Id.* at 1095–96 (quoting *Sosa*, 542 U.S. at 732 n.2).

Applying the principles established in *Sosa*, the Ninth Circuit in *Cisco* held that while "certain forms of conduct violate the law of nations only when undertaken by state actors or those acting under color of law . . . not all violations of international law require state action." *Cisco*, 73 F.4th at 740. "Courts have recognized several that do not, including the prohibitions against piracy, the slave trade, and certain war crimes." *Id.* (first citing *Kadic*, 70 F.3d at 239; and then citing *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012)); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1316 (11th Cir. 2008) ("Under the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation.") (citation omitted). Thus, the Court turns to the specific war crime alleged to determine whether state action is required.

The "arbitrary detention of civilians . . . [has] long been recognized in international law as violations of the law of war." *Kadic*, 70 F.3d at 242 (citing *In re Yamashita*, 327 U.S. 1, 14 (1946)). Following World War II, "the law of war was codified in the four Geneva Conventions, which have been ratified by more than 180 nations, including the United States[.]" *Id.* (citation

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 17

omitted). Common Article 3, which appears in all four Geneva Conventions, "applies to armed conflicts not of an international character and binds each party to the conflict," providing that:

> [T]he following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> > (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
> >
> > (b) taking of hostages;
> >
> > (c) outrages upon personal dignity, in particular humiliating and degrading treatment;
> >
> > (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court . . .

*Id.* (quoting Geneva Convention I art. 3(1)).

Here, Plaintiffs allege that Defendants are liable under the ATS for aiding and abetting civilian hostage-taking. Dkt. 41 ¶¶ 2–4, 11–13. Plaintiffs are correct that hostage-taking is prohibited under the Geneva Conventions for state and non-state actors. *See Kadic*, 70 F.3d at 243 ("The offenses alleged by the appellants, if proved, would violate the most fundamental norms of the law of war embodied in common article 3, which binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents."). But Defendants counter that the Geneva Conventions do not apply because "Plaintiffs utterly fail in their Amended Complaint to even try to claim that the alleged violations against them were carried out in the course of any armed conflict." Dkt. 45-1 at 14–15; *see* Dkt. 54 at 11. The Court disagrees. Plaintiffs' amended complaint alleges that each Plaintiff was "abducted during Hamas's October 7, 2023 attack on Israel." Dkt. 41 ¶¶ 11–13; *see id.* ¶¶ 44–49 (describing October 7 as the "deadliest attack on Israel and Jews since the Holocaust"). At this stage, this is sufficient to allege that the kidnapping was carried out during an armed conflict. *See Kadic*, 70

F.3d at 273, 243 (holding that various atrocities committed by insurgent military forces constituted an armed conflict under Article 3 of the Geneva Conventions).

Thus, even though Hamas is not a state actor, because taking civilian hostages is a violation of international law that applies to "all parties," this Court may exercise jurisdiction over Plaintiffs' aiding and abetting claims under the ATS. *See Kadic*, 70 F.3d at 243 ("[U]nder the law of war as codified in the Geneva Conventions, all 'parties' to a conflict—which includes insurgent military groups—are obliged to adhere to these most fundamental requirements of the law of war.").

### D.  Claims Against Individual Defendants

Defendants also argue that the claims against individual Defendants Baroud and Harvey should be dismissed "as they are based upon their conduct as the officers/managers of the People Media Project." Dkt. 45-1 at 19. Defendants argue that "it is the corporation, not its owner or officer, who is . . . subject to vicarious liability for torts committed by its employees or agents." *Id.* (citation omitted). But Plaintiffs are not seeking to hold Baroud and Harvey vicariously liable for Aljamal's actions. They have instead alleged individual claims of accomplice liability under the ATS against each defendant, including Baroud and Harvey. As Plaintiffs correctly point out, "a corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016). And in *Cisco*, although the Ninth Circuit concluded that the complaint in that case did not contain sufficient allegations against the individual defendants, the court did not suggest that individual corporate officer defendants could not be held liable under the ATS. 73 F.4th at 739. At this early stage of litigation, Plaintiffs have plausibly alleged an accomplice liability theory against all three defendants.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY - 19

### E. Defendants' Motion to Stay

Defendants also moved to stay discovery pending the Court's order on the motion to dismiss. Dkt. 46. Since Defendants' motion to dismiss, Dkt. 45, is DENIED, the Court also DENIES the motion to stay as moot, Dkt. 46.

### V. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss (Dkt. 45) is DENIED. Defendants' motion to stay (Dkt. 46) is also DENIED as moot.

Dated this 6th day of May, 2025.

Tiffany M. Cartwright
United States District Judge