1

2

3

4

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

5

6

7

8

9

10

| | |
|---|---|
| ALMOG MEIR JAN, SHLOMI ZIV, and ANDREY KOZLOV, | NO. 3:24-cv-05553-TMC |
| Plaintiffs, | **OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| PEOPLE MEDIA PROJECT, a Washington Non-Profit Corporation, d/b/a PALESTINE CHRONICLE; and RAMZY BAROUD, | *NOTED FOR HEARING:* **December 29, 2025** |
| Defendants. | |

11

12

13

14

15

16

17

18

19

Discovery has revealed extensive evidence that Defendants paid their correspondent, Abdallah Aljamal, despite knowing that he was affiliated with Hamas, thereby aiding him in holding Plaintiffs hostage for almost six months. Aljamal's Hamas connections were not hidden—he repeatedly appeared publicly as a spokesman for the Hamas government and repeatedly posted Hamas military symbols to Facebook and TikTok, including praise of the October 7 attack and a photograph of his pre-teenage son wearing Hamas military symbols and holding a toy gun. And, in the small Gaza refugee camp of Nuseirat, Aljamal's family is well-known for its Hamas connections. Indeed, Aljamal's uncle serves in the Hamas legislature and as a high-level official in the Hamas government.

20

21

22

23

If anyone would know these facts, it is Ramzy Baroud. Baroud was born and raised in Nuseirat, a place where, in his words, people "tend to know each other." He testified that the Aljamal family was well-known in Nuseirat and that he hired Aljamal without vetting him because of the Aljamal family's reputation. Baroud has spent his entire career studying and

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

reporting on Gaza and considers himself an expert on Palestine and Hamas. It is simply implausible that Baroud—who runs a publication that exclusively reports on Palestine—would not know that his most prolific reporter previously served as a spokesman for the Hamas government or that his uncle served at high levels within the Hamas government.

Similarly implausible are Defendants' denials that Palestine Chronicle ever paid Aljamal. Defendants testified that Palestine Chronicle typically pays its writers $100 for "features", which are written exclusively for Palestine Chronicle and contain "human stories" from Gaza. There are multiple examples of Palestine Chronicle paying mere "contributors" who only submitted two or three stories and did not even ask to be paid. Aljamal, by contrast, was one of only two Palestine Chronicle "correspondents," and its most productive Gaza-based reporter, publishing over 100 stories, including "many" features, in just eight months. Defendants insist they agreed with Aljamal at the outset that he would not be paid for his stories. But Defendants have not produced a single record to corroborate this purported agreement—no emails to Aljamal, no texts thanking him for the free labor, no internal notations of which reporters were paid—despite claiming that their regular practice was to put payment agreements in writing.

Defendants' horrendous record-keeping and shifting stories further support the inference that they hid payments to Aljamal because they knew of his terrorist connections. Defendants frequently paid Gaza-based writers by sending payments to the PayPal accounts of third parties, meaning there is no way of determining for sure whether any of Defendants' thousands of PayPal payments were, in fact, intended for Aljamal.

When Plaintiffs discovered a WhatsApp message in which Aljamal provided a PayPal address to Baroud and Palestine Chronicle, Baroud testified that Aljamal had asked for $500

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 2



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

to fund haircuts for Gaza kids but that Baroud declined to contribute. Yet records Plaintiffs subsequently obtained from PayPal—but that were conspicuously absent from Defendants' productions—show that Baroud attempted to pay Aljamal $2,625.86. Baroud now claims the payments were for the haircuts and a "bit more" as "a thank you to Abdallah for all the journalist work." But the memo lines for these attempted payments do not mention haircuts or charity, just "reporting, writing, photos, [and] videos." And it is very difficult to believe that Baroud forgot about this large, attempted payment, given that it occurred just one month before Aljamal's highly publicized death.

Even more suspicious is that the PayPal account where Baroud attempted to send money to pay Aljamal was not Aljamal's account; the account belongs to an activist in Malaysia who was apparently going to forward the money to Aljamal. And, despite Defendants' claims that they always documented the ultimate intended recipients in the memo lines when they paid writers via the PayPal accounts of third parties, PayPal's records contain no indication that the money was intended for Aljamal. This raises a very strong inference that Defendants chose to pay Aljamal through surreptitious methods because they knew of his nefarious connections, and that there may be many more such payments that Plaintiffs have no way of discovering.

Defendants' assistance to Aljamal was not just financial. Defendants publicly promoted Aljamal as a Palestine Chronicle "correspondent" which helped divert suspicion from the Israeli Defense Forces (IDF), which "would hesitate to attack the home of [a Western journalist]." And, while Defendants claim Aljamal was given the title of "correspondent" simply to thank him for his work and assist him in finding other employment, that explanation makes no sense because they admit they never informed him of the title.



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

This Court does not have to accept Defendants' self-serving, shifting, and implausible denials as undisputed facts. There is significant circumstantial evidence that Defendants knew exactly what they were doing and serious questions about the credibility of Defendants' testimony. The Court should deny the summary judgment motion, hear all the testimony, and decide for itself.

## I.    STATEMENT OF OPPOSING FACTS

Plaintiffs submit the following Statement of Opposing Facts to demonstrate that most of the facts Defendants present as undisputed are, in fact, disputed:

**A. Defendant Baroud is the founder of Palestine Chronicle, Its Primary Decision Maker, and an Expert in Palestine, Gaza, and Hamas.**

Defendant Baroud founded Palestine Chronicle in 1999 as "an independent media organization that attempts to communicate a Palestinian message to Americans." Ex. A, Baroud Dep. 20:14–25, 21:4–6.[1] Baroud serves as Palestine Chronicle's Editor-in-Chief, and his responsibilities include hiring and firing decisions, management, financial decisions, and final approval over payments to contractors and employees. Baroud Dep. 23:16–24:1, 25:9–11. Editing of articles and day-to-day management of Palestine Chronicle is handled by its managing editor, Romana Rubeo. Baroud Dep. 22:20–23:2.

Baroud is an expert on Palestinian studies, having dedicated his entire life to the subject. He was born and raised in the Nuseirat refugee camp in Gaza, where he lived until he moved to the United States in 1994 at the age of 22. Baroud Dep. 7:6–20. Defendant Baroud received a Ph.D. from the University of Exeter in 2015 in People's History with a focus on Palestinian History. Baroud Dep. 14:14–19. He has written about Palestine his entire life.

