UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| ALMOG MEIR JAN, SHLOMI ZIV, and ANDREY KOZLOV,<br><br>Plaintiffs,<br><br>v.<br><br>PEOPLE MEDIA PROJECT, a Washington Non-Profit Corporation, d/b/a PALESTINE CHRONICLE; and RAMZY BAROUD,<br><br>Defendants. | NO. 3:24-cv-05553-TMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX**<br><br>*NOTED FOR HEARING:*<br>**December 27, 2025** |

Defendants' knowledge of Abdullah Aljamal's Hamas affiliation is a key issue in this case that Plaintiffs must prove by circumstantial evidence. Plaintiffs intend to do so—in part—through the testimony of two witnesses, Dr. Matthew Levitt and Stephen Wilcox, who are experts in their fields. Dr. Levitt's testimony will establish that several facts were public knowledge among people with expertise and experience in Gaza, but that might not be well-known to a lay factfinder. Specifically, he will testify that Hamas was widely known to be holding over 200 hostages in Gaza between October 2023 and June 2024; that Abdallah Aljamal (Plaintiffs' captor) had extensive and open connections to Hamas, including serving as a spokesman for the Hamas government; and that Aljamal's family was widely known to have connections to Hamas as well. Because Defendant Ramzy Baroud testified that he is an expert in Hamas and Palestine, and grew up in the same Gaza refugee camp as the Aljamal

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 1

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

family and is familiar with the family's reputation, Dr. Levitt's testimony raises a strong inference that Baroud knew this widely-known information about Aljamal.

Drawing on his extensive experience in law enforcement and in advising companies on sanctions compliance, Mr. Wilcox will educate the factfinder on the basic due diligence that is industry standard before sending money to someone living in an area, like Gaza, that is controlled by a terrorist organization under heavy U.S. sanctions. Mr. Wilcox will also testify that basic industry standard due diligence on Abdallah Aljamal (steps as simple as Google searches and checking social media) would have revealed several red flags suggesting that Aljamal was connected to Hamas. This evidence strongly suggests that Defendants either did conduct basic industry standard due diligence on Aljamal, in which case they knew his Hamas connections, or they deliberately chose not to, in which case they were willfully blind to his Hamas connections. The Court should deny the Motion and hear these esteemed experts' testimony.

## BACKGROUND

**I.    Dr. Levitt is one of the nation's most respected experts in international terrorism and Middle East terrorist groups like Hamas.**

Dr. Levitt holds both a Master's of Law and Diplomacy ("MALD") and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy at Tufts University. *See* Dkt. 79-1, Expert Report and Decl. of Dr. Matthew Levitt ("Levitt Report") ¶ 5.[1,2] His Master's Degree included concentrations in Conflict Resolution, International Security Studies, and the Middle East. *Id.* Dr. Levitt's doctoral dissertation, entitled, "The Impact of

---

[1] All Exhibits (including Expert Reports), and references to Exhibits, herein are attached to the Declaration of Daniel Bruce in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.
[2] A copy of Dr. Levitt's curriculum vitae, which was produced with Dr. Levitt's Expert Report and incorporated therein, is attached as Exhibit A to the Declaration of Daniel Bruce ("Levitt CV").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 2

TOMLINSON BOMSZTYK RUSS
1000 Second Avenue, Suite 3660, Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

1  Acute Security Crises on the Process of Ongoing Negotiations," examines the impact of
2  terrorism on the Arab-Israeli peace process. Levitt Report ¶ 6. The dissertation examines acts
3  of terrorism carried out by both Islamic and Jewish terrorists. *Id.*

4  Dr. Levitt has been a Senior Fellow and Director of the Program on Counterterrosim
5  and Intelligence at the Washington Institute since 2007. Levitt Report ¶ 10. In this capacity, he
6  frequently provides analysis and commentary on terrorism issues for major media outlets
7  including CNN, ABC, NBC, CBS, PBS, The New York Times, The Washington Post, The
8  Wall Street Journal, National Public Radio, BBC, al Jazeera, al Arabiya, and more. *Id.* He has
9  lectured and consulted on terrorism for a variety of government and other organizations and
10 writes frequent policy briefs and articles on issues relating to terrorism and U.S. policy. *Id.* Dr.
11 Levitt is also an adjunct professor at both Georgetown University's Edmund A. Walsh School
12 of Foreign Service and at Pepperdine University's School of Public Policy. *Id.* Prior to these
13 roles, Dr. Levitt held various positions in the U.S. government related to counterterrorism and
14 intelligence, including with the U.S. Department of the Treasury, Department of State, and
15 Federal Bureau of Investigation. Levitt Report ¶¶ 6–9.