---

[1] All Exhibits, and references to Exhibits, herein are attached to the Declaration of Daniel Bruce in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

Baroud Dep. 10:20–25. He holds a position at the Center for Islam and Global Affairs and previously wrote for Al Jezeera. Baroud Dep. 12:10-16. To perform his duties as Editor-in-Chief of a publication focused on Palestine, Baroud closely follows the news and reads both American and Arabic media. Baroud Dep. 28:5–6.

Baroud considers himself an expert in Palestinian studies, Palestinian government and politics, the Israeli-Palestinian Conflict, Hamas, the Popular Front for the Liberation of Palestine, and the Palestinian Islamic Jihad. Baroud Dep. 14:20–25, 15:20–16:8. Moreover, as a professional journalist, Baroud is "good at assessing people's credibility," adept at "seeing warning signs" and "red flags," and skilled at conducting investigations. Baroud Dep. 189:16–190:1.

### B. Baroud and Aljamal Are Both From Nuseirat—a Small Refugee Camp in Gaza Where People "Tend To Know Each Other."

Nuseirat is a refugee camp that was established in 1948 to house refugees of the 1948 war between Israel and several Arab states. Baroud 114:19–115:11. Among those refugees was Baroud's father. Baroud himself was born in Nuseirat, where he lived until he was 22. Baroud Dep. 7:6–7, 7:21–22. Baroud still has family Nuseirat. Baroud Dep. 37:5–8.

Nuseirat is a compact, tight-knit community of approximately 30,000 people. As Baroud explained it, people living in Nuseirat "tend to know each other" because "they are living in very, very condensed environment, you know, there are very little spaces" and "you don't have the [advantage] of living in a big city where people are so far away from each other." Baroud Dep. 115:14–22. Moreover, "because most of those refugees come from southern Palestine, they tend to know each other because . . . many of them from same clans, families, tribes." Baroud Dep. 115:11–14. Some families are particularly well known in

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Nuseirat, including Baroud's own family and the Aljamal family: "a lot of people knew, you know, the Jamal family, the Baroud family, the Muqaddimah (phonetic) family, and so forth." Baroud Dep. 115:17–20; *see also* Baroud Dep. 116:5–7 ("[T]he Jamal family was a well-known family in Nuseirat? A They are, yes."). Baroud was familiar with the Aljamal family's reputation in Nuseirat, which he testified was very good. Baroud Dep. 116:5–16.

### C. The Aljamal Family Has Well-Known Connections to Hamas.

According to Dr. Matthew Levitt, one of the leading experts on Hamas, even before Abdallah Aljamal was caught holding hostages, the Aljamal family was "well-known," both in Nuseirat and world-wide, for being "tied to Hamas." Ex. B, Expert Report & Decl. of Dr. Matthew Levitt ("Levitt Report") ¶ 78. According to the *Wall Street Journal*, "it was common knowledge in Nuseirat that the Al-Jamal family was close to Hamas," with local residents confirming that the family "had a number of ties to Hamas." Levitt Report ¶ 72 (citing Abeer Ayyoub, *The Hostages Next Door: Inside a Notable Gaza Family's Dark Secret*, WALL ST. J. (June 17, 2024), https://www.wsj.com/world/middle-east/the-hostages-next-door-inside-a-notable-gaza-familys-dark-secret).

Aljamal's uncle, Abdelrahman al-Jamal, is a Hamas member elected to the Palestinian Legislature. Levitt Report ¶ 78 (citing HANDBOOK OF HAMAS PALESTINIAN LEGISLATIVE COUNCIL MEMBERS, WASH. INST. FOR NEAR EAST POLICY 76 (2006), https://www.washingtoninstitute.org/media/7560). Abdelrahman al-Jamal has long been designated a Specially Designated Global Terrorist (SDGT) by the U.S. government, under a list that included persons "identified as members of the Palestinian Legislative Council (PLC) who were elected on the party slate of a Foreign Terrorist Organization." *Id.* Abdelrahman al-Jamal frequently appears publicly with many top Hamas leaders and personnel. *Id.* (citing news



articles showing Abdelrahman al-Jamal with top Hamas leadership at public events in Nuseirat). Abdelrahman al-Jamal served on Hamas Shura Councils at various levels, including the local Shura Council in the Nuseirat refugee camp, at the central governate level in Gaza, all the way to serving as the deputy head of the Hamas Shura Council in the Gaza Strip from 2010 to 2014. Levitt Report ¶ 79. Abdelrahman al-Jamal publicly supports the use of violence against Israel, writing that he "believes that resisting the occupier [Israel] by all means is a right guaranteed to the Palestinian people, guaranteed by divine laws and positive laws, and it is the way to liberation Palestine and expel the occupation from it." *Id.* He was arrested at various times by both Israeli (1989, 1994) and Palestinian Authority (1996) security forces. *Id.*

According to Dr. Levitt, Abdelrahman al-Jamal is well known in Nuseirat and would almost certainly be recognized by someone from Nuseirat or someone with expertise on Hamas local leadership there. Levitt Report ¶ 78. Similarly, Abdallah Aljamal's father, Ahmed, a doctor who lived in the same complex where Abdallah held Plaintiffs hostage, was known to be involved in the leadership of the local al-Farouk mosque in Nuseirat, that is known to be controlled by Hamas and used as a Hamas compound. Levitt Report ¶ 80.

### D. Baroud Hires Abdallah Aljamal *Because of* His Family's Reputation.

Baroud met Abdallah Aljamal through Aljamal's cousin, Yousef Aljamal, whom Baroud hired to work as a "fixer" for the Palestine Chronicle in approximately 2012 or 2013. Baroud Dep. 110:7–24, 112:2–3. As a "fixer," Yousef conducted interviews for Palestine Chronicle, took photographs, and generally served as Baroud's eyes and ears on the ground in Gaza. Baroud Dep. 116:20–117:20. Palestine Chronicle paid Yousef around $250 per month for his services. Baroud Dep. 117:21–23, 120:1–2.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    Baroud became something of a mentor to Yousef; as Baroud explained it, "I come from

2    the Nuseirat refugee camp myself. I was born and raised in Nuseirat. So for young people in

3    Nuseirat, especially those who wanted to achieve something in academia or journalism, or they

4    always look up to me" as "someone from their neighborhood or someone from their refugee

5    camp who, you know, did something with his life." Baroud Dep. 110:20–111:8. Baroud and

6    Yousef met in person at least twice. Baroud Dep. 112:8–13.

7    In 2018 or 2019, Yousef recommended his cousin, Abdallah, to Baroud for a position

8    with the Palestine Chronicle, and reminded Baroud that Abdallah was the son of a well-known

9    doctor in Nuseirat, who had treated Baroud's mother. Baroud Dep. 113:3–22. Baroud did not

10   Google Abdallah Aljamal or review Aljamal's social media before hiring him and later

11   publishing his articles. Baroud Dep. 132:17–19, 142:21–25. Baroud did not "find the reason

12   to do so." Baroud Dep. 143:2. Baroud testified that he "knew everything [he] needed to know

13   about Abdallah . . . through his cousin," Yousef Aljamal, who "vouched" for him. Baroud Dep.