16 Through his academic and professional experiences, studies, and research, Dr. Levitt
17 has developed a particular expertise on the terrorist group Hamas. Levitt Report ¶ 12. He has
18 authored a peer-reviewed book on Hamas published by the Yale University Press. *Id.* His work
19 routinely includes the study of Middle Eastern terrorist groups, front organizations and state
20 sponsors, the logistical and financial support networks that facilitate their activities, and the
21 extremist and militant ideologies that drive their recruitment and radicalization efforts. Levitt
22 Report ¶ 13.

23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 3

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

1    Multiple federal courts have described Dr. Levitt's methodology as "the gold standard
2    in the field of international terrorism." *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir.
3    2005); *see also Linde v. Arab Bank*, 922 F. Supp. 2d 316, 325 (E.D.N.Y. 2013). And the United
4    States Supreme Court cited Dr. Levitt's work on Hamas twice in its watershed ruling, *Holder
5    v. Humanitarian Law Project*, 561 U.S. 1, 30–31 (2010), upholding the material support
6    statute, 18 U.S.C. § 2339B. He has provided expert testimony in dozens of civil and criminal
7    court proceedings involving terrorism and related issues and routinely testifies before the U.S.
8    Senate and House of Representatives. Levitt Report ¶ 18; Levitt CV at 3–4.

   **II.    Dr. Levitt's analysis provides strong evidence of Aljamal's connections to Hamas, Hamas's violations of international law, Defendants' knowledge, and the substantial effect any payments to Aljamal would have had on his ability to hold Plaintiffs hostage.**

   Dr. Levitt provides numerous opinions that provide strong evidence on key facts at issue, such as Hamas's violations of international law, Aljamal's connections to Hamas, Defendants' knowledge, and the extent to which even small sums of money aid Hamas. Dr. Levitt concluded that Hamas carried out the October 7, 2023, attack, for which the group has claimed responsibility, and has been widely condemned for constituting war crimes and crimes against humanity. Levitt Report ¶ 3. It was well-known in the days and weeks after October 7, 2023, that Hamas carried out the attack and was holding over 200 hostages in Gaza. *Id.* It is also well-known that Hamas has a long history of kidnapping and hostage taking. *Id.*

   Dr. Levitt also concluded that Abdallah Aljamal held an official position in the Hamas government's Ministry of Labor in Gaza. Levitt Report ¶ 76. Because Hamas exercises de facto control over Gaza, it dictates who may hold a position in the Hamas government and who may not. Levitt Report ¶ 77. Aljamal was open about his affiliation with Hamas and appeared

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 4



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

publicly in Arabic media as a Hamas spokesperson. Levitt Report ¶ 71. Based on Dr. Levitt's review of posts from Aljamal's Facebook account, it is his expert opinion that the green headband worn by Aljamal's son in a June 6, 2023, Facebook post is a headband typically worn by Hamas and its supporters. *Id.*

According to Dr. Levitt, even before Abdallah Aljamal was caught holding hostages, the Aljamal family was "well-known," both in Nuseirat and world-wide, for being "tied to Hamas." Levitt Report ¶ 78. According to the *Wall Street Journal*, "it was common knowledge in Nuseirat that the Al-Jamal family was close to Hamas," with local residents confirming that the family "had a number of ties to Hamas." Levitt Report ¶ 72 (citing Abeer Ayyoub, *The Hostages Next Door: Inside a Notable Gaza Family's Dark Secret*, WALL ST. J. (June 17, 2024), https://www.wsj.com/world/middle-east/the-hostages-next-door-inside-a-notable-gaza-familys-dark-secret).