14   133:1–2, 16–17. Baroud did not Google Abdallah, check his social media, or do any other

15   diligence because "for me, I knew everything I needed to know about Abdallah previous to it

16   through his cousin. You know, he's from a general family. He's from Nuseirat. You know, and

17   that's that." Baroud Dep. 133:17–134:4.

18   **E.  Aljamal Was Open About His Connections to Hamas**

19   Abdallah Aljamal's connections with Hamas were easily accessible to anyone who

20   cared to check. Dr. Levitt concluded that Abdallah Aljamal "was open about his affiliation

21   with the terror group, appearing publicly in Arabic media as a spokesperson and posting Hamas

22   graphics and photos of his son wearing a Hamas headband on social media." Levitt Report

23   ¶ 71 (quoting Luke Tress, *US Judge Says There's Reason to Believe US-based Media*



*Nonprofit Aided Hamas*, TIMES OF ISRAEL (May 9, 2025), https://www.timesofisrael.com/us-judge-says-theres-reason-to-believe-us-based-nonprofit-aided-hamas/). The Hamas headband is highly recognizable symbol worn by Hamas members and supporters, which includes Hamas's logo featuring Jerusalem's al Aqsa Mosque and a rifle, and the name of Hamas' military wing, the Qassam Brigades. *Id.* Dr. Levitt reviewed Aljamal's social media profiles and confirmed that the headband worn by Aljamal's son in Aljamal's June 6, 2023, Facebook post is a headband typically worn by Hamas and its supporters.[2]  Here is the image:[3]



On October 7, 2023, the same day Plaintiffs were taken hostage, Aljamal posted the following on Facebook and TikTok: "Praise be to God…Oh God, guide us…Oh God, guide us…Oh God, guide us…Oh God, grant us the victory you promised." Levitt Report ¶ 74.

Baroud testified that he never saw any pro-Hamas Facebook posts from Aljamal, even though the two were Facebook "friends" and Aljamal once publicly wished Baroud "happy birthday" on Facebook. Baroud Dep. 148:3–16. Similarly, Baroud testified he never viewed

---

[2] When shown this photo at his deposition, Baroud admitted it "could be a Hamas headband," but then testified implausibly that he could not tell. Baroud Dep. 155:15–19. Rubeo recognized that the headband resembled the headbands worn by the al-Qassam fighters, the armed wing of Hamas. Ex. C, Rubeo Dep. 98:2–11.
[3] The full Facebook post is attached as Exhibit D.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 9



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

Aljamal's TikTok, even though Baroud is active on TikTok, amassing over 20,000 followers and checking his account daily. Baroud Dep. 157:17–158:6.

Abdallah Aljamal served as the spokesperson for the Hamas government's Ministry of Labor in Gaza, acting as the public face of this official Hamas office. Levitt Report ¶ 76. In this capacity, Aljamal was responsible for communicating with the public about administrative affairs of the Hamas government. *Id.* On February 17, 2022, Abdallah spoke to Palestine Online as "the spokesperson for the Ministry of Labor in the Gaza Strip," announcing the Ministry's efforts to secure permits for Gazans to work in Israel. *Id.* In the interview, Aljamal described the negotiation process which took place with "the occupation" (i.e., Israel) and informed Gazans where to register for permits to work in Israel. *Id.* Two videos posted on the Hamas Labor Ministry's YouTube channel show Abdallah interviewing students graduating from Gaza's Northern Vocational Training Center. *Id.*

According to Dr. Levitt, "[f]or an individual to serve in a prominent, public-facing role such as spokesperson at a Hamas government ministry, that person would have to be a Hamas member or supporter." Levitt Report ¶ 77. The *New York Times* reported that Aljamal also wrote for the *Palestine Now*, described as a "Hamas-affiliated news agency," according to the Media Office of the Hamas government in Gaza. Levitt Report ¶ 75.

According to Stephen Wilcox, a preeminent expert on international sanctions and export controls compliance with 30+ years of experience in industry and government, Aljamal's Hamas connections were easily discoverable through basic open-source research. Basic Google searches revealed substantial public information regarding Aljamal's connections to Hamas. Ex. E, Expert Report of Stephen A. Wilcox ("Wilcox Report") at 18. English language internet searches revealed a Facebook video in which Aljamal was referred



to as the spokesperson of Hamas's Ministry of Labor. *Id.* Arabic language searches revealed numerous articles and videos from 2021 and 2022 identifying Aljamal as a Hamas spokesperson. *Id.* at 18–19.

**F. Aljamal Became Palestine Chronicle's Most Prolific Writer and Was Promoted to Correspondent.**

Abdallah Aljamal's work for Palestine Chronicle began with photography but, by 2019, he was publishing articles. Baroud Dep. 108:20–23, 110:5–6. His publications increased exponentially after October 7, 2023, and he published over 100 articles between October 2023 and his death. Baroud Dep. 165:3–7. Aljamal was Palestine Chronicle's "most active" Gaza-based writer, with no other writers "publishing as often." Baroud Dep. 165:3–15. According to Palestine Chronicle's Managing Editor, Romana Rubeo, the volume of his content was "[a]bsolutely disproportionate" to Palestine Chronicle's other writers. Ex. C, Rubeo Dep. 87:11–13.

"Many" of Abdallah Aljamal's articles were considered "features" for Palestine Chronicle. Rubeo Dep. 34:12–14; Baroud Dep. 164:3–7. Between October 2023 and his death in June 2024, Defendants communicated with Abdallah Aljamal daily via WhatsApp. Baroud Dep. 127:3–4. Al-Jamal even co-authored an article for Al-Jazeera with Baroud. Baroud 135:6–25; Ex. F. The article reports an interview that Aljamal conducted with a confessed attempted suicide bomber who had been trained by a terrorist group. Baroud Dep. 137:9–14, 138:1–17, 140:23–141:3. Baroud did not question how Aljamal was able to obtain that interview. Baroud Dep. 140:23–141:3.