Aljamal's uncle, Abdelrahman al-Jamal, is a Hamas member elected to the Palestinian Legislature. *Id.* ¶ 78 (citing HANDBOOK OF HAMAS PALESTINIAN LEGISLATIVE COUNCIL MEMBERS, WASH. INST. FOR NEAR EAST POLICY 76 (2006), https://www.washingtoninstitute.org/media/7560). Abdelrahman al-Jamal has long been designated a Specially Designated Global Terrorist (SDGT) by the U.S. government, under a list that included persons "identified as members of the Palestinian Legislative Council (PLC) who were elected on the party slate of a Foreign Terrorist Organization." *Id.* Abdelrahman al-Jamal frequently appears publicly with many top Hamas leaders and personnel. *Id.* (citing news articles showing Abdelrahman al-Jamal with top Hamas leadership at public events in Nuseirat). According to Dr. Levitt, Abdelrahman al-Jamal is well known in Nuseirat and would almost certainly be recognized by someone from Nuseirat or someone with expertise on Hamas

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 5



TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660, Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  local leadership there. Levitt Report ¶ 78. Similarly, Abdallah Aljamal's father, Ahmed, a

2  doctor who lived in the same complex where Aljamal held Plaintiffs hostage, was known to be

3  involved in the leadership of the local al-Farouk Mosque in Nuseirat, that is known to be

4  controlled by Hamas and used as a Hamas compound. Levitt Report ¶ 80.

5        In addition, Dr. Levitt concluded that any funds Aljamal received would have helped

6  fund his ability to hold hostages in his home, including payments for rent, food, clothing,

7  medicine, and other basic provisions needed to keep hostages alive, secured, and concealed.

8  Levitt Report ¶ 81. This is because, in the wake of the October 7 attack, Hamas was denied

9  significant income streams and suffered a cash crunch. *Id.*

10 **III.  Mr. Wilcox is a preeminent expert on international sanctions and export controls compliance.**

11

12       Mr. Wilcox has over 30 years of experience in international security, export controls,

13 sanctions, enforcement, compliance, and matters involving national security. *See* Dkt. 79-7,

14 Expert Report of Stephen A. Wilcox ("Wilcox Report") at 6.[3] Mr. Wilcox is the CEO of Export

15 Controls and Sanctions Advisors LLC, a consulting firm specializing in working with small,

16 medium and large multinational companies on all aspects of compliance with global export

17 controls and sanctions. *Id.*; Wilcox Report at 1. He also founded the International Sanctions

18 and Export Control Society, a membership organization designed to assist industry in

19 compliance with international export controls and sanctions. Wilcox Report at 6.

20       Prior to his current roles, Mr. Wilcox was the Managing Director of FTI Consulting

21 LLP's export controls, sanctions, and trade practice. *Id.* at 6–7. He also worked for 25 years in

22 various government roles involving international security, export controls, and sanctions

---

[3] A copy of Mr. Wilcox's resume, which was produced with Mr. Wilcox's Expert Report and incorporated therein, is attached as Exhibit B to the Declaration of Daniel Bruce ("Wilcox Resume").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 6

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1    regulatory compliance, including with the Bureau of Industry and Security, the Naval Criminal

2    Investigative Service, the intelligence community, and the U.S. Air Force. *Id.* at 7–9.

3          Throughout Mr. Wilcox's decades of government experience in sanctions compliance,

4    he became uniquely familiar with compliance requirements and best practices involving

5    sanctions enforcement administered by the U.S. Department of Treasury's Office of Foreign

6    Assets Control ("OFAC"). *See id.* at 7. Now, his roles advising industry leaders, both big and

7    small, on sanctions compliance make him well-situated to testify as to the minimum acceptable

8    industry standards of due diligence required before transacting overseas, particularly in high-

9    risk jurisdictions like Gaza.

10   **IV.   Mr. Wilcox's analysis provides strong evidence of Defendants' knowledge and consciousness of guilt.**

11

12         Mr. Wilcox's opinions regarding the applicable industry standards of due diligence,

13   what evidence was publicly available through standard due diligence that Aljamal was a

14   member of Hamas, and whether Defendants followed appropriate industry standards of due

15   diligence provide strong evidence of Defendants' knowledge and consciousness of guilt. In his

16   report, Mr. Wilcox concluded that it is industry standard, even for small nonprofits, to conduct

17   due diligence on counterparties of international transactions, particularly in high-risk areas

18   such as Gaza that are known to be controlled by sanctioned entities like Hamas. Wilcox Report

19   at 20. This industry standard due diligence is largely derived from guidance issued by OFAC

20   and other government entities. *Id.* at 12. Industry standard due diligence requires a "risk-based

21   approach" guided by the concepts of "Know Your Customer" and "Know Your Customer's

22   Customer." *Id.* at 13–14. At minimum, industry standard due diligence includes open-source

23   research on potential counterparties and locations of transactions prior to sending money to a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 7



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  foreign individual or entity. *Id.* at 14–15. It is also industry standard to maintain a record of the
2  steps taken to conduct due diligence and the result of that due diligence. *Id.* at 15.