Abdallah Aljamal was one of only two individuals who Palestine Chronicle awarded the title, "Correspondent," whereas all other writers were "contributors." Baroud Dep. 44:20–

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

21; Rubeo Dep. 31:16–32:6. According to Baroud, he gave Aljamal this title "because he *wasn't* getting paid" and "as a way of saying thank you for . . . the stuff that you're sending . . . for free . . . with the hope that this was going to help him try to locate work elsewhere." Baroud Dep. 45:10–46:3. "I just felt like we needed to do something to give him," Baroud explained, "some sort of a reason to continue doing this, because we were desperate for content from Gaza." Baroud Dep. 45:20–24. The title, "Correspondent," "gives you a certain kind of credibility," Baroud Dep. 51:12, and "allows that person to kind of take that title" and go to another organization with "a certain kind of validation." Baroud Dep. 45:10–14. But no one ever told Aljamal that he was given the title of "Correspondent" or that it was a thank you for his unpaid labor. Baroud Dep. 47:2–8 ("Q Would there be any written message that you sent to Aljamal or anyone else to tell them thank you for your work? You know, it's voluntary, but thank you. And we're giving you this title. A No, not the title. For sure, not the title."); Baroud Dep. 46:5–21; Rubeo Dep. 32:15-33:1.

According to Dr. Levitt, Aljamal's title would have been an asset for Hamas: "The home of a journalist with many publications in western media outlets would be a particularly attractive location for Hamas to hold hostages because Hamas would reasonably believe that Israel would hesitate to attack the home of such a person, given the public relations risk of doing so." Levitt Report ¶ 64.

The day after Plaintiffs were rescued and Aljamal was killed, someone changed Aljamal's title on Palestine Chronicle's website from "correspondent" to "contributor." Baroud testified that he did it. Baroud Dep. 141:22–25, 142:18–20. Rubeo testified that she was the one who changed Aljamal's title and that she decided to do so on her own, without Baroud's involvement. Rubeo Dep. 99:8–24.



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

### G. Palestine Chronicle Frequently Compensated Its Contributing Writers, Even New Writers Who Did Not Even Ask to Be Paid.

Palestine Chronicle typically pays contributors $100 per article "for features that are written exclusively for the Palestine Chronicle," Baroud Dep. 31:23–32:6, although these payments are reportedly only for "features that we deem important," Rubeo Dep. 26:17–19. When asked how Palestine Chronicle "decide[s] which features are deemed important and should be paid for," Rubeo explained that it's her "discretional editorial decision," but "the important thing is the human touch on stories . . . human stories from Palestine and Gaza." Rubeo Dep. 27:13–23; *id.* 34:3–14 ("[W]e do not compensate for merely news stories, but features that have to have an angle, some interviews with somebody, so it becomes, like, a story of interest, of human interest."). If a contributor submitted a feature that did not meet the standard for payment, it would not be published at all: "[i]f we publish it, we pay, otherwise we don't publish it." Rubeo Dep. 28:9–10.

When shown several emails in which Palestine Chronicle paid new contributors who did not even ask to be paid, Rubeo was unable to identify anything exceptional about those articles. Rubeo Dep. 69:13–71:21 ("Why did you decide to pay Noor for this article? . . . the editorial criteria [had been] met for us to decide to publish the article. Q And you felt that she met the criteria here? A Yes. Q Did she ask to be paid? A No."); Rubeo Dep. 72:9-20 ("Why was Ms. Skaik being paid $200? A I think it was for two articles. No, I'm sure was for two articles. Q Okay. And I assume you made the determination that she met the editorial criteria? A Yes. Q And what was it about her work that met that criteria, do you recall? . . . It is a story that has a human interest and it fit our editorial guidelines"); Rubeo Dep. 78:10-17 ("Why did


TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

you decide to pay Taqwa? . . . A Because she met the criteria. Q Did Taqwa ever ask to be paid before this point? A No.").

### H. When Palestine Chronicle Did Not Intend To Pay for Content, It Made That Clear To the Author Before Publication.

"[I]f someone submits an article" that Palestine Chronicle does not intend to compensate, "we will let them know in advance that . . . we cannot pay, we cannot afford [to] pay[]." Baroud Dep. 33:11–34:4. Baroud instituted this policy because "on multiple occasions" and in his previous jobs "there's some confusion, maybe people expected to get paid more" and "you don't want the negotiations over money to start once the article is published" and "[s]o we try to clarify things to them from the [outset]." Baroud Dep. 33:21–34:4; *see also* Baroud Dep. 34:18–25 ("[W]hy would it be important to make it clear to them before they publish that they're not going to get paid? A Well, again, because, you know, you just don't want anyone to have certain expectations. And then once the article is published, they make the discovery that we are not paying publication. So just to avoid misunderstandings and that sort of thing."); Baroud Dep. 35:7–11 ("I know from my experience as a journalist for many years, that this, the issue regarding payment is critical to be communicated from the editor to writers anywhere."); Rubeo Dep. 47:2–4 ("[W]e tell the author in the beginning that there will be some kind of compensation"). Palestine Chronicle's discussion with its writers regarding payment would typically be in wring. Rubeo Dep. 24:2–5.

### I. There Is No Written Communication Acknowledging that Aljamal Was Providing Over 100 Articles for Free.

Defendants have repeatedly claimed that Aljamal was not paid for any of his 100 articles. According to Defendants, when Aljamal sought to increase his publications with Palestine Chronicle after October 7, 2023, "we agreed, with the understanding that the



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  Palestine Chronicle is a small organization with a very limited budget, and is unable to pay for

2  most of the content it receives." Ex. G, Response to Interrogatory 18. In response, "Mr. Aljamal

3  insisted that money was not an object, and that perhaps could have been discussed at a later

4  stage." *Id.*

5      Yet, Defendants failed to produce a single piece of paper to corroborate its alleged

6  agreement with their most prolific writer to work for free. No email to Aljamal confirming the

7  arrangement; no WhatsApp chat or voice note thanking him for the free labor; no messages

8  between Baroud and Rubeo remarking on how lucky they are to get free labor; no internal

9  records recording which writers were owed payment and which were not. There is not "any

10 written communication from anyone at Palestine Chronicle acknowledging to Aljamal that he

11 was providing content voluntarily." Baroud Dep. 49:9–50:8, 123:23–124:2.