3  Based on this industry standard due diligence, Mr. Wilcox opined that certain acts and
4  omissions would not be expected of an entity making a good faith attempt at complying with
5  the law. *Id.* at 16. First, it would fall beneath industry standards to transmit a payment if one
6  cannot perform due diligence. *Id.* If the paying party lacks sufficient information to conduct
7  standard due diligence, industry standard practice is to either not make the payment or submit
8  a license to do so to the appropriate regulatory agency. *Id.* Second, it would fall beneath
9  industry standards to transmit a payment to an area controlled by a Foreign Terrorist
10 Organization without transmitting the funds directly to the intended recipient. *Id.* Additional
11 due diligence should be conducted if a paying party is asked to pay a counterparty through a
12 third party. *Id.* at 16–17. And third, by using peer-to-peer payment platforms such as PayPal
13 to send money to an individual through a third-party, an entity could circumvent the oversight
14 that traditional banks or the payment platforms themselves perform if the transaction had been
15 sent through a bank or directly to the party. *Id.* at 17.

16 Mr. Wilcox also conducted the industry standard open-source research on Abdallah
17 Aljamal, which revealed substantial public information regarding Aljamal's connections to
18 Hamas. *Id.* at 18. English language internet searches revealed a Facebook video in which
19 Aljamal was referred to as the spokesperson of Hamas's Ministry of Labor. *Id.* Arabic language
20 searches revealed numerous articles and videos from 2021 and 2022 identifying Aljamal as a
21 Hamas spokesperson. *Id.* at 18–19. Under prevailing industry standards, the results of this due
22 diligence would have required an entity to conduct further due diligence, submit for a license
23



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

to conduct a transaction with Aljamal, or refrain from transacting with Aljamal altogether. *Id.* at 20.

Finally, Mr. Wilcox concluded that Palestine Chronicle failed to follow industry standard due diligence when compensating its writers. *Id.* at 20. Specifically, Palestine Chronicle's policies of using PayPal to compensate individuals known to be located in Gaza, with little to no due diligence, and compensating individuals located in Gaza through third-party PayPal accounts with little to no due diligence fall below industry standards. *Id.*

## ARGUMENT

### I. The standard for admissibility of expert testimony is liberal, and exclusion of expert testimony is disfavored.

The admissibility of expert testimony is controlled by Federal Rule of Evidence 702, which provides, in relevant part, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. The test to determine whether an expert is "qualified" is not overly formalistic. An expert can be "qualified . . . by knowledge, skill, experience, training, or education." *Id.* Expert testimony is admissible under Rule 702 if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the trier of fact in understanding or resolving a fact at issue. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). Ultimately, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 9

TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

Relevancy is a low bar. It demands "only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrill Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*")). "[E]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). Further, it is well-settled that an expert may "offer an opinion based on a set of facts assumed to be credible." *Rapp v. NaphCare Inc.*, No. 3:21-cv-05800-DGE, 2023 U.S. Dist. LEXIS 160492, at *8 (W.D. Wash. Sept. 11, 2023) (cleaned up). "An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). Concerns about whether an expert's opinion rests on sufficient facts or data "speak to corroboration, not foundation, and are properly addressed through impeachment" at trial. *Id.* at 1023–24.

While recognizing that the court serves a "gatekeeping" role to keep junk "science" away from juries, the Supreme Court intended the *Daubert* standard to be "a liberalization, not a tightening, of the rules controlling admission of expert testimony." *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1158 (4th Cir. 1996). "[E]xclusion is the least favored means of rendering questionable [expert] evidence ineffective." *Id.* Under *Daubert*, "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). As the Supreme Court made clear in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the



1 traditional and appropriate means of attacking" admissible expert testimony, not "wholesale
2 exclusion." 509 U.S. at 596. Applying these standards, Defendants' Motion must be denied.