12 **J.  Palestine Chronicle's Financial Record-Keeping Is Abysmal.**

13     Palestine Chronicle pays its writers exclusively via PayPal. Baroud Dep. 37:24–38:1;

14 Rubeo Dep. 34:15–17.[4] This is apparently because Baroud believes that payments from

15 traditional banks cannot be initiated online. Baroud Dep. 38:2–10 ("Why PayPal rather than a

16 traditional bank? A Well, because John, our administrative person, he's a volunteer. And . . . I

17 can't have him go to the bank . . . every other day to pay someone . . . So we thought PayPal

18 is the easiest way of doing it."). Baroud also likes PayPal because "you have to have a very

19 clean record regarding these things, especially [when] you're dealing with issues that could be

20 considered controversial from some people's point of view." Baroud Dep. 38:3–16.

21

22

23 ―――――――――――――――
[4] Palestine Chronicle uses its U.S.-based PayPal account that is linked to Palestine Chronicle's Washington-based
bank account to pay its writers. Baroud Dep. 40:13–17. Baroud is "usually the one who makes the transfers," and
"most of these transactions happen when [he is] in Washington State." Baroud Dep. 41:13, 42:1–3.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 15

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Beyond the records automatically generated by PayPal itself and rudimentary accounting spreadsheets, Palestine Chronicle did not keep any records of payments. Baroud Dep. 68:25–69:5; Rubeo Dep. 30:5-7 ("all the information that are there, are in the PayPal documents that we provided, because there's nothing aside from that."). Beyond that, Palestine Chronicle's only records of which writers were paid and which were volunteers was Rubeo's "good memory." Rubeo Dep. 28:23–29:6; *see also id.* 46:5–13 ("So, each month when you're trying to decide who you have to pay, how do you know which writers have an agreement to be paid versus which writers have agreed to work voluntarily? A That's something I remember."). While Rubeo does keep "a Google doc just for my eye, for my use only" tracking which writers are owed payment, *id.* at 28:23–29:6, that document was not produced because Rubeo deletes it every month. Rubeo Dep. 45:23–25 ("Q And why do you delete those names every month? A Because it's just personal notes.").

**K. Palestine Chronicle Frequently Pays Gaza-Based Writers Through the PayPal Accounts of Third Parties.**

Palestine Chronicle frequently pays its Gaza-based writers via PayPal accounts that belong to third parties. Baroud Dep. 59:1–19, 60:21–61:7, 63:25–64:1. Rubeo testified that Palestine Chronicle began doing so to circumvent PayPal's policy of blocking direct payments to Gaza. Rubeo Dep. 52:13–16, 53:18–54:1. Neither Baroud nor Rubeo ever asked writers why they could not be paid via a PayPal account in their own name. Baroud Dep. 62:5–10. Nor did they conduct any investigation to determine who the third-party payees actually were. Baroud Dep. 63:1–19. But they insisted that when they pay a writer via a third party's PayPal account, they note in the memo line the identity of ultimate payee and the reason for the payment. Baroud Dep. 59:1–6, 60:21–61:7, 67:12–18; Rubeo Dep. 54:21–55:25. Beyond the comment


TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

section of PayPal, Palestine Chronicle keeps no other records memorializing the intended recipients of payments it makes to writers through third party PayPal accounts. Baroud Dep. 68:25–69:5.

### L. Defendants Provided Conflicting Testimony on When Palestine Chronicle Started Paying Gaza-Based Writers.

Baroud testified that Palestine Chronicle has paid writers located in Gaza through PayPal since at least September 2023. Baroud Dep. 56:9–19. Rubeo, by contrast, testified that Palestine Chronicle only began compensating Gaza-based writers in May or June 2024. Rubeo Dep. 26:13–14, 51:3–4. Before that, according to Rubeo, "it was impossible [to pay Gaza-based writers] because of the conditions of the banking system in Gaza." Rubeo Dep. 49:23–25. In May 2024, according to Rubeo, Gaza-based writers "started having access to PayPal accounts and they communicated it to us." Rubeo Dep. 50:16–19. In connection with Defendants' summary judgment motion, Rubeo submitted an affidavit now claiming that Palestine Chronicle did not pay any Gaza-based writers until July 2025 [Dkt. 80-1 at 3]. But that is objectively false. Rubeo testified about several payments to Gaza-based writers that were detailed in emails before July 2025. Rubeo Dep. 74:21, 75:10.

### M. Defendants Conducted Little Due Diligence Before Sending Money into Gaza.

Sometimes, but not always, Palestine Chronicle would Google a writer who did not have a fully developed biography or look at that person's social media accounts. However, Palestine Chronicle primarily Googled writers only to determine whether they had been previously published. Baroud Dep. 81:17–25, 82:16–25, 84:7–9; Rubeo Dep. 62:8–24. Besides reviewing a writer's self-reported biography and occasionally Googling the writer or looking at their social media, Palestine Chronicle took no additional steps to verify the identities of its



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Gaza-based writers, or to confirm that the writers were not affiliated with Hamas. Baroud Dep. 90:20–24. Palestine Chronicle does not keep written records of what to look for when vetting writers and does not have a written policy of what due diligence it takes to ensure that none of its writers are affiliated with Hamas. Baroud Dep. 84:15–19, 91:1–3. Palestine Chronicle does not require writers to provide a government I.D., tax I.D. number, date of birth, or physical address before making a payment to writers. Baroud Dep. 92:18–93:15. And Palestine Chronicle typically did not take basic steps, such as Googling Gaza-based writers or checking their social media, to determine whether its Gaza-based writers had red flags that could indicate a Hamas-connection.

Rather, "the fact that a certain person ... has a bio where that person is already published in respective media, we immediately assume that that person is safe." Baroud Dep. 79:18–80:25. "[W]hen someone sends me an email and he says, this is the email I would like you to use to send me that payment. I don't ask, where did you open it? Were you in Gaza? Were you in Ramallah? Were you in Cairo? Just that's the email and we use it and we send the money." Baroud Dep. 58:4–9. When a writer represented that a third-party PayPal account belonged to a friend or relative, Baroud conducted no investigation or due diligence to determine who this third party was, whether they were associated with Hamas or groups that facilitate money laundering or sanctions-evasion, or whether the account even actually belonged to the third person the writer identified. Baroud Dep. 61:4–7, 62:5–22, 63:1–19.

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

**N. Defendants Attempted to Pay Abdallah Aljamal at Least $2,625.86 for "Editing Articles," "Writing," and "Reporting," Through a Third-Party PayPal Account, Less Than One Month Before His Death, While He Was Still Holding Plaintiffs Hostage.**

On May 16, 2024, Aljamal sent Defendants a message on WhatsApp containing information through which to pay him on PayPal: "PayPal email is hslibrarygaza@gmail.com." Ex. H; Rubeo Dep. 105:22–24. When asked about this message at his deposition, Baroud explained that Aljamal had asked for $500 to provide haircuts to children in Gaza, but "I told Romana [Rubeo] not to do that because that kind of falls outside the nature of our work." Baroud Dep. 180:5–15. Rubeo initially testified that there was discussion about perhaps paying $200 to support Aljamal's haircut charity, but there was never any agreement and that was "the only time where we spoke about payments." Rubeo Dep. 90:10–20; 92:7–93:3.