3     **II.    Dr. Levitt's and Mr. Wilcox's opinions are reliable and relevant.**

4     Dr. Levitt's and Mr. Wilcox's opinions are both reliable and relevant and easily satisfy
5 the *Daubert* standard. Defendants make little to no meaningful argument that either Dr. Levitt's
6 or Mr. Wilcox's opinions are unreliable, nor could they. Expert testimony is reliable if "the
7 knowledge underlying it has a reliable basis in the knowledge and experience of the relevant
8 discipline." *Alaska Rent-a-Car, Inc.*, 738 F.3d at 969. Dr. Levitt's and Mr. Wilcox's opinions
9 are based on their decades of experience in their relevant disciplines and the knowledge,
10 information, and skill they have developed as a result. Dr. Levitt's methodology has been
11 recognized as "the gold standard in the field of international terrorism." *Damrah*, 412 F.3d at
12 625. Other than the fact that Dr. Levitt and Mr. Wilcox at times assumed Defendants
13 compensated Aljamal (discussed below), Defendants do not argue that either expert's
14 methodology lacked a reliable basis in their relevant disciplines. And Defendants chose not to
15 depose Dr. Levitt or Mr. Wilcox to examine them about their respective methodologies.
16 Defendants thus fail to show Dr. Levitt's and Mr. Wilcox's expert opinions are unreliable.

17     Dr. Levitt's and Mr. Wilcox's opinions are also relevant. Dr. Levitt's analysis of
18 Hamas, its purpose and operations, and its role in the October 7, 2023, terrorist attack, and the
19 ongoing hostage situation in Gaza in 2024 support an inference that, if Defendants knowingly
20 aided a Hamas member, they knowingly aided international law violations. *See Doe v. Cisco*
21 *Sys. Inc.*, 73 F.4th 700, 734–35 (9th Cir. 2023) (when the primary wrongdoer's "ongoing
22 abuses are common knowledge, knowing action may be imputed to the defendant"). Dr.
23 Levitt's analysis of the *public* evidence of Abdallah Aljamal's, and the Aljamal family's,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 11

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

1  connection to Hamas similarly supports an inference that Defendant Baroud was aware of those
2  connections, particularly given that Baroud testified that he knew the Aljamal family's
3  reputation and is an expert in in Hamas and Palestinian studies. Ex. C, Baroud Dep. 14:20–25,
4  15:20–16:8, 115:17–20, 116:5–16. And Dr. Levitt's analysis of the extent to which even a
5  small amount of money would better enable Aljamal to hold Plaintiffs' hostage provides strong
6  evidence to support the substantial effect element of Plaintiffs' aiding and abetting claim.
7  Finally, Dr. Levitt's testimony is relevant to rebut Baroud's testimony in which he claimed
8  that Aljamal's service as a spokesman for the Hamas government did not indicate that Aljamal
9  was Hamas, Baroud Dep. 128:20–129:14, and his testimony questioning whether Aljamal's
10 Facebook posts, in fact, contained Hamas symbols, Baroud Dep. 154:24–155:19.

11        Mr. Wilcox's opinions are likewise relevant. His analysis of the applicable industry
12 standard due diligence that similar organizations perform before paying individuals located in
13 high-risk jurisdictions like Gaza and Defendants' failure to follow those standards
14 demonstrates Defendants' knowledge through consciousness of guilt or willful blindness.
15 *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1001 (9th Cir. 2023) (articulating willful
16 blindness standard); *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1228–29
17 (9th Cir. 2001) (consciousness of guilt); *Knapp v. Gomez*, No. CV 87-0067, 1993 U.S. Dist.
18 LEXIS 8577, at *19–21 (S.D. Cal. May 5, 1993) (failure to follow industry standards may
19 suggest willful blindness). Mr. Wilcox's analysis also demonstrates what facts about Aljamal
20 were publicly available through simple internet searches when Aljamal began publishing an
21 increasing number of articles for Palestine Chronicle in 2023. In short, Mr. Wilcox's testimony
22 strongly suggests that, if Defendants did conduct even basic due diligence on Aljamal, they
23 were aware of his Hamas connections. And, conversely, Mr. Wilcox's testimony suggests that,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 12



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

if Defendants truly did not conduct even basic industry standard due diligence on Aljamal, they were likely willfully blind to his Hamas connections.

### III. Defendants' objections to Dr. Levitt's and Mr. Wilcox's opinions are meritless and primarily go to weight, not admissibility.