Yet, records produced by PayPal in response to a third-party subpoena after Baroud's deposition indicate that Palestine Chronicle initiated four payments to the hslibrarygaza@gmail.com PayPal account on May 16 and May 17, 2024, around the same time Aljamal requested to be paid through that account [Dkt. 80-2 at 6]. The records reflect that the hslibrarygaza@gmail.com PayPal account is owned by an individual named Normah Hashim [Dkt. 80-2 at 6]. These payments were not reflected in any of the financial records Defendants produced to Plaintiffs. Excluding one of the payments, which appears to be a duplicate, the payments totaled $2,625.86 [Dkt. 80-2 at 6]. There is also a "test" payment for approximately $1.00 to what appears to be Normah Hashim's personal PayPal account [Dkt. 80-2 at 6].

According to the memo line of each payment, one payment on May 16, 2024, for $1,167.15 was for "reporting, writing, photos, [and] videos." [Dkt. 80-2 at 6]. The other

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

payment on May 16, 2024, for $486.31 was for "writing." [Dkt. 80-2 at 6]. And the payment (excluding the duplicate) on May 17, 2024, for $972.40, was for "editing articles." [Dkt. 80-2 at 6]. None of the memo lines indicated the payments were for Aljamal or for a haircut charity project [Dkt. 80-2 at 6]. Except for the $1 test payment, the payments were ultimately denied by PayPal [Dkt. 80-2 at 6]. The hslibrarygaza@gmail.com PayPal account is owned by Normah Hashim and based in Malaysia [Dkt. 80-2 at 6]. Hashim is an activist with no connection to the Palestine Chronicle. Rubeo Dep. 109:22-110:8. Baroud has now submitted an affidavit, explaining he attempted to send money to Hashim to be forwarded to Aljamal for Aljamal's charity and "a bit more money above that necessary for the haircut project as a thank you to Abdallah for all the journalist work he had been doing for free." [Dkt. 80-2 at 4].

Contrary to Defendants' stated practice, there is nothing in the memo/comment line of PayPal's records indicating that Palestine Chronicle's attempted payments to the hslibrarygaza@gmail.com PayPal account were actually intended for Aljamal. Because Defendants did not disclose these payments, Plaintiff was not able to obtain any discovery into Baroud's conversations with Hashim or the nature of her agreement to serve as a cutout to help Palestine Chronicle funnel money to Aljamal in Gaza. Plaintiffs may need to file a motion for limited discovery into this question.

### O. While in Captivity, Plaintiffs Observed Aljamal Admit That He Was a Hamas Operative, Write Regularly on a Laptop, and Use Large Sums of U.S. Dollars in Cash.

Just like Aljamal did not hide his Hamas affiliations online, he did not hide them while he held Plaintiffs captive either. While he held them captive, Aljamal openly admitted he was a member of Hamas, that he was "proud of it," and that his house was associated with Hamas. Ex. I, Ziv Dep. 59:19–24; Ex. J, Kozlov Dep. 44:5–6, 45:4–9, 47:24, Ex. K, Jan Dep. 21:19–

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 20



20. Plaintiffs also observed Aljamal with large sums of cash. Ziv Dep. 62:3–6; Kozlov Dep. 45:18–46:12; Jan Dep. 22:2–5, 43:11–15. The money was used to purchase supplies from the market. Jan Dep. 43:22–44:5. Aljamal's family was complicit in the hostage-holding; Aljamal's father, the doctor, also treated Plaintiffs while they were being held hostage and appeared to live in the same building. Kozlov Dep. 59:11–18, 65:6–22; Jan Dep. 34:23–35:4. Aljamal rarely left the apartment during the time he was holding Plaintiffs hostage, and Plaintiffs observed Aljamal regularly writing on a laptop. Kozlov Dep. 38:21–39:4, 45:15–19; Jan Dep. 32:18–22. Dr. Levitt concluded that any money Aljamal received would have helped fund his ability to hold hostages in his home, including payments for rent, food, clothing, medicine, and other basic provisions needed to keep hostages alive, secured, and concealed. Levitt Report ¶ 81. This is because, in the wake of the October 7 attack, Hamas was denied significant income streams and suffered a cash crunch. *Id.*

## II.    SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is appropriate only if...there is no genuine issue of material as to any material fact." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540 (9th Cir. 1989). The court must "view[] the evidence in the light most favorable to the nonmoving party." *Hansen v. United States*, 7 F.3d 137, 137 (9th Cir. 1993). "[S]ummary judgment is singularly inappropriate where credibility is at issue." *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978).

TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1

### III.     ARGUMENT

2

**A. There is a genuine dispute of material fact about whether Defendants compensated Aljamal.**

3

Defendants insist they never paid Abdallah Aljamal. But PayPal records demonstrate—

4

and Defendants now admit—that they attempted to pay Aljamal more than $2,500. *Supra* §

5

I.N. These attempted payments came immediately after Aljamal provided Defendants with a

6

third-party PayPal account through which to pay him. *Id.*

7

Defendants' late-breaking attempt to get their story straight regarding these payments

8

demonstrates that Defendants' credibility will play a major role in whether a factfinder could

9

find by a preponderance of the evidence that Defendants paid Aljamal. Initially, Baroud

10

testified that Aljamal sent his PayPal information in order for Palestine Chronicle to contribute

11

$500 to Aljamal's haircut charity initiative, but that he declined to fund the project because it

12

fell "outside the nature of our work" and "wasn't our thing." *Id.* Baroud now claims that he did

13

agree to donate to Aljamal's haircut initiative and "added a bit more money above that

14

necessary for the haircut project" to compensate Aljamal for his publications. *Id.*

15

Baroud's newfound explanation still does not add up. Baroud wrote in the memo line

16

that each payment was for "reporting, writing, photos, [and] videos," "writing," and "editing

17

articles." *Id.* Conspicuously absent is any mention of a haircut charity project. And, the total

18

amount of the attempted payments—more than $2,500—is substantially more than the few

19

hundred dollars Aljamal requested for the project. The attempted payments also departed from

20

Palestine Chronicle's claimed practice of always noting the intended recipient and description

21

of services when paying someone through a third party's PayPal—none of the payments

22

mentioned Aljamal or a charity project. *Id.* Either Defendants lied about their PayPal practice,

23

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    or they intentionally departed from that practice to hide the fact they attempted to make a

2    payment to Aljamal. Defendants have not explained why they have no record of this payment,

3    nor how Baroud could have forgotten about his attempt to pay Aljamal such a large sum of

4    money just one month before Aljamal's highly-publicized death.