Defendants' arguments for excluding Dr. Levitt's and Mr. Wilcox's opinions are meritless and primarily attack the weight of their opinions, not their admissibility. Defendants' primary argument is that Dr. Levitt's and Mr. Wilcox's opinions are simultaneously unreliable and irrelevant because portions of their opinions assume that Palestine Chronicle paid or compensated Abdallah Aljamal when Defendants claim they never compensated Aljamal. First, as demonstrated in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, whether Defendants paid Aljamal is disputed. But second, expert witnesses are always permitted to base their opinions on assumed facts. *Rapp*, 2023 U.S. Dist. LEXIS 160492, at *8. While Plaintiff bears the burden of proving the assumed facts at trial and that the expert's opinion can be applied to those proven facts, the fact that an expert bases his opinion on an assumed fact is no reason to wholly exclude the testimony from the factfinder's consideration. Rather, such concerns about whether an expert's opinion rests on sufficient facts "speak to corroboration, not foundation," *Elosu*, 26 F.4th at 1024, and can be tested through "vigorous cross-examination [and] presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

Defendants' argument that Mr. Wilcox's opinions rely on the wrong legal standard (actual knowledge), likewise fails. *See* Dkt. 79 at 10–11. Plaintiffs do not intend to offer Mr. Wilcox's opinions regarding the applicable industry standards of due diligence and Palestine Chronicle's failure to follow those industry standards as evidence that Defendants *should have known* Aljamal was a Hamas operative. Rather, Defendants' failure to follow even minimal

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW
LEVITT AND STEPHEN WILCOX - 13



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871    F/ 206.621.9907

industry standards shows a consciousness of guilt and/or willful blindness—evidence of actual knowledge. *See Knapp*, 1993 U.S. Dist. LEXIS 8577, at *19–21 (holding permissible for expert to testify that failure to follow industry standards "constituted a deviation from settled practice so striking as to suggest willful blindness"). Indeed, if Defendants truly did not even do the bare minimum due diligence expected by industry standards, it was likely because they knew the Aljamal family's reputation and chose to avoid learning more about Aljamal for fear of what they would find. Any concern that such an approach overlaps with a negligence knowledge standard and could lead a jury "down the garden path," Dkt. 79 at 11 (quoting *Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991)), is significantly diminished here where no party has requested a jury and the case is expected to proceed to a bench trial.

Finally, Defendants' argument that the probative values of Dr. Levitt's and Mr. Wilcox's opinions are outweighed by their danger of unfair prejudice and confusing the issues likewise fail. As discussed above, Dr. Levitt's and Mr. Wilcox's opinions are highly probative to a number of facts at issue. Defendants provide little to no explanation of what unfair prejudice or confusion would arise from any of Dr. Levitt's or Mr. Wilcox's opinions other than that Dr. Levitt's opinions regarding Aljamal's connections to Hamas "infers guilt through association." *See* Dkt. 79 at 9. But even if Defendants articulated prejudice that "*substantially* outweighed" the probative value of the opinions, Fed. R. Evid. 403 (emphasis added), "in a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 14

TOMLINSON BOMSZTYK RUSS
1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871  F/ 206.621.9907

# CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Exclude Dr. Levitt's and Mr. Wilcox's expert testimony.

This Opposition contains 4,066 words, in compliance with Local Civil Rules.

DATED this 22nd day of December 2025.

*/s/ DRAFT*
Aric S. Bomsztyk, WSBA #38020
Blair M. Russ, WSBA #40374
1000 Second Avenue, Suite 3660
Seattle, WA 98104
Telephone: (206) 621-1871
Facsimile: (206) 621-9907
asb@tbr-law.com
bmr@tbr-law.com

Mark Goldfeder (*pro hac vice*)
NATIONAL JEWISH ADVOCACY CENTER, INC.
THE INTERNATIONAL LEGAL FORUM
1718 General George Patton Drive
Brentwood, TN 37027
Phone: (800) 269-9895
mark@jewishadvocacycenter.org

David Schoen (*pro hac vice*)
LAW OFFICES OF DAVID SCHOEN
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Phone: (334) 395-6611
schoenlawfirm@gmail.com

Jason Torchinsky (*pro hac vice*)
Kellen Dwyer (*pro hac vice*)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW, Suite 643A
Washington, DC 20037
Phone: (202) 737-8808
jtorchinsky@holtzmanvogel.com
kdwyer@holtzmanvogel.com

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 15



edavidson@holtzmanvogel.com

John Cycon (*pro hac vice*)
Daniel Bruce (*pro hac vice*)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
jcycon@holtzmanvogel.com
Phone: (202) 737-8808

Dallin Holt (*pro hac vice*)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2555 E Camelback Rd., Suite 700
Phoenix, AZ 85016
Phone: (615) 647-8528
dholt@holtzmanvogel.com

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' RETAINED EXPERTS DR. MATTHEW LEVITT AND STEPHEN WILCOX - 16

TOMLINSON BOMSZTYK RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907