5          This behavior supports an inference that Palestine Chronicle paid Aljamal

6    surreptitiously because they knew of his Hamas connections. *See United States v. Wagner*, 834

7    F.2d 1474, 1484 (9th Cir. 1987) (attempt to suppress evidence probative of consciousness of

8    guilt); *United States v. Jarmillo-Suarez*, 950 F.2d 1378, 1385 (9th Cir. 1991) (concealment of

9    evidence may indicate consciousness of guilt and "should be placed before the trier of fact").

10   Moreover, Baroud's attempt to pay Aljamal thousands of dollars for his "writing"—when

11   Aljamal did not even request it—is highly inconsistent with Aljamal's alleged agreement to

12   work for free. The factfinder is best positioned to make a credibility determination as to

13   Defendants' shifting narratives. *See Koracorp Indus.*, 575 F.2d at 699.

14         Despite Defendants' claims that they recorded the intended recipient in memo line of

15   every PayPal payment sent through a third-party PayPal account, they failed to do so with the

16   one set of payments to Aljamal that Plaintiffs happened to have discovered. *Supra* § I.N. This

17   undermines the integrity of the entirety of Defendants' financial record-keeping and strongly

18   suggests Defendants were attempting—likely successfully—to pay Aljamal surreptitiously

19   through third parties in third countries without leaving any record whatsoever. Again, a

20   factfinder is best positioned to make this determination. *See Johnson v. Paradise Valley*

21   *Unified Sch. Dist.*, 251 F.3d 1222, 1228–29 (9th Cir. 2001) ("[T]he factfinder is entitled to

22   consider a party's dishonesty about a material fact as affirmative evidence of guilt." (quoting

23   *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000))); *In re JDS Uniphase Corp.*

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 23



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

1    *Sec. Litig.*, 238 F. Supp. 2d 1127, 1135–1136 (N.D. Cal. 2002) ("Where conduct of a party

2    tends to preclude availability of information relevant to a litigation...a court or factfinder may

3    infer that the information, if disclosed, would be contrary to the position of the party engaging

4    in such conduct.").

5        Defendants' claim that they never paid Aljamal has never made sense. Defendants

6    admit Aljamal was a prolific contributor whose volume of contributions was "[a]bsolutely

7    disproportionate" to Palestine Chronicle's other writers. *Supra* § I.F. Defendants further admit

8    that Aljamal's articles were the same types of "features" for which they regularly paid other

9    writers—even those who wrote just two or three stories and did not even ask to be paid. *Id.*

10    And Defendants' failure to document Aljamal's alleged agreement to work for free—despite

11    their policy of documenting payment agreements and their strong incentive to document such

12    an agreement—supports an inference that no such agreement existed. *See Wagner*, 834 F.2d at

13    1484; *Johnson*, 251 F.3d at 1228–29.

14    **B. There is a genuine dispute of material fact about whether Defendants knew
        Aljamal was a Hamas operative.**

15        Plaintiffs must show Defendants had "actual knowledge" that Aljamal was associated

16    with Hamas [Dkt. 40 at 15–16; Dkt. 55 at 8]. "The knowledge *mens rea* standard is satisfied

17    when a defendant acts...with awareness of a substantial likelihood that the defendant's acts

18    would assist the commission of a crime." *Doe v. Cisco Sys.*, 73 F.4th 700, 734 (9th Cir. 2023)

19    (cleaned up). That said, "[i]t is not necessary that the aider or abettor know the precise crime

20    that was intended and was in fact committed" so long as the aider and abettor "is aware that

21    one of a number of crimes will probably be committed, and one of those crimes is committed."

22    *Id.* (quotations omitted); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 495 (2023) ("Aiding

23

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 24

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

and abetting does not require the defendant to have known all particulars of the primary actor's plan." (Quotations and citation omitted)). Moreover, "when ongoing abuses are common knowledge," as Hamas's holding of hostages in Gaza was, "knowing action may be imputed to the defendant." *Id.* (quotations omitted).

### 1. A factfinder could determine that Defendants had actual knowledge that Abdallah Aljamal was Hamas.

There is extensive evidence from which a factfinder could determine that Defendants had actual knowledge that Aljamal was associated with Hamas, despite their assertions to the contrary. Aljamal's Hamas connections were no secret—he openly posted about them on social media and appeared in Arab media as a spokesperson for Hamas's Ministry of Labor. *Supra* § I.E. Aljamal's family also has well-known ties to Hamas: his uncle is a prominent member of the Hamas legislature. *Supra* § I.C. It is beyond implausible that Baroud—an expert in Palestinian politics and reporter on Gaza—would be unaware of Aljamal's position with Hamas's Ministry of Labor or his family's well-known connections to Hamas. *Supra* § I.A. Indeed, Baroud hired Aljamal *because of* his family's reputation. *Supra* § I.D.

A factfinder could reasonably determine from Baroud's connections to Abdallah Aljamal's family that Baroud had actual knowledge that Aljamal was a Hamas associate. Baroud was born and grew up in Nuseirat—the same refugee camp in Gaza that Aljamal is from and in which Aljamal held Plaintiffs hostage—where people "tend to know each other." *Supra* § I.B. Baroud has known and employed Abdallah Aljamal's cousin, Yousef Aljamal, since approximately 2012 or 2013. *Supra* § I.D. Baroud also knows Abdallah Aljamal's father, who helped his son hold Plaintiffs hostage. *Id.*



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

Any claims that Baroud was unaware of Aljamal's position with the Hamas government or his family's ties to Hamas is implausible. Baroud is an expert in Palestinian politics and runs a media outlet exclusively focused on Gaza. As part of his duties at Palestine Chronicle, he closely follows the news and reads both American and Arabic media. *Supra* § I.A. As the reports of Dr. Levitt and Mr. Wilcox make clear, both American and Arabic media were replete with reports of Aljamal's Hamas connections. *Supra* § I.E.

> ### 2. At minimum, a factfinder could determine that Defendants were willfully blind to the fact that Abdallah Aljamal was a Hamas operative, which is sufficient to prove actual knowledge.

A factfinder could also determine that Defendants were, at minimum, willfully blind to the fact that Aljamal was associated with Hamas. The Ninth Circuit has consistently held that willful blindness is sufficient to demonstrate knowledge, across various contexts. *See Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1001 (9th Cir. 2023); *United States v. Jewell*, 532 F.2d 697, 701 (9th Cir. 1976). Willful blindness requires (1) subjective belief that [unlawful activity] likely was occurring and (2) deliberate actions to avoid learning about the" unlawful activity. *Y.Y.G.M. SA*, 75 F.4th at 1001 (cleaned up). In other words, the defendant must take "active steps to avoid acquiring knowledge," *id.* (citation omitted), or act with "a conscious purpose to avoid learning the truth," *Jewell*, 532 F.2d at 701.

A factfinder could reasonably determine that Defendants took deliberate actions to avoid learning about Aljamal's connections to Hamas. Defendants perform little to no due diligence on Gaza-based writers before publishing and compensating them for their content. While Defendants sometimes Google writers to determine whether they have been published before, they do not regularly check writers' social media accounts or perform any other background checks. *Supra* § I.M. When making payments through third-party PayPal



accounts, Defendants perform little to no due diligence to verify whether the recipient of the funds has any connection to Hamas. Palestine Chronicle does not require writers to provide a government I.D., tax I.D. number, date of birth, or physical address before making a payment to writers. *Id.* Palestine Chronicle also does not keep written records of what to look for when vetting writers and does not have a written policy to ensure that none of its writers are affiliated with Hamas. *Id.* Baroud says he did not Google Abdallah Aljamal or review Aljamal's social media, relying instead solely on the recommendation from Yousef Aljamal and the Aljamal family reputation, such as it is. *Supra* § I.D. This is more than enough to conclude that Defendants intentionally avoided conducting even minimal industry standard due diligence on Aljamal because they did not want to learn of his Hamas connections. *See Knapp v. Gomez*, No. CV 87-0067, 1993 U.S. Dist. LEXIS 8577, at *19–21 (S.D. Cal. May 5, 1993) (failure to follow industry standards may suggest willful blindness).

### C. There is a genuine dispute of material fact about whether any compensation Defendants knowingly paid Aljamal had a substantial effect on Aljamal's ability to hold Plaintiffs hostage.

Finally, there is sufficient evidence from which a factfinder could determine that any compensation Defendants paid Aljamal substantially effected his ability to hold Plaintiffs hostage. Defendants primarily argue there is no substantial effect because there is no payment. However, as discussed above, there is a genuine issue of material fact about whether Defendants paid Aljamal. If a factfinder determines that Defendants paid Aljamal, there is also sufficient evidence to determine such compensation substantially effected his ability to hold Plaintiffs hostage.

In assessing the effect of Defendants' assistance, a factfinder must consider the "cumulative contribution" made to the alleged violation, not whether each individual act had



1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    substantial effect. *Doe*, 73 F.4th at 725–26. "[A]n actor may have a substantial effect on the

2    perpetration of international law violations by [providing assistance] that enhances the capacity

3    of the principal to coordinate and facilitate operations in which crimes are committed." *Id*. at

4    726. Further, assistance does not "need to be used for exclusively criminal purposes to be

5    actionable." *Id*. at 728–29.

6        While being held hostage in Aljamal's home, Plaintiffs routinely observed him carrying

7    large sums of cash that he used to pay for various items. *Supra* § I.O. Plaintiffs were provided

8    with food, water, and occasional medicine, which required money. *Id.* Aljamal rarely left the

9    apartment while he held Plaintiffs hostage and regularly typed on a laptop, suggesting he

10   derived his income from whatever he was typing. *Id.* Dr. Levitt concluded that any money

11   Aljamal received would have helped fund his ability to hold hostages in his home, including

12   payments for rent, food, clothing, medicine, and other basic provisions needed to keep hostages

13   alive, secured, and concealed. *Id.* This is because, in the wake of the October 7 attack, Hamas

14   was denied significant income streams and suffered a cash crunch. *Id.*

15       Defendants' substantial assistance to Aljamal was not just financial. Baroud repeatedly

16   testified that writing for an outlet like the Palestine Chronicle provides writers with

17   "credibility." *Supra* § I.F. Indeed, Baroud's stated purpose for promoting Aljamal to the title

18   of "correspondent" was to increase his credibility and public persona as a journalist with a

19   western publication. *Id.* Dr. Levitt notes, "[t]he home of a journalist with many publications in

20   western media outlets would be a particularly attractive location for Hamas to hold hostages

21   because Hamas would reasonably believe that Israel would hesitate to attack the home of such

22   a person, given the public relations risk of doing so." *Id.* Accordingly, there is sufficient

23   evidence for a factfinder to determine that any compensation paid to Aljamal, as well as

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 28


TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

Aljamal's position and title with the Palestine Chronicle itself, substantially effected his ability to hold Plaintiffs hostage.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment so that it can hear all the evidence and decide the facts for itself.

This Opposition contains 8,373 words, in compliance with Local Civil Rules.

DATED this 22nd day of December 2025.

*/s/ DRAFT*
Aric S. Bomsztyk, WSBA #38020
Blair M. Russ, WSBA #40374
1000 Second Avenue, Suite 3660
Seattle, WA 98104
Telephone: (206) 621-1871
Facsimile: (206) 621-9907
asb@tbr-law.com
bmr@tbr-law.com

Mark Goldfeder (*pro hac vice*)
NATIONAL JEWISH ADVOCACY CENTER, INC.
THE INTERNATIONAL LEGAL FORUM
1718 General George Patton Drive
Brentwood, TN 37027
Phone: (800) 269-9895
mark@jewishadvocacycenter.org

David Schoen (*pro hac vice*)
LAW OFFICES OF DAVID SCHOEN
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Phone: (334) 395-6611
schoenlawfirm@gmail.com

Jason Torchinsky (*pro hac vice*)
Kellen Dwyer (*pro hac vice*)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW, Suite 643A

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 29



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Washington, DC 20037
Phone: (202) 737-8808
jtorchinsky@holtzmanvogel.com
kdwyer@holtzmanvogel.com
edavidson@holtzmanvogel.com

John Cycon (*pro hac vice*)
Daniel Bruce (*pro hac vice*)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
jcycon@holtzmanvogel.com
Phone: (202) 737-8808

Dallin Holt (*pro hac vice*)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2555 E Camelback Rd., Suite 700
Phoenix, AZ 85016
Phone: (615) 647-8528
dholt@holtzmanvogel.com

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 30



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